# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Coanne Wilshire

_____

_____

Write the full name of each plaintiff.

_____CV_____

(Include case number if one has been assigned)

-against-

Lemle & Wolff Inc., L&M Investor Member LLC,
L&M Development Partners, Larkspur LLC,
Larkspur Managers LLC, Ronald Moelis
Pablo Rios

_____

_____

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

## COMPLAINT

Do you want a jury trial?
☑ Yes    ☐ No

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 1/9/17

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑   **Federal Question**

☐   **Diversity of Citizenship**

## A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?
Civil Rights
_____
Other
_____
Housing/Accommodations
_____

_____

## B.   If you checked Diversity of Citizenship

### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
                         (Plaintiff's name)


_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
(Defendant's name)

_____                    _____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____ .

If the defendant is a corporation:

The defendant, L&M Larkspur Investor Member LLC _____, is incorporated under the laws of

the State of New York _____

and has its principal place of business in the State of New York _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in New York _____ .

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II. PARTIES

## A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

Coanne                                    Wilshire
_____
First Name            Middle Initial        Last Name

304 West 117th Street, 3H
_____
Street Address
New York                        NY                10026
_____
County, City                    State            Zip Code
212 464 7973                    soireenews@outlook.com
_____
Telephone Number                Email Address (if available)

## B. Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

| Pablo | Rios | |
|---|---|---|
| First Name | Last Name | |

Property Manager

Current Job Title (or other identifying information)

5925 Broadway

Current Work Address (or other address where defendant may be served)

| Bronx | NY | 10473 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 2:

| Ronald | Moelis | |
|---|---|---|
| First Name | Last Name | |

Chief Executive Officer

Current Job Title (or other identifying information)

1865 Palmer Ave, #203

Current Work Address (or other address where defendant may be served)

| Larchmont | NY | 10538 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 3:

| | | |
|---|---|---|
| First Name | Last Name | |

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| | | |
|---|---|---|
| County, City | State | Zip Code |

If the defendant is a corporation: **Lemle & Wolff Inc.** is incorporated under the laws of the State of New York
and has its principal place of business in the State of **New York** or is incorporated under the laws of (foreign state)
and has its principal place of business in **New York**
[5925 Broadway, Bronx NY 10473]

If the defendant is a corporation: **Larkspur LLC** is incorporated under the laws of the State of New York
and has its principal place of business in the State of **New York** or is incorporated under the laws of (foreign state)
and has its principal place of business in **New York**
[5925 Broadway, Bronx NY 10473]

If the defendant is a corporation: **Larkspur Managers LLC** is incorporated under the laws of the State of New York
and has its principal place of business in the State of **New York** or is incorporated under the laws of (foreign state)
and has its principal place of business in **New York**
[5925 Broadway, Bronx NY 10473]

If the defendant is a corporation: **L&M Development Partners is** incorporated under the laws of the State of New York
and has its principal place of business in the State of **New York** or is incorporated under the laws of (foreign state)
and has its principal place of business in **New York**
[1865 Palmer Ave, #203 Larchmont NY 10538]

Defendant 4:

First Name                          Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                        State              Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: Residence, 304 West 117 Street, 3H New York, NY 10026

Date(s) of occurrence: March 8, 2022 - March 1, 2024

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

Landlord has denied my reasonable accommodations requests since October 7, 2020, on their policy and practice to provide tub reglazing services. After my first attack of trouble breathing, uncontrollable coughing and choking, tingling tongue swelling, eyes tearing and hives, due to the toxic odors that had suddenly overwhelmed my apartment.

I contacted the Landlord explained the symptoms I experienced and requesting notification prior to scheduling regazing services so I can arrange to be out of the building. This has been repeated request after every episode through February 7, 2024. I experiend anothe episode on March 1, 2024.

Further there is a policy and practice lawful income discrimination, as the Landlord either ignores my entitled repairs, addressing my repair requests only after I go through the long process of having a goverment agency intervene and issue an Order to repair, and/or providing me with unequal repair standards and treatment granted to other tenants.

Disparate Treatment.

Infringes on Privacy Laws

*Retaliation*

*See attached.*

## INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

I use a variety of aerosol inhalers, antihistamines, anti-inflammatory, cortisone creams, eye drops, eye ointment, Xanax and monitored Erythromycin Ophthalmic Ointment, 0.5% as needed. I am treating for my respiratory distress, hives, eyes and temperament.

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

Compensatory Monetary Award includes the lifelong requirement of over-the-counter very expensive products, for controlling the ailments caused By Landlor'd reckless behavior and that are exacerbated by Landlord's reckless behavior.

Paid Holistic treatment and Methodology that offer healing. Including Oxygen therapy.

Punitive Danmages as appropriate

## STATEMENT OF FACTS

1. My name is Coanne Wilshire. I reside at 304 West 117th Street, **(Larkspur),** an 80/20 Affordable Housing, LUXURY, rent-stabilized building, in Central Harlem.  The registered title of Ownership is **Larkspur LLC**.  The three person Managing Members are Frank Anelante, Joseph Zitolo and Thomas Metallo.

2. There is involvement with registered title **Larkspur Managers, LLC**, The managing members are Frank Anelante, Joseph Zitolo, Thomas Metallo and Steven Judelson.

3. **L&M Larkspur Investor Member LLC** is listed on Construction Loan documents as having a percentage ownership in corporate title, Larkspur LLC which is registered as the Owner. L&M (Sandy Lowentheil and Ronald Moelis) solely secured the financing.

4. There is involvement with **Lemle & Wolff Inc** (a/k/a Lemle & Wolff Companies).  The Founders of Lemle and Wolff Inc. are **Frank Anelante** and **Joseph Zitolo**.
Lemle & Wolff represent themselves as the exclusive property management company of Larkspur: No disclosure of the tangle of LLC's including the well-hidden L&M Larkspur Investor Member, LLC, not made known to tenants, city government, state agencies or United States Courts.

5. A commercial lease dated August 28, 2008, bears L&M's corporate address 1865 Palmer Ave, Larchmont NY 10538.

6. Premium real estate advertisements marketed commercial spaces under the L&M brand. It is commonly known, and otherwise noted on their website, L&M only leases commercial properties they own.

7. Defendants purposely keep their joint ventures and or alter-ego partnership hidden, but financial documents proffer evidence of financial hierarchy by L&M. [Sandford Loewentheil and Ronald Moelis]. There is no transparency and disclosure of Lemle & Wolff's partner-owner-relationship to Larkspur tenants, NY/NYC government or the Court.

8. The intertwined ownership practices of Respondents is not unique to Larkspur; *Supreme Court of the State of New York: Carlos Vasquez vs 301 West 111 Owners LLP and 557-561 West 149 LLC and 557 West 149 Corporation, filed November 8, 2010.*

9. Lemle & Wolff describe themselves as Low-Income property managers, which is likely to be the reason why the 20% tenants at Larkspur, whose apartments are supported by **LIHTC**, are treated as lesser tenants, and receive sub-standard repairs compared to the management's more desirable 80% tenants.

10. As the Owner of the building, the Owner of the Property Management Company and the Owner of the Maintenance Company, Lemle & Wolff operates unchecked solely for their own benefit without adherence of rules, Ethics, Recommended Training for protected classes, HPD Property Management Training, or impartiality which has allowed them to discriminate against me in relative peace.

1

11. I rented and moved into Apartment 3H, on **April 15, 2005**, and I rented Handicap Parking Space No. 25 on **June 1, 2005**.
In **2007**, I lost my ability to continue working in my long-term profession, due to my permanent mobility disability.

12. On **July 31, 2018**, I was terminated from my handicap parking space on a pretext. I made official complaints to DHR which resulted in a Civil complaint.
My persitent fight against the Landlord's unlawful conduct, resulted in multiple acts of retaliation and disparate treatment against me by the Landlord, who retaliated against me with refusal of entitled repairs, extended delays in entitled repairs which exacerbated and worsened my permanent mobility disability,  providing me with unequal substandard repairs, and causing me to suffer respiratory harm and distress by their repeated use of toxic solvents without notice, and fully replacing floors and other renovations on every move-out apartment, since 2017, without notice or tenant protections.

13. According to the HUD Investigator I emailed the Landlord on **February 7, 2017**, to inform them that I have a permanent mobility disability.  But in 2018 DHR case and its subsequent civil suit the Landlord denies knowing I have a disability.

14. The Landlord's records - my Tenant's File, documents my disability beginning with 2004 apartment application, through my **DRIE** participation **2012 – Present**, for which the Landlord directly receives a monthly stipend and an annual property tax credit. There would be no reason for me to announce my permanent mobility disability to the Landlord in 2017.

15. I am filing this civil case, because a Determination in HUD Case No. 02-22-0807-8, reads: On March 8, 2022, Coanne Wilshire (Complainant) filed a Complaint with Department of Housing and Urban Development…

16. Under **Right to Civil Lawsuit** reads: Notwithstanding HUD's dismissal of this complaint under Section 813(a) of the Act, the complainant may file a civil lawsuit in an appropriate federal district court or state court within (2) years of the date on which the alleged discriminatory housing practice occurred or ended.

17. Since **October 7, 2020**, and most recently on **March 1, 2024**, I have been exposed to widely-known hazardous and toxic odors of reglazing solvents, without the most basic courtesy of Notice.
The Landlord has been repeatedly notified that I am severely allergic to the odors tub reglazing solvents that is dispersed throughout the building and regularly overwhelms my apartment, when they provide tub reglazing services to tenants.

18. Since my first episode of tracheobronchial attack, swollen tingling tongue, hives, uncontrollable coughing, chocking, and hacking on **October 7, 2020**, I have asked the Landlord to please provide me with common courtesy of scheduling notice, so I may arrange to be away from the building when the reglazing solvents are being used.
The Landlord has never responded to my innumerable requests sent by email, written in the lobby Repair Book, or sent by message to the Landlord via the building Super.

2

19. I have asked the Landlord an innumerable amount of times to be provided with the name/brand of the reglazing products used, in hopes of researching focused holistic treatment to supplement medical treatment.
As with my requests for scheduling notice the Landlord has never provided me with the name of solvents used.

20. In fact, the Landlord has never responded to me for this request, other than by the ongoing practice of using reglazing services without notifying me, makes it clear, that the Landlord does not care that they are affecting my respiratory health.

21. I made a HUD complaint for the Landlord's discriminatory lack of **providing me with entitled repairs,** their retaliatory **refusal to provide me with notice when their toxic reglazing services** are scheduled, and their **refusal** to provide me with the **name of the reglazing brands** being used, their Retaliation for reporting their FHA violations, their discriminatory refusal to honor reasonable accommodations requests, and their acts of lawful **income discrimination** against me.

22. In **October 2018,** I requested floor and baseboard repairs due to damages from a hall bathroom leak that was no fault of my own.
In retaliation for my parking space complaints, subsequent service requests and resulting penalties they received on the property's non-compliant parking lot, the Landlord ignored my floor and baseboard repair requests until **2021,** when I discovered I could elevate my repair requests at Housing Preservation and Development (**HPD**) and/or Housing Community and Renewal (**HCR**).

23. On **October 7, 2020,** I was in the back room of my apartment when suddenly my tongue began to tingle and swell, my hands and face broke out in hives, and I was coking so hard tears streamed down my face.
My whole apartment was overwhelmed with what I found out was tub reglazing in an apartment across the hall. There is a ventilation issue and the toxic odors in my apartments was as if the job was taking place in my apartment.
Almost every day for months, I asked to know the name of the products that were used so I could seek appropriate healing. As of this writing the Landlord has not provided me with the brand/name of the products used or made any comment whatsoever.

24. I made requests to the Landlord about poor air quality, potential mold, damaged floor and baseboard outside bathroom hallway, my complaints were ignored.
On **December 23, 2020,** I sought assistance from HPD requesting their assistance in having the Landlord divulge the product-name, to no avail.

25. The Landlord continued practice of tub reglazing without giving me the common courtesy of notice, despite being notified of the damaging health affects to me. Some episodes were worse than others., but all had accumulative effect on my respiratory system and my eyes.

26. Especially **significant** episodes occurred and were reported to the Landlord on, June 30, 2021, July 20, 2021, September 1, 2021, November 16, 2021, November 26, 2021, December 15,

3

2021, December 16, 2021, December 20, 2021, **April 18, 2022**, February 7, 2023, **February 7, 2024, twice**.

27. The episode on **April 18, 2022**, affected my eyes most of all, my eyes felt so dry I explained to the doctor that I wanted to take them out of my head and soak them in cool water.  I was referred to Ophthalmology Specialist, Dr. Monica Dweck who on **June 23. 2022** diagnosed me with Blepharitis/Meibomianitis, she informed me it was one of the most severe cases she had seen.

28. Because the condition is chronic it is imperative that I stay away from triggers that causes flares.  However, as of this writing the Landlord has not even acknowledged my reasonable accommodations requests of notification, so I may be away from the building when reglazing services are scheduled, much less offered me the common decency of notification.

29. Beginning in 2021, I reported that there was overall poor air quality entering my apartment, which I believed was the reason for moldy condition began to be present in my apartment.  Also, the Landlord had been slacking on conducting required mold inspections.
Shortly thereafter, HPD issued violations to the Landlord, ordering Mold **remediation** at my apartment **entrance**, in **primary bathroom walls and tiles**, both **bedrooms** by windows, living room windowsill and **primary bedroom windowsill**.  HPD also ordered repairs be made on the damaged floor planks and baseboard next to hallway bathroom.

30. I advised the Landlord and Leslie Kahn at HPD, that due to respiratory health and wellness, *caused by the Landlord,* I would need a **reasonable amount of time** to make arrangements to be away for repairs to take place.
I made arrangements to be away from my apartment, beginning **February 15, 2021**. I advised the Landlord and HPD.

27. **NYC Maintenance Code §27-2008** says, the Landlord's right of entry must be exercised at a **reasonable time** and in a **reasonable matter**.
Despite the Landlord being aware of my health issues and my reasonable timeline departure arrangement. And despite the fact that my repair requests had been ignored for almost two years until HPD got involved, Pablo Rios began bombarding me with immediate DEMANDS for access, ahead of my scheduled departure.

28. There is no good reason other than a **no-access scheme** for the Landlord to continue asking for access, when they were notified, and HPD was notified, within a reasonable amount of time that I would leave my apartment so that my respiratory system would not be further damaged by the dust and odor producing repairs needed in my apartment.

29. The Landlord claimed I was the only tenant making a complaint about ventilation and poor air quality, but the Lobby repair book in 2021 and 2022, says different.  Those tenants may have had corrections in their apartment because I seem to be the only one making repeated reports, as the issue has continued.

4

30. The Landlord behaves as if they are an Authority in my Life, they are not! The Landlord owns the apartment/property, not me, the Tenant. I repeatedly emailed them asking them to stop bullying me with immediate repair demands now that HPD had intervened.

31. In my HUD complaint, the Landlord did a pick-and-choose of select emails, and presented them out of context to HUD to match a manufactured no-access defense:
The Landlord deceptively advised the HUD Investigator, that: on **January 26, 2021**, they issued a Work Order to regrout and recalk, my bathroom, which proves nothing.
Especially because the HPD ORDER was not just to reglaze and recalk the bathroom but to remediate mold from walls tiles and shower.
I replied to the Landlord pointing out the same, then Rios' emails demands started, to list "cleaning shower body and tiles with Bleach", as well as "cleaning my entrance door with Bleach", intentionally sidestepping the point that they had no legitimate reason to be emailing me with access demands.

32. Pablo Rios knew I could not be at home for a full bathroom and Entrance bleach-wash to remediate mold.
Pablo Rios even sent me a mocking email giving me his unsolicited opinion that bleach is a household product that would not affect me. I was given no consideration or respect for anything I had to say. Rios kept up his aggressive demands that I choose one of his dates, despite knowing I had made arrangements to leave. None of his bosses who were cc'd intervened.
The Landlord issuing a work order is in no way not proof of MY no-access. Any email the Landlord has provided to HUD, is connected to previous and post emails which tell the full story.

33. Furthermore, the HPD repair order included replacement of the Living Room windowsill where mold was present, both bedrooms walls under windows where mold was present, replacement of the bedroom windowsill, following which the bedroom areas listed for mold remediation were to be painted. There was also the floor and baseboard outside hallway bathroom to be repaired.
The Landlord answered the HUD Investigator in way that hid the fact that multiple violations were written and multiple items were to be repaired.
So, what was the Landlord's urgency on grout and caulk, the Landlord's work order written on January 26. 2021 is a pitiful ruse.

34. The Landlord deceptively told the HUD Investigator that: on **January 28, 2021**, their contractors called me twice about repairs.
As detailed in the series of email between Pablo Rios and myself, on **January 28, 2021**, my phone showed two missed back-to-back calls, both **at 2:58 PM**, no message was left.
The Landlord intentionally told the HUD Investigator I was called twice on January 28, 2021, to mislead HUD into believing their bogus no-access storyline. **On the most basic level, calling back-to-back without leaving a message either time, amounts to not calling at all.**

35. The Landlord claims they sent me an email on **January 29, 2021**, to ask if their contractors'. had regrouted, recalked and cleaned my bathroom and entrance"?
I have no record of a January 29, 2021, email from the Landlord. However, I did receive a message from their contractor, which was left on **Friday, January 29, 2021. at 3:35 PM**.

36. As the Owner/Property Manager, with **in-house** contractors **All Type Maintenance**, working out of the same Lemle & Wolff office ... WHY would the Landlord ever need to send ME an email to ask if their contractors had completed work in my apartment, other than to feed their manufactured no-access storyline.

37. The Landlord deceptively told the HUD Investigator that on **February 1, 2021**, I emailed them about drafty windows, air quality and to have my tub reglazed.
The drafty windows had already been part of HPD violation, however on the Landlord's DEMAND inspection emails and work order, the drafty windows are not mentioned.  I asked several times why the Landlord was not listing ALL the violation items on their Repair, list.  I was not emailing them with new repair requests.
I wanted to make sure ALL items were repaired while I was away.
The Landlord deceptively present emails of me questioning why there are missing repair items on their list, to HUD, as if I am making first time requests.

38. I never requested tub reglazing; my inquiry *(one of many)* was made in hopes of getting the name of the reglazing product.
I consistently asked the Landlord for the name of the reglazing products and the Landlord consistently ignored my question.

39. The primary reason for sending an email to the Landlord on Monday - **February 1, 2021**, was because it was a timely response to the contractor message that was left the previous Friday.

40. The Landlord deceptively told the HUD Investigator that on **February 3, 2021**, I was emailed to schedule bathroom maintenance.
The truth is, despite knowing I needed to be away for repairs to be done, on February 3, 2021, Pablo Rios emailed me **TELLING ME** he made appointments for me, for **February 11**, 2021, and **February 12, 2021**, and that contractors would arrive to my apartment between 8 and 9AM for: Self-closing doors, Floors, Clean Bathrooms, Clean Bathroom Tiles, Windowsill, Abate air draft at window areas, Paint area and abate Mold condition and door frame.

**Note: The Landlord MADE appointments for me, like I am their child, 4 and 5 days, before my scheduled departure for repairs to be done.)**
The email implied, they would be entering my apartment whether I agreed or not, so I made it clear that I am not granting them permission to enter my apartment.
My responses are reasonable and normal, the content of the Landlords emails are not.

41. §25-101 Owner's Rights of Access and Requirements does not compel Tenant to jump to Respondents dictated appointment dates, underline especially for repairs that I had been requesting for way more than a year while they ignored me.

42. The Landlord deceptively told the HUD Investigator that on **February 17, 2021** "the reglazing vendor" called me and gave me the name of the products used to reglaze tubs.
**I clearly notified the Landlord by email on February 17, 2021**; that the vendor said he is not the Vendor who did the reglazing job in the building on October 7, 2020.

6

*NOTE: On February 17, 2021, I am away for repairs to be done, but stuck doing the Property Manager's job of scheduling repairs.*

43. I told the Landlord that the Reglazing Vendor said he would call me back with the name of the products HE used for reglazing. The vendor did not call back so I called him. **The Vendor told me that "the Landlord did not authorize him to share that information with me".**

44. The Landlord received multiple emails from me, well past February 17, 2021, still requesting to know the name of the reglazing solvent.
So, when the Landlord deceptively report to HUD, that I was given the name of products used for reglazing, it is an intentional lie.

45. It seems impossible that HUD could believe that on **February 17, 2021**, I requested repair of my floorboards. The HPD violation had already been issued. I was already away for repairs to be done, including the floorboards.

46. The Landlord's **2021 "repair"** of my damaged floors were intentionally installed using drastically inappropriate wood color and in a defective, shoddy, unworkmanlike manner which hurt my feet and impacted my walking.
The Landlord falsely advised the HUD Investigator that Bamboo is difficult to find as an excuse for them installing dark-tones of wood on my light color floors:
Bamboo's popularity as a reliable flooring option, is due to bamboo's fast-growing characteristics, and short 5-Years from growth to harvest.

47. The color "Natural", originally installed, in my apartment is offered within a narrow range of tones, making it easy to find a **perfect match** or an **acceptable blend**. Only disdain for me as a Black woman, with a disability, renting an apartment subsidized by LIHTC, having the nerve to stick up for herself, would allow an unscrupulous Landlord to install the wood that was used in my apartment.
I easily found three different Sources for Bamboo and sent samples to the Landlord. One of those sources were used for my PARTIAL floor repairs, in **May 2023**.

48. The Landlord intentionally used leftover scraps of dark wood to repair my floors because they consider me a lesser tenant.
Despite the property supposedly being a luxury building. The landlord only offers luxury repairs to the 80% apartments of non-LIHTC renters.
Then when the Landlord gets appropriate wood for my apartment, they improperly store it.

49. The Landlord intentionally, improperly stored the bamboo wood delivered for my 2023 repairs outside, which voided its warranty. (I reported this to HUD)
Advertisements of Apartments for Rent, always highlight the flowing floors throughout the apartment as a major feature of residing in the Luxury building.
Yet I was forced to live with and accept a Ghetto patchwork of unsightly, trip hazardous floors while going through the lengthy time of reporting complaints to government agencies.

50. The wood delivered for my apartment is the only time wood was ever stored outside. Wood deliveries for renovations and 80% tenants are ALWAYS stored in the cellar.

51. On **February 17, 2021**, I am away and sending emails asking the Landlord to schedule repairs in my apartment.
**While I was home, the Landlord was bombarding me with immediate demand dates for their non-access stunt.**
The Landlord had advance notice of my departure. Yet, once I was away scheduling is one delay after another.

52. On **March 30,2021**, I was finally able to schedule a viewing of my floors by the Floor Vendor. Prior to my departure, on a walk-thru with the Building Super, I requested that the Landlord relace the full *(small)* hallway and entranceway, due to sixteen years of visible wear and tear on the high-traffic areas.
The floor vendor advised me that the replacement flooring would be lighter than the original floor, reiterating this detail to me over and over again.
I expressed that I understood and accepted that the replacement floors would be slightly lighter.

53. Ironically, on **April 1, 2021**, significantly dark multi-toned wood planks were installed in my apartment. For some unknown reason my RING camera which allowed me to monitor goings-on in my apartment, somehow became unplugged that day.

54. On **April 2, 2021,** after Cable representative came to my apartment and reattached the disconnected modem plug,
I was shocked to view the Ghetto mess of flooring in my apartment.

55. I immediately called the Floor Vendor to ask what happened. The floor vendor apologized profusely and told me that he ran out of lighter colored wood after completing a move-out apartment renovation.
The vendor said he told Rios he was going to call me, to advise me that he only had dark wood. The vendor told me Rios instructed him to not call me and proceed with installing the dark shades of wood.
After forcing me to spend weeks doing the property manager's job, which I did order to ensure the job got done, the agreement the Vendor made with me, is cavalierly overturned by Rios without thought or consideration. The Landlord behaves as if they feel, that since I am a lesser tenant in their eyes, so I should accept whatever they give me and be happy about it.

56. After speaking with the floor vendor, I emailed Pablo Rios and copied Andrew Kleiman about the unsightly floor repair. **I received no response from either Rios or Kleiman.**
Less than two hours later Pablo Rios hightailed himself into my apartment to take skewed angled pictures of the floors, *presumably* to show Kleiman that the shoddy repair was satisfactory.
*(This action by Pablo Rios, is a repeated response. Rios did the same action after I complained about unlawful conditions at Handicap Parking Space No.25 and copied Kleiman.)*

57. According to my HUD case, the HUD Investigator WRONGLY finds that on **April 13. 2021** "while my floors were repaired" and I was "dissatisfied by the color", I complained to HCR.

The fact is, that my complaint to HCR was about Pablo Rios' unlawful **non-emergency** Trespass into my apartment., along with him installing a color the extreme opposite of what was agreed to, and his refusal to tell me the name of the reglazing solvent: I believed his combination of actions was Harassment.

**For the Landlord to report to HUD that I was unhappy with the color, also misleading. Only a blind person would not object to the color.**

58. In 2021, my plan was to be away for THREE_weeks, for the repairs. Due to scheduling delays I had to extend my time away to TWELVE_weeks.
**After twelve weeks away, I return home to find my apartment worse off then I left it.**

59. The Landlord deceptively neglect to **clarify** to the HUD Investigator that the conference call they reference, on **June 8, 2021,** was the Hearing for my April 13, 2021, harassment complaint to HCR.

On the call, there were at least five Landlord agents, including some who had participated in the unlawful termination of my handicap parking space in 2018, I was thrown.

Pablo Rios then proceeded to **blatantly lie**, claiming he had entered my apartment to inspect my floor complaint:

A. **If Rios' had entered for inspection,** one would expect he or Kleiman would have responded to my email complaint about the floor repair after his inspection was over. Also, no inspection document was produced.

B. **If Rios' had entered for inspection,** he would have noticed that the one baseboard originally damaged by the bathroom leak had not been repaired and was now significantly worse.

C. **If Rios' had entered for inspection,** he would have noticed that there were now severely damaged baseboards throughout the whole hallway and entrance.

D. **If Rios' had entered for inspection,** he would have acknowledged the dark-wood patchwork floors of unmatched colors is sub-standard for an apartment in a Luxury building.

E. **If Rios' had entered for inspection** Rios would have observed that areas of newly installed flooring in the hallway had uneven planks, large gaps, and trip hazards.

60. While I was away, **the** Super contacted me **every single time** my apartment was accessed, except **on April 2, 2021,** when Pablo Rios gained non-emergency access. My RING camera video proves that Rios did **not** conduct an inspection.

61. Nonetheless, HCR did subsequently conclude no proof of Harassment, but **Without Prejudice.**

9

*Considering the treatment I have received since then, and my education on rent stabilization laws, and the fact that I am no longer thrown by the Landlord's lies, I strongly suspect results of an HCR Harassment case, would not be the same today.*

62. At the Hearing, HCR ordered the Landlord to provide me with the name of the reglazing product. On a follow-up email on **June 14, 2021**, Rios writes that he is still awaiting for the vendor to provide reglazing product information. Yet, according to the HUD Investigator, the Landlord reported that I was provided with name of reglazing products on February 17, 2021.

63. The Landlord deceptively told the HUD Investigator that on **June 21, 2021**, I refused to give his worker access to repair the baseboards. The worker arrived with white tile caulk to repair the badly damaged baseboards, that were unsalvageable and needed to be replaced.

64. On **June 21, 2021**, I clearly ALLOWED ACCESS to the Landlord's worker!
The worker arrived at my apartment and gained access. The worker realized that white tile caulk, could not provide proper repair to the badly damaged baseboards. The gaps were too wide, and the white tile caulk would be sorely visible.
Pablo Rios seemed intent on creating more deplorable conditions in my apartment. Its common sense, that the floors first needed to be replaced.

65. The Landlord's worker took 8 photos of the damaged baseboards to show the Landlord why white caulk was not appropriate.
**Before departing the worker texted me the 8 photos.**
NOTE: Pablo Rios was on vacation on **June 21, 2021**, but that did not stop his eagerness to issue a manufactured no-access letter to me. cc'd on the letter are the **vague** words HPD Legal and HCR Legal.

66. The Landlord deceptively told the HUD Investigator the absolutely ridiculous lie, that I insisted on brown caulk for repair of the baseboards. I have no knowledge of brown caulk; it turns out it was the worker who suggested brown caulk to the Landlord when he returned to the office.

67. The Landlord deceptively told the HUD Investigator that they sent a copy of the no-access letter to HCR and HPD, in order to imply their no-access accusations against me are factual and recognized by HPD and HCR.

68. No one at HPD or HCR acknowledged receiving the Landlord's no-access letters, much less acting on the bogus accusation.
I asked the Landlord multiple times to know the names of the persons at HPD and HCR who received a copy of the no-access letter issued to me. The Landlord ignored all my inquiries.
Certainly, the Landlord should have presented confirmation to HUD Investigator that the letter was received/acknowledged by HPD and HCR Legal.

69. I submitted the 8 photos taken by the Landlord's worker to Leslie Kahn (HPD) and to the Office of Rent Administration (HCR).

**Obviously, the worker had access into my apartment in order to take hallway and entranceway photos of the baseboards.**
Considering both **HPD** and **HCR** wrote follow-up, non-compliance violations to the landlord for the baseboards, it's apparent the landlord's no-access stunt against me, failed.

70. I was vindicated by HCR Inspector's inspection of the Landlord's 2021 flooring "repairs", after which I received a second letter from Carl Foster who had facilitated the **June 8, 2021, HCR Conference Hearing**, emphasizing that my HCR Harassment complaint, had been dismissed because I did not tie my complaints to Rent Stabilization Laws.

71. Before I skip to the Landlord's absurd **August 5, 2021**, submission to **HUD**, it is curious why the Landlord did not report to HUD the fact that I received an email on **July 7, 2021**, from Andrew Kleiman's requesting an appointment for him to do his own inspection of my apartment.
I had not let up on fighting to get my apartment restored to a Zen space, and persistently wrote to the Landlord about the problematic repair job. It is plausible Kleiman had decided to see what I was complaining about for himself.

72. On **July 15, 2021**, Andrew Kleiman inspected my apartment.  He was accompanied by Eddie Ahmetaj.  Both men acknowledged how horrible my flooring was. Kleiman measured the space to determine how much wood was needed to replace the dark-tones, defective installation. However, on **August 3, 2021**, Kleiman reneged on his promise to replace the defective flooring.

73. Undoubtedly Kleiman reneged due to the systemic corporate campaign against Complainant. Kleiman reneged following an inter-office email dated **July 23, 2021**. Kleiman gave no reason for reneging on his promise.  I received the inter-office email in Defendants Discovery on my parking space case.
The inter-office emails, work-orders, etc., illustrate a systematic company effort to refuse my repair requests or provide me with sub-standard repairs. The obvious conclusion is that Kleiman was **directed** to renege on replacing the floors by Virginia Colon despite the fact that he had already acknowledged the floors should be replaced.

74. **Many of the emails indicate that some communication to me from Rios, Kleiman and Cabreja were penned by someone else.**  I suspect Virginia Colon or Angela Colon.

75. On **August 5, 2021**, the Landlord set up a Mold inspection in my apartment, after the mold in my apartment had already been remediated.  **The Landlords ALC Group Mold test was performative!**
The Landlord submitted a copy of the **Mold** report by ALC Group to HUD.  Of course, the report showed no mold in my apartment.
I believe the Landlord submitted the report by ALC to trigger implicit bias by the HUD Investigator, by giving her the impression that I was slovenly.

76. ALC Group's offered the sole "opinion" of the dark staining effect on the cabinets, by recommending that I clean my cabinet doors, because they had an accumulation of dust.  **The Landlord knew this was an absurd conclusion but submit the report as evidence to HUD.**

The Lobby Repair Book shows that several tenants had experienced similar issues with their cabinets, but the Landlord pretends my repair request is an anomaly.

77. Both **HPD** and **HCR** Inspectors, Ymer Ahmetaj, Andrew Kleiman and Eddie Ahmetaj had all inspected the cabinet and determined the material on the cabinet doors had deteriorated.
If the Landlord agreed that the cabinet doors were dirty with accumulated dust, they would have had All Type Maintenance clean them, instead of replacing the cabinets in 2023.

78. It's important to note the Landlord did not implement any of ALC's potentially helpful suggestions:  **reduce relative humidity** in my apartment, **test for particulate matter,** and **clean the duct systems inside the apartment.**
NOTE: I had paid for my own Mold Testing Report, done on **February 10, 2021,** by New York Standard, Home Inspection Consultants. I was concerned that the Landlord's plan for using Bleach to remediate the Mold in my apartment might be a band-aid fix.
The remediation steps recommended by my Mold Inspection definitely did not happen.

79. I asked the Landlord to have ALC test for particulate instead of Mold, but the Landlord denied testing for particulate. It's not clear why the Landlord tested for Mold after the mold had been remediated and had passed follow-up inspection by HPD.
The Landlord has been renovating every move-out apartment since **2017**, with no protections for tenants and no permits required for the full floor replacements. The likelihood of particulate in the air, affecting the air quality in my apartment that is diagonal from the hallway vent, is high.
Testing for particulate made sense, but Landlord chose Mold testing.

80. The Landlord deceptively told the HUD Investigator that in **August 2021**, a Black female, non-disabled tenant of Apartment 5E also requested floor repairs, and those repairs were completed that same month.
 The Landlord told HUD there is no evidence that the tenant in 5E was permitted to select a certain color bamboo panel or replaced the bamboo panel with a particular color.

81. The tenant composition/description the Landlord reported to HUD is not complete. In August 2021, the Black female tenant has a husband and both are non-disabled, non-LIHTC tenants.
The female tenant in 5E explicitly told me that the Landlord attempted to provide her with unmatched floor repair too, so her husband stepped in and took over communication with the Landlord for the flooring job.

82. The husband requested that all the floors in the apartment be replaced.
A compromise was made and the flooring in the whole back portion of their apartment: flooring in both bedrooms and the hallway were replaced, providing a uniform flooring effect.
The color of flooring installed in 5E in 2021, is an extreme opposite result of the flooring repair I received.
The repair result itself, is the evidence that the non-LIHTC tenants were permitted preferential floor color installation in comparison to the floor color used in my apartment.

83. Also, the Landlord tells HUD that the floor repair in 5E, was requested and installed within one month.  My first request for floor repairs was in October 2018 and it did not take place until

March 2021. The March 2021 repairs for me, dark-tones wood and was installed with unlevel planks with gaps and trip hazards.
My request for the replacement of the shoddy unworkmanlike repairs, in **June 2021** did not take place until **May 2023**, and then only partial completion.

84. The tenant in 5E did not have to elevate her requests to a government agency in order for the Landlord to act.
**NOTE:** Sadly, the Tenant in 5E had a bad breakup a year or so ago. She has an Order of Protection against her husband. Despite being removed from the Lease and no longer living at the building, the Landlord allows the Husband to park/store his car in the parking lot, the wife is not allowed to drive the husbands' parked/stored car. The Landlord even allows the husband to access the building using his still-working fob key, despite the Landlord being aware of the Order of Protection and complaints to the Landlord from the wife. **Clearly, the Landlord would agree to the Husband's insistence of uniform colored floor repairs**.

85. RULES are for **non**-LIHTC tenants even when they are no longer tenants. (In 2018 I was terminated from my Handicap Parking Space, for allowing their tenant to park in my space after the Landlord made my space unusable and inaccessible.)

86. A White, Female, non-disabled, non-LIHTC tenant in 4L told me that she too had uniformed full room, flooring replacement, comparable to the Tenant in 5E.
But the Landlord repeatedly told ME that full room floor replacement is only done for move-out units.

87. The Landlord deceptively told the HUD Investigator that on **October 8, 2021**, they attempted to schedule an appointment to address sealing of the gaps between baseboards and molding in my unit but I refused access.

88. The Landlord omits the fact that **I initiated the email communication on October 8, 2021**, pleading *(again)* by email with Andrew Kleiman to keep his **July 15, 2021,** promise to correct my defective floors.
I had submitted a floor inspection with HCR, which is a long process. I was tired of feeling like I was stepping on Lego blocks, when traversing my hallway.
I attached a medical note requesting accommodation because the gaps in the floors pinched my feet and the unlevel planks and trip hazards impacted my walking.

89. The trip hazards in my flooring were not replaced until **MAY 2023** after HCR Order and Stipulation of Settlement. According to the Landlord 5E got their floor replaced within **one month** of their request but request to repairs, for me, my repair requests take an average **two years**.
Neither Kleiman nor anyone else at the Landlord's office responded to my reasonable accommodation floor repair request in my **October 8, 2021**, email, or attached medical accommodation note. This is a denial of my accommodation request.
**A timely response to my reasonable accommodation request is REQUIRED.**

90. A reasonable accommodation request does not have to use specific words, the content need only convey that the repair request will afford usability to a person with a disability, just like the usability afforded to other tenants without a disability.

**My words on October 8, 2021**, email are clearly an accommodation request: "Furthermore, as I have previously reported, in my apartment not only is the color match completely unfair and unacceptable, there are <u>two defective areas that hurt my feet and exacerbate my disability. (See doctor's note attesting to my need for accommodation)</u> " I do not understand how the HUD Investigator can determine those words, represent a repair request and not a reasonable accommodation request.

91. I had been regularly writing Kleiman hoping he would choose to not force further delay of my decreased habitability, by unnecessarily making me wait-out the lengthy HCR process, and for once just do the right thing. He had seen the floors in my apartment with his own eyes. I hoped he would be decent.
Two hours later, on **October 8, 2021**, I receive an email the Landlord's Repair Coordinator Melanie Cabreja, stating she heard from Andrew Kleiman and she wanted to make an appointment to repair the **Baseboards**.

92. **I made a reasonable request for a one-and-done on the need for flooring and baseboards repair in my apartment:** If the baseboards were fixed first, when floors were ordered to be replaced the baseboards would be damaged.  I would run the risk of having to fight all over again, for a proper baseboard repair. **The industry sequence is floors first, then baseboards**.

93. For the Landlord to then accuse me of no-access is a flagrant misuse and manipulation of law and order. For the Landlord to repeatedly insist to HUD that I REFUSED to give them access on October 8, 2021, or any other time is misleading.

94. On **October 20, 2021**, HCR issued an order **JW410262S** which determined that the floors which impacted my walking, the baseboards, and drywall in my unit were defective. The Order directed the Landlord to make repairs within 30 days. As per usual the Landlord ignored it.

95. On **April 28, 2023,** the unworkmanlike 2021 floors were only partially replaced.  The damaged baseboards were removed and replaced with new baseboards, **per proper industry standard** correction. NO inappropriate caulking, brown or white, *on which much of the Landlord's bogus no-access accusations against me is based*, was used.

96. On **May 15, 2023**, I asked Andrew Kleiman why he left pieces of ugly dark tones planks, which had overspilled from the hallway/entryway into of the living room?
94. Kleiman told me to my face, that the HCR Order said replace the wood in the Hallway!

97. To recap, the Landlord determined since the word hallway was used, it was not HCR's intention for them to also remove the offending dark-tones planks, which had overspilled from the Hallway and Entryway into the open-plan Living Room. **This response is quite telling and capsulates ALL of my credible allegations against this Landlord.**

98. HCR issued the Landlord an Order, dated **June 6, 2022**, to repair the 3rd Floor ventilation that contributes to the transfer of toxic odors into my apartment. **JN410008B**

99. As like in 2021, I needed to go away in 2023 for repairs to take place. My respiratory system has significantly worsened due to more incidences of toxic tub reglazing without courtesy of notice.
I went away TWICE in 2023 in hopes of getting repairs done that equal the repairs of the 80% tenants.
The first time from **April 4, 2023, to June 5, 2023**. I returned to the dark-tones planks of wood bordering the hallway, entryway and living room, to smaller, shorter, backless bathroom vanities, to smaller, less storage kitchen cabinets installed on a slant. My dinner plates no longer fits in the cabinets so one door is perpetually left open.
The second time left from **June 10, 2023, to July 16, 2023**, so the partial repairs could be fully completed.
**On my second departure, there was no work done whatsoever.** The Landlord kept dragging me along with appointments they never kept,

100. When I was presented with a global settlement deal for my handicap parking space case, the Landlord's evil plan was revealed. ALL my entitled repairs and a promise to give me of three-day notice before toxic reglazing service, was in the unfair settlement draft.
I did not sign the Landlord Agreement so I am still waiting for the return of a nice apartment.
I've suffered THREE reglazing attacks in 2024, two of them in one day, **all without notice**.

101. On **July 7, 2021,** after the landlord ignored my repair request on cabinet doors, I submitted my complaints to HCR. An Order for Repair was issued to Landlord on **July 15, 2022**: **JW410238S**.
HCR issued an Order, dated **July 15, 2022,** for the Landlord to replace my Kitchen Cabinet and Bathroom Vanity doors within **30 days**.

102. In late 2021, I made a request to the Landlord for kitchen countertop replacement, the Landlord ignored me and never responded.
In Defendants' Discovery on my handicap parking space case, I discovered Pablo Rios' denied providing me with a new kitchen countertop, even though I knew he had provided new kitchen countertops for non-LIHTC long-term tenants who had lived in the building less years than me,

103. On **March 2, 2023**, Andrew Kleiman came to my apartment to address my kitchen cabinets and bathroom vanity doors. Kleiman told me replacing the cabinet doors would cost more than replacing the cabinets. I should have known there was a catch, but I was so weary and hopeful, I anticipated no down-side to having new cabinets and vanities.

104. I asked Kleiman to inspect my kitchen countertops, he agreed they needed to be replaced. I asked him to replace the countertops with Quartz *which I knew they had been using for a few years by then,* instead of laminate he offered me. Kleiman told me Quartz was only for move-out apartments but he would see what he could do. Kleiman also agreed to regrout the kitchen and bathroom floors.

105. On **March 24, 2023**, the Landlord approved installation of Quartz countertops in my apartment, which were being installed for others in the building for a few years, The Landlord said it was a good faith gesture and then continued with a whole announcement: **"We do want to explain that the practice has been to install quartz when a unit is vacated and undergoes a full renovation. So, it is not determined in any way based on source of income of the tenant of the unit. With that said, Lemle & Wolff approved the installation of the quartz in your unit as part of this renovation."**
The Landlords' unprovoked quartz declaration is equivalent to the widely known "some of my best friend are Black" quote.
**Also, note that the Landlord refers to MY entitled repairs as a Renovation!**

106. Meanwhile, my long-term, White, non-disabled, 80% non-LIHTC neighbor in 3J sent me a photo of her Quartz countertop which had been installed in 2021.
The comparisons between the thickness of her Quartz countertop and mine are drastic.
The thickness of my Quartz Kitchen countertops are traditionally used for desks or bathroom sinks.

107. Since the Landlord did not do any work while I went away for the second time in 2023, my apartment remains in a hoarder state.
I did agree to Kleiman's' offer of new cabinets and vanities but it did not occur to me that the new cabinets and vanities would have less storage space.
The majority of boxes I packed up with my belongings in March 2023 from the original bathroom vanities and kitchen cabinets, are still in boxes throughout my apartment, with no room in the new cabinets and vanities.
As a person that takes pride in my surroundings, my apartment is depressing.

108. There are two larger vanities on-site that should be installed in my bathrooms but that was before I refused to sign the Settlement agreement.
I now have to submit a Decrease Service complaint he offered me would hold less storage.

109, On **February 16, 2024**, HCR informed me the landlord is refusing to repair the slanted kitchen cabinets installation, saying the cabinets excuse will not fall. No other tenant, except me is forced to live with a wall of slanted cabinets.
If I had signed the Landlords' unfair settlement agreement, that's when I could have had straight kitchen cabinets, like everybody else.

110. I reported two critical examples of Intimidation attempts to HUD. For the following example, I submitted the notices placed on my door after the Landlord's on-demand inspections, the bogus letters and the USPS tracking proof to HUD on **March 16, 2022**, with a request to update my complaints to include this incidence of the Landlord's attempts to intimidate me. at Intimidation:

111. **On March 8, 2022,** Pablo Rios got wind of my HUD Complaint and immediately dispatched the Super to my door for an unlawful On-Demand inspection, so that the landlord could pretend to HUD that they had not been ignoring my repair requests.
I was not at home and returned to find a notice implying I had missed an appointment, pasted on my door by the Super.

I immediately contacted the Super who told me Pablo Rios had called him that morning and asked him to go to my apartment. The Super told me, when he let Rios know, there was no answer at my door, Rios instructed him to post the notice on my door.

112. On **March 16, 2022**, once again I am not at home, and come home to find another notice pasted on my door, as if I have missed another appointment. The Super repeats his story of March 8, 2022, as the same timeline of events on March 16, 2022.

113. On **Saturday - March 19, 2022**, I get a letter from the Landlord dated **March 16, 2022**, requesting an appointment to "inspect" on **March 24, 2022**.

114. On the next business day **Monday – March 21, 2022**, I respond to the letter by email twice, first asking about the odd inconsistencies of the letter referring to comingled HCR repair orders and secondly advising that I have am not available on March 24, 2022.
I do not receive a response to either of my emails.
On Tuesday - **March 22, 2022**, I get another letter from Landlord, this one is **backdated** to **March 8, 2022**, requesting an appointment on **March 16, 2022**.
USPS History shows **USPS** was not in possession on the backdated letter until **March 18, 2022**.

115. **Manufactured no-access accusations is the Landlord's go-to, stunt to try and cover for the fact that my repair requests are discriminatorily ignored.** It is important that I am given an opportunity to rebut the Landlord's false statement defenses.
**The Landlord created false evidence and submitted an accusation against their tenant (Me) to a government agency.**
There are several inconsistencies on the letter including the fact that HCR communication requires a Docket number, conspicuously missing from these set-up no-access letters.
The letter if legitimate would have requested a date to make repairs.
The Super would not be the person to make the needed repairs so dispatching him to my door for on-demand inspections expose Rios' stunt to anyone taking a closer look.

116. In their submission to HUD of the **March 16, 2022**, letter, of course, the landlord omits the fact that an inspection would be unnecessary as inspections for the repair-item list had already been performed, by the Super, Kleiman and the HCR Inspector. The landlord was already in HCR non-compliance status for items listed.
The Landlord switched my words, by telling the HUD Investigator that I said, "I would not grant access on that requested date" instead of telling the HUD investigator what I actually said which was "I am not available on that date".

117. Even if Rios legitimately wanted a FOURTH inspection, the HCR procedure requires that the Super be accompanied by the Landlord's repair person. The Super was alone on both dates.
116. In the HUD investigation, the Landlord deceptively omits the existence of the backdated March 8, 2022, letter. The Landlord only submits the March 16. 2022 letter to HUD, knowing I already reported their **fake** March 8, 2022, letter.
The HCR no-access procedure requires that the tenant is notified with TWO letters before the Landlord can make a no-access accusation.

118. On **March 26, 2022**, the Landlord sent both letters to HCR accusing me of non-access. (The backdated March 8, 2022, and the March 16, 2022, letter)
Because the Landlord had pulled the no-access stunt on me back in 2021, I recognized the setup early, and I wrote to HCR first.

119. In response, HCR ordered a mandatory **no-access inspection** on **April 27, 2022,** requiring a Landlord's representative ***with decision-making authority*** and a Landlord repairs person, attend.
Neither a qualified Landlord's representative nor a Landlord repairs-person showed up on April 27, 2022.  It was just me and the HCR Inspector.
The assessment of the Landlord's bogus no-access accusation is noted in HCR's **Docket JP410262S**: "the Tenant, did not deny access to the Landlord. "

120. As is the practice of Landlord, there a majority of false statements in their responses to my HUD complaint. **I should be given an opportunity to submit proof for rebuttal.**

121. Another example of Intimidation, I submitted to HUD was Pablo Rios' most blatant action to intimidate me, by wordlessly taking multiple pictures of me as I walked from the parking lot to the building.

122. On **May 10, 2022**, Pablo Rios, Andrew Dube and Ymer Ahmetaj were aggressively posted up in the parking lot, with their positions narrowing my path into the building, while Rios focused his camera on me taking my picture without my permission or legitimate cause.
I became immediately anxious as I walked toward the three white men.  I later expressed in a therapy session that it felt like a pre-lynching ritual.
I quickly raised my phone and was able to capture two images, the first shows the posture of the men, particularly Rios and Dube. Ahmetaj appeared to want to remove himself from the scenario. My second photo captures Rios' recognition that I was taking my own pictures.

123. Rios suddenly points off to his left pretending that he had been taking pictures of something other than me. Clearly Rios knew what he was doing was wrong.

124. While away in 2023 for corrections of the unworkmanlike 2021 Floor repair, **RING captured the floor vendor conspiratorially reminding the Super about the concrete sub-floor coming up during the "repairs" in 2021.**
I believe this is the reason for the unlevel flooring and wide gaps. The landlord knew the flooring in my apartment would not be right but they did not care.

125. **Docket JP410262S** issued **October 20, 2021**, for the floors which hurt my feet and impacted my walking, reads:
 A. **"Hallway Flooring Leveling Defects as Follows: unworkmanlike repair to hallway parquet flooring.**
 **"Hallway flooring is unleveled and there are gaps between the floor planks, a trip hazard.".**

**B. "Hallway Floor Defect As Follows: parquet wood floor was repaired in an unworkmanlike manner with different floor colors".**

126. The Landlord did not adhere to the Order to repair my floors. On **February 7, 2023,** a Stipulation of Settlement between the Landlord and HCR was signed. The Landlord agreed to repair my floors and baseboards within **90 days**, but as it the pattern they did not.

127. The monetary fines the Landlord has paid to HCR, thus far for my flooring and cabinets complaints appear to be worth it to the Landlord for my distress. As a renter of a LIHTC funded apartment I am treated as a lesser tenant. My complaints are credible, the Landlord false statement defenses are not.

128. In **December 2023** the landlord signed a Stipulation of Settlement agreeing to repair my cabinets within 30 days. As of this writing there is only a partial completion and the repair is in non-compliance review with HCR.
The monetary penalties the Landlord incurs from HCR penalties is less than chump change to the Landlord. Teaching me a lesson is more valuable. My habitability has been intentionally interrupted since 2017.

129. On **January 23, 2024,** workers came to install vanities that will offer more storage, not less as what is currently installed in 2023, but after removing the old vanity and installing the new vanity, the workers realized they had the wrong faucets. As of this writing I still have an unusable sink.

130. **On February 7, 2024**. I was hit in the morning with a moderate reglazing solvent attack and in the afternoon a severe attack from an apartment down the hall. My lungs felt singed, I can feel the degeneration of my trachea. I wheezed for two weeks, only to be hit again on the morning of **March 1, 2024**. My face and hands break out in hives, my tongue tingles and swells. Even when the worse is over, I am prone to suddenly choke as my throat restricts and my saliva glands block.

131. The respiratory distress I am made to suffer feels calculated and deliberate. My eyes are continually irritated, dry and uncomfortable with lingering effects.
I continue making reasonable accommodation requests, informing the Landlord about my continued distress and episodes, but not one response. Last year I had a bright red dot that remained on my hand for months. The Landlord refuses to take precaution or give ne the basic courtesy of notice.

132. On **February 29, 2024**, the Landlord made an appointment to complete vanities installation on **March 27, 2024**. If vanities are completed on March 27, 2024, it would mark TWO MONTHS without a usable sink.

133. The landlord attempts to trigger implicit bias in the HUD Investigator by reporting the outright LIE that in **2005** "I received a **Section 8 voucher** from **NYC HPD** and proceeded to rent Apartment 3H". **This is intentional misinformation.**

Even if it was true, it does not have any bearing on my complaints, or how I should be treated by the Landlord or any legitimate defenses that can be made by the Landlord. So, why is it there?

134. In 2017 the Landlord fully converted the Handicap Access Aisle, a bona-fide accessibility features, which accompanies Handicap Parking Space No. 25. into a dump for Construction Refuse.

135. In the HUD Letter, Larkspur, **304 West 117 Street is described as a 50-unit building.**

136. Hidden ownership by L&M is likely to be why the building is represented as having only 50 units, when it has 94. *Plus, an additional 22 units in a second residential building: 318 West 117 Street.* The property appears to be covertly carved up to satisfy the ownership entanglement. The housing initiative, and UDAAP acquisition under Cornerstone Program, strictly prohibits **Speculation** as dictated on the Deed a/k/a Land Disposition Agreement (LDA).

137. **I have provided HUD with proof that L&M Founders, Sandy Loewentheil and Ron Moelis a/k/a L&M Larkspur Investor Member LLC is a percentage owner in Larkspur LLC.** The LLC is active with a dissolution date listed as 2052.
**L&M Larkspur Investor Member LLC is a corporate title filed solely for speculative percentage ownership interest in the Owner, Larkspur LLC.**

138. Commercial Tenant's, lease at Larkspur (a/k/a Larkspur Plaza) dated **August 28, 2008**, lists L&M's corporate address **1865 Palmer Ave, Larchmont NY 10538**.

139. **2004** Premium advertisements, market the commercial spaces fronting Frederick Douglass Blvd under the **L&M Development Partners**, brand. As commonly known, and as otherwise noted on their website: **L&M only leases commercial properties they own.** Any subsequent clandestine changes they may have made should not overshadow the intentional omissions and non-disclosure of Ownership, past or present.

140. **L&M** is listed in DOB documents, as **Owner** and **General Contractor** with only the three most **pertinent permit signoff** which **dictate the** *curated* **property description**, is by Sandy Loewentheil.
If **L&M** did not put their thumb on the scale to facilitate Lemle & Wolff's inclusion in acquisition of the development site, it is likely I would not have had to face Lemle & Wolff's discrimination, had my life disrupted, and forced fight for my rights, since 2017.

141. On **March 15, 2022**, I submitted the name of corporate title L&M Larkspur Investor Member, LLC to HUD for inclusion as a Respondent, in my HUD case.

142. **Larkspur LLC** listed as the corporate title, **Owner** with Managing Members Frank Anelante, his possible brother-in-law Joseph Zitolo and Thomas Metallo. (the latter being the Founder of Great American Construction)

143. **Larkspur Managers LLC** listed as the Managing LLC, with Managing Members, Frank Anelante, Joseph Zitolo, Thomas Metallo and **Steven Judelson**. *Except Steven Judelson is listed*

*in NYC HPD records as the select **Sponsor** chosen by HPD for the land development site acquisition, the indication is that he would under Larkspur LLC.*

144. **Lemle & Wolff** Inc. a/k/a **Lemle & Wolff Companies**, founders/owners Frank Anelante and Joseph Zitolo. L&W is described as **property management company** for low-income communities. Perhaps this is why me and the 20% tenants are treated unequally from the 80% tenants!

145. **Larkspur - 304 West 117 Street**, is an **80/20**, luxury building with 94 units. LARKSPUR – 304 West 117 Street is NOT a low-income community, but it is **Owned** *(via Larkspur LLC, managing members Anelante and Zitolo)*, **Managed,** and **"Maintained"** by **Lemle & Wolff**: this may explain the discriminatory, inappropriate, systematic company DNA that I have been forced to endure since 2017.

146. As the **Owner**, the **Property Manager** and the **Maintenance Company**, Lemle & Wolff has the unchecked benefit of treating low-income tenants poorly, in peace.

147. Lemle & Wolff's full control of all aspects of operations at Larkspur ~ 304 West 117 Street, without transparency or disclosures, which has allowed them to recklessly inflict their discriminatory conduct unto me. on me.

148. Ronald Moelis's name is documented at HUD in association with Larkspur. L&M Larkspur Investor Member LLC, L&M Development Partners, or **whichever LLC**, L&M **(Ron Moelis, Sanford Loewentheil)** use to hide ownership, does not mean that the ownership does not exist. **L&M Larkspur Investor Member LLC** is why the property Larkspur, Larkspur LLC, Larkspur Managers LLC, and Lemle & Wolff as exclusive property manages of Larkspur, **exist.**

149. It is, interesting that in the HUD letter, it is revealed that Pablo Rios and Joseph Zitolo *(the founder of Lemle & Wolff, and an Owner-Managing member of Larkspur,)* both started new management duties on the property in **2017**. It appears 2017 was a pivotal year for Lemle & Wolff!
In 2017, Lemle & Wolff acquired a $37M FHA refinance loan on Larkspur using a falsified Certificate of Occupancy, with material false statements. **This item is a matter of Public interest**.

150. As the end of 421A tax credits near expiration on Larkspur, the **TRUTH** that the property is (a) intended to be governed under strict rules of the Cornerstone Program, (b) and that the building is intended to be a Permanent Affordable Housing **RENTAL** building, and (c) L&M's percentage ownership in Larkspur LLC, is getting buried deeper and deeper.

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| March 4, 2024 | | | | Plaintiff's Signature |
| --- | --- | --- | --- | --- |
| Dated | | | | |

**Coanne** | | | | **Wilshire**

| First Name | | Middle Initial | | Last Name |
| --- | --- | --- | --- | --- |

**304 West 117 Street, 3H**

Street Address

**New York** | | NY | | 10026

| County, City | | State | | Zip Code |
| --- | --- | --- | --- | --- |

**212 464 7973** | | | soireenews@outlook.com

| Telephone Number | | | | Email Address (if available) |
| --- | --- | --- | --- | --- |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☑ Yes    ☐ No

    If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

Page 7



COANNE WILSHIRE
212-646-7973
304 WEST 117TH STREET
NEW YORK NY 10026

1 LBS          DWT: 12.9.1          1 OF 1

**SHIP TO:**
PRO SE INTAKE UNIT
COURTS - GOVERNMENT OFFICE
ROOM 120
500 PEARL STREET
**NEW YORK NY 10007**

NY 102 9-10

**UPS GROUND**

TRACKING #: 1Z 5NT 53B 03 0001 2612

BILLING: P/P

XOL 24.01.23    NV45 10.0A 03/2/2024*

https://www.ups.com/ship/core/confirmation?tx=6614197269280...n_US&promoCodeAlias=DELivsr&WT.mc_id=UPSmiVTGSDELIVER

3/4/24, 12:47 PM
Page 1 of 1