1:20-cv-07998-OTW
1:24-cv-01756-OTW

RECEIVED
SDNY PRO SE OFFICE
2024 JUL 11 PM 1:14

RECEIVED
SDNY PRO SE OFFICE
2024 JUL 11 PM 1:14

# EXHIBIT A

Plaintiff has included limited portions of documents and document in Exhibit to not flood the record. Full documents and additional documents are available upon request. exhibit

1. 2024 ADA Summonses on Parking Lot - 3 pages

2. Breach of Warranty of Habitability 2 page DOB Civil Matter - (Plaintiff has additional evidence)

3. Pattern and Practice – 8 Pages
Defendants have a history of discriminatory conduct. On **October 5, 2011**, a Consent Decree was filed: United States of America vs Larkspur LLC, Larkspur Managers LLC, et al. **Civil Case No. 1:11-cv-06321-DAB**.
As proven by Defendants Discovery on **1:20-cv-07998-JPO-OTW**, Defendants reneged on the majority of elements in the Consent Decree:
   a) Commitment to education/training.
   b) Managers would be informed on all portions of the Fair Housing Act that relate to accessibility requirements, reasonable accommodations and reasonable modifications.
   (c) aggrieved tenants (or any tenants) were not notified of this case or of the Fund where they may seek relief, etc.

4. Disparate Treatment – 3 pages
Defendants *officially* denied disparate treatment against Plaintiff from **2018 -2022**, the majority of parking tenants: White, non-disabled people, distributed a notice on the cars in parking lot, that made it impossible for Defendants to continue denying the truth of Plaintiff's testimony. Interestingly enough, Defendants removed Clause 1A from the majority White parking tenants but not the few Black tenants.

The Commercial Tenant used to terminate Plaintiff continues to park in the Residents Only parking Lot. Plaintiff is the only tenant ever evicted from the parking lot on a pretext.

Defendants were on Notice about obstructing the Access Aisle as ADA violation, **March 22, 2011**.

5. Affordable Housing Programs- 7 pages
Between 2001-2006 L&M Defendants facilitated the okiedoke that allowed Larkspur to exist and allowed Larkspur LLC, Larkspur Managers LLC, Larkspur Condominiums LLC, and L&M Larkspur Investor Member LLC undeserved predatory profits.
The history of fraud on the property, has been a setup for tenants of Protected Classes, hence my litigation. Black and Brown 20% tenants are overwhelmingly the aggrieved tenants with Open Violation for their units. Defendants buried the requirement of community enhancement provided by housing programs: the Cornerstone Program and the 80/20 Program.

6. Defendants finesse an unnecessary A/K/A address to cover-up fraud. See all documents in Exhibit.
Defendants acquired 10 formerly-owned City-lots but only registered 9. The unregistered Lot is #127, where the Parking Lot is positioned.

 

☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

**Buildings**

### NYC Department of Buildings

## Overview for Complaint #: 1669995 = RESOLVED

**BIN:** 1087201        **Borough:** MANHATTAN        **ZIP:** 10026

**Complaint at: 304 WEST 117 STREET**
Re: ADA ACCESSIBILITY FROM WITHIN BUILDING TO PARKING FACILILTYFAILURE TO MAINTAIN

**Category Code:**        77        CONTRARY TO LL58/87 (HANDICAP ACCESS)

**Priority:** C

**Assigned To:**        QUALITY ASSURANCE UNIT

**Community Board:** 110

**Block:** 1943        **Lot:** 7503

**Received:**        06/07/2024
**Owner:**        UNAVAILABLE OWNER

**Last Inspection:** 06/10/2024 - - BY BADGE # 2570
**Disposition:** 06/12/2024 - A8 - ECB VIOLATION SERVED
**ECB Violation #:**  39116383Y
**Comments:** FAILURE TO MAINTAIN, ACCESSIBLE PARKING SPACES MUST BE LOCATED ON SHORTEST ROUTE TO ACCESSIBLE ENTRANCE FOR ADA COMPLIANCE. AT TIME OF INSPECTION THERE IS A CONCRETE STEP FROM BUILDING ENTRANCE CLOSEST TO PARKING FACILITY, FORCING A WALK AROUND BUILDING FOR TENANTS.

## Complaint Disposition History

| # | Disposition Date | Disposition Code | Disposition | Inspection By | Date |
|---|---|---|---|---|---|

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.





☒ **CLICK HERE TO SIGN UP FOR BUILDINGS NEWS**

**Buildings**

**NYC Department of Buildings**

**Overview for Complaint #:1669866 = RESOLVED**

BIN: 1087201        **Borough:** MANHATTAN        **ZIP:** 10026

**Complaint at: 304 WEST 117 STREET**
Re: ADA ACCESSBILTY WITH SIGNAGE TO PARKING LOT

**Category Code:**        77        CONTRARY TO LL58/87 (HANDICAP ACCESS)

**Priority:** C

**Assigned To:**        QUALITY ASSURANCE UNIT

**Community Board:** 110

**Block:** 1943        **Lot:** 7503

**Received:**        06/07/2024   16:08
**Owner:**        UNAVAILABLE OWNER

**Last Inspection:**   06/10/2024 - - BY BADGE # 2570
**Disposition:**   06/12/2024 - A8 - ECB VIOLATION SERVED
**ECB Violation #:**   39116375Y
**Comments:**   AT TIME OF INSPECTION, ADA ROUTE FROM OUTSIDE OF BUILDING LACKS ADA SIGNAGE TO ACCESS PARKING FACILITY. ACCESS DOOR TO PARKING FACILITY IS NOT EASILY OPENED WITH KEY FAB. FAILURE TO MAINTAIN.

**Complaint Disposition History**

| # | Disposition Date | Disposition Code | Disposition | Inspection By | Date |
|---|---|---|---|---|---|

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.



# Buildings



☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

### NYC Department of Buildings

## Overview for Complaint #: 1651940 = RESOLVED

**BIN:** 1087201 **Borough:** MANHATTAN **ZIP:** 10026

**Complaint at: 304 WEST 117 STREET**

Re: MISSING Accessibility signage on the Ancillary/Acessory parking lot: The Handicap Parking spaces are required to have identifying signage but does not. NY Building Code requires a No Parking sign in Access Aisle. Multiple Dwellings as provided by 25-412 of the Zoning Resolution, where the Lot is exclusively on an accessory basis for Residents, a Month to Month lease must be given to non-disabled tenants renting an accessible parking spot. Signs of these requirements must be permanently and prominently posted. (Emphasis Added) The Landlord is subject to Civil and Criminal penalties for this violation.

**Category Code:** 49 STOREFRONT OR BUSINESS SIGN/AWNING/MARQUEE/CANOPY - ILLEGAL
SIGN - BUILDING : ILLEGAL

**Priority:** C

**Assigned To:** SPECIAL OPERATIONS

**311 Reference Number:** 311-16350566

**Community Board:** 110

**Block:** 1943 **Lot:** 7503

**Received:** 10/25/2023

**Owner:** UNAVAILABLE OWNER

**Last Inspection:** 10/26/2023 - - BY BADGE # 2665
**Disposition:** 10/27/2023 - A8 - ECB VIOLATION SERVED
**ECB Violation #:** 39098069J
**Comments:** OBSERVED NO DESIGNATED ADA PARKING SLOT WITH SIGNAGE IN TENANT PARKING LOT AS REQUIRED BY NYC ZONING RESOLUTION.

## Complaint Disposition History

| # | Disposition Date | Disposition Code | Disposition | Inspection By | Date |
|---|---|---|---|---|---|

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.





**Buildings**

Recent ADA Violations on Parking Lot

EXHIBIT

Overview for Complaint #: <u>1667560</u> = RESOLVED    Borough: MANHATTAN    ZIP: 10026

BIN: <u>1087201</u>

Complaint at: 304 WEST 117 STREET

EPA Release

Category Code:    83    CONSTRUCTION - CONTRARY/BEYOND APPROVED PLANS/PERMITS

Notarized Witness Statement
CONSTRUCTION IN PROGRESS : CONTRARY TO PLAN

|  |  | Priority: B |
|---|---|---|
| Assigned To: | MANHATTAN CONSTRUCTION ENFORCEMENT | 311 Reference Number: <u>311-18542398</u> |

Block: 1943    Lot: 7503    Community Board: 110

Received:    05/09/2024

Owner:    UNAVAILABLE OWNER

Last Inspection:    05/14/2024 - - BY BADGE # 2725

Disposition:    05/14/2024 - H1 - PLEASE SEE COMPLAINT NUMBER <u>1667080</u>

Comments:    PLEASE SEE COMPLAINT #1667080 - 8TH FLOOR ROOFTOP RECREATION AREA IS
ACCESSIBLE VIA KEY FOB LOCK - TENANT CLAIM THAT THEY HAVE NOT BEEN ISSUED
THE KEY FOB FOR ACCESS TO THAT AREA IS A CIVIL MATTER

## Complaint Disposition History

| # | Disposition Date | Disposition Code | Disposition | Inspection By | Date |
|---|---|---|---|---|---|

If you have any questions please review these <u>Frequently Asked Questions</u>, the <u>Glossary</u>, or call the 311 Citizen Service Center by
dialing 311 or (212) NEW YORK outside of New York City.



*View Facing West along Frederick Douglass B*



PHOTO 2

## West 117th Street (Southwest Corner)

CORNERSTONE PROGRAM

MFY Legal Services, Inc.
299 Broadway
New York, New York 10007; and

United Spinal Association
75-20 Astoria Blvd
Jackson Heights, New York 11370.

29.     Within 30 days of the entry of this Consent Decree, the Developer Defendants

shall send, by first-class mail, postage pre-paid, a copy of the Notice to each past or present

resident at The Larkspur. For past residents, the Developer Defendants will have complied with

the requirements of this paragraph by mailing such notice to the forwarding address, if any,

provided by the former resident at the time the former resident moved out of The Larkspur.

Within 60 days of entry of this Consent Decree, the Developer Defendants shall provide the

United States with proof that the Notices have been sent.

30.     The United States may make its own efforts to locate and provide notice to

potential aggrieved persons.

31.     The Developer Defendants shall permit the United States, upon reasonable notice,

to review any records that may reasonably facilitate its efforts to locate and provide notice to

potential aggrieved persons and its determinations regarding the claims of alleged aggrieved

persons.

32.     The United States shall investigate the claims of allegedly aggrieved persons and

shall determine which persons are aggrieved and an appropriate amount of damages that should

be paid to any such person. The United States will give the Developer Defendants written notice

of each of its determinations, and the factual basis thereof, together with a copy of a sworn

declaration from each aggrieved person setting forth the factual basis of the claim.

33.     If the Developer Defendants dispute the United States' determination of an alleged grievance or the amount of a payment to an aggrieved person, the Developer Defendants shall, within 14 days of receiving notice of a determination (a "Determination") from the United States, provide a written objection to the United States, along with any information or documents that they believe may refute the aggrieved person's claim.  The United States shall give due consideration to any objections it receives from the Developer Defendants and shall, following any objection, give the Developer Defendants written notice of its reconsidered determination (a "Reconsidered Determination"), setting forth the aggrieved person and the amount that the aggrieved person should be paid.  If the Developer Defendants dispute the Reconsidered Determination, the Developer Defendants shall file an objection with the Court, which may sustain or overrule the objection.

34.     The Developer Defendants shall, no later than 30 days after receiving a Determination to which no objection has been made, or 10 days after receiving a Reconsidered Determination to which no objection has been filed with the Court, or 10 days after any decision by the Court overruling a filed objection, whichever is earliest, deliver to the United States checks payable to aggrieved persons in the amounts identified by the United States or allowed by the Court.  In no event shall the aggregate of all such checks exceed the amount of the Settlement Fund, including accrued interest.  No aggrieved person shall be paid until he/she has executed and delivered to the United States and the Developer Defendants duplicate originals of the release at Appendix F.

35.     No adverse action shall be taken by the Developer Defendants against any person because such person makes or seeks to make a claim under Section IX of this Consent Decree.

36.    In the event that less than the total amount of the Settlement Fund, including accrued interest, is distributed to aggrieved persons, and after the United States determines that no further aggrieved persons will be identified, the remainder plus FIVE THOUSAND DOLLARS ($5,000) shall be distributed to a qualified organization(s), mutually agreed upon by the United States and the Developer Defendants, subject to the approval of the Court, for the purpose of conducting fair housing enforcement-related activities in New York City.

## X.  CIVIL PENALTY

37.    Within 30 days of the date of the entry of this Consent Decree, the Developer Defendants shall pay a civil penalty of THIRTY-FIVE THOUSAND DOLLARS ($35,000) pursuant to 42 U.S.C. § 3614(d)(1)(C) to vindicate the public interest.  Said sum shall be paid by submitting a check made payable to the "United States of America" to the United States.

## XI.  EDUCATIONAL PROGRAM

38.    Within 30 days of the entry of this Consent Decree, the Developer Defendants shall provide a copy of this Consent Decree to all their employees involved in the design or construction of The Larkspur, as well as to all other entities (e.g., firms) that were involved in the design or construction of The Larkspur as the Developer Defendants' agent, and secure the signed statement from each employee and other entity acknowledging that he, she, or it has received and read the Consent Decree, and has had an opportunity to have questions about the Consent Decree answered.  This statement shall be substantially similar to the form of Appendix G.

39.    During the term of this Consent Decree, any new employee of a Developer Defendant who will be involved in the design or construction of Covered Multifamily Dwellings,

as well as any entities (*e.g.*, firms) acting as a Developer Defendant's agent that will be involved in the design and construction of Covered Multifamily Dwellings, shall, within 30 days after the date he or she commences an agency or employment relationship with any Developer Defendant, be given a copy of this Consent Decree by such Developer Defendant, and such Developer Defendant shall require each such new employee or entity to sign a statement, acknowledging that he, she, or it has received and read the Consent Decree, and has had an opportunity to have questions about the Consent Decree answered. This statement shall be substantially similar to the form of Appendix G.

40.     Within 30 days of the entry of this Consent Decree, the Developer Defendants shall provide a copy of this Consent Decree to all their employees involved in rental of units at The Larkspur and/or the provision of services to residents at The Larkspur, and the Managing Agent of The Larkspur, and secure the signed statement from each employee and the Managing Agent acknowledging that he, she, or it has received and read the Consent Decree, and has had an opportunity to have questions about the Consent Decree answered. This statement shall be substantially similar to the form of Appendix G.

41.     During the term of this Consent Decree any new employee of a Developer Defendant who will be involved in the renting of units at The Larkspur, and/or the provision of services to residents at The Larkspur, and the Managing Agent of The Larkspur shall, within 30 days after the date he, she, or it commences an agency or employment relationship with any of the Developer Defendants, be given a copy of this Consent Decree by such Defendant, and such Defendant shall require each such new agent or employee to sign a statement, acknowledging that he or she has received and read the Consent Decree, and has had an opportunity to have

questions about the Consent Decree answered.  This statement shall be substantially similar to the form of Appendix G.

42.    In lieu of providing employees, entities or the agents listed in paragraphs 38 through 41 with copies of the Consent Decree as required therein, a Developer Defendant may provide employees or agents with a summary of the Consent Decree, designed to provide personnel with information relevant to their positions.  A Developer Defendant may only provide such summaries in lieu of copies of the Consent Decree with the United States' advance written approval of the form and content of any proposed summary.

43.    Each Developer Defendant shall also ensure that it and its employees, as well as any entities (e.g., firms) acting as a Developer Defendant's agent, who have direct management duties for the design and/or construction of Covered Multifamily Dwellings have a copy of, are familiar with, and personally have reviewed, the Fair Housing Accessibility Guidelines, 56 Fed. Reg. 9472 (1991), and the United States Department of Housing and Urban Development, Fair Housing Act Design Manual, A Manual to Assist Builders in Meeting the Accessibility Requirements of the Fair Housing Act (August 1996, Rev. April 1998).  All employees of the Developer Defendants whose duties, in whole or in part, involve the management, sale and/or rental of multifamily dwellings at issue in this case, including the Managing Agent of The Larkspur, shall be informed of those portions of the Fair Housing Act that relate to accessibility requirements, reasonable accommodations and reasonable modifications.

44.    Within 90 days of the date of entry of this Consent Decree, all employees of the Developer Defendants whose duties, in whole or in part, involve or will involve supervision over the development, design and/or construction of Covered Multifamily Dwellings, as well as any

entities (*e.g.*, firms) acting as a Developer Defendant's agent that will be involved in the design and construction of Covered Multifamily Dwellings, shall undergo training on the design and construction requirements of the Fair Housing Act. The training shall be conducted by a qualified third-party individual, not associated with any Developer Defendant or its counsel, and approved by the Department of Justice, which approval shall not be unreasonably withheld or delayed; and any expenses associated with this training shall be borne by Developer Defendants. The Developer Defendants shall provide to the United States, 30 days before the training, the name(s), address(es) and telephone number(s) of the trainer(s); and copies of the training outlines and any materials to be distributed by the trainers. The Developer Defendants shall provide to the United States, 30 days after the training, certifications executed by all the Developer Defendants and covered employees and entities confirming their attendance, in a form substantially equivalent to Appendix H.

## XII. NOTICE OF THE DEVELOPER DEFENDANTS' NON-DISCRIMINATION POLICY AND THE DEVELOPER DEFENDANTS' OUTREACH EFFORTS

45.     Within 10 days of the date of entry of this Consent Decree, the Developer Defendants shall post and prominently display in the sales or rental offices of all Covered Multifamily Dwellings owned or operated by them a sign no smaller than 10 by 14 inches indicating that all dwellings are available for rental on a nondiscriminatory basis. A poster that comports with 24 C.F.R. Part 110 will satisfy this requirement.

46.     For the duration of this Consent Decree, in all future advertising in newspapers and electronic media, and on pamphlets, brochures and other promotional literature regarding The Larkspur or any new Covered Multifamily Dwelling that any Developer Defendant may develop or construct, the Developer Defendant shall place, in a conspicuous location, and a

statement that the dwelling units include features for persons with disabilities required by the federal Fair Housing Act.

47.    For the duration of this Consent Decree, the Developer Defendants will affirmatively market The Larkspur to persons with disabilities. Such affirmative marketing will include: the distribution of marketing materials regarding accommodation of residents with disabilities to the general public and to governmental and charitable groups that assist persons with disabilities; and the provision of available apartment listings to Disabled American Veterans, the New York State Division of Housing and Community Renewal, the Mayor's Office for People with Disabilities, the New York City Department of Housing Preservation and Development, and the New York City Housing Development Corporation for publication on each group's respective website.

## XIII. NOTIFICATION AND DOCUMENT RETENTION REQUIREMENTS

48.    Within 180 days after the date of entry of this Consent Decree, the Developer Defendants shall submit to the United States an initial report regarding the signed statements of the Developer Defendants' employees and entities who or that have completed the training program specified in paragraph 44 of this Consent Decree. Thereafter, during the term of this Consent Decree, the Developer Defendants shall, on the anniversary of the entry of this Consent Decree, submit to the United States a report containing the signed statements of new employees or entities that, in accordance with paragraph 39 of this Consent Decree, they have received and read the Consent Decree, and had an opportunity to have questions about the Consent Decree answered. The final report shall be due 60 days prior to the anniversary of the entry of this Consent Decree.

49.    For the duration of this Consent Decree, the Developer Defendants shall advise the United States in writing within 15 days of receipt of any written administrative or legal fair housing complaint regarding any property owned, managed, and/or designed or constructed by them, or against any employees of the Developer Defendants working at or for any such property, or against the Managing Agent of such property, regarding discrimination on the basis of disability in housing.  Upon reasonable notice, the Developer Defendants shall also provide the United States all information in their possession it may request concerning any such complaint.  The Developer Defendants shall also advise counsel for the United States, in writing, within 15 days of the resolution of any complaint.

50.    For the term of this Consent Decree, the Developer Defendants are required to preserve all records related to this Consent Decree, for The Larkspur, and any other Covered Multifamily Dwellings designed, constructed, owned, operated, or acquired by them during the duration of this Consent Decree.  Upon reasonable notice to the Developer Defendants, representatives of the United States shall be permitted to inspect and copy any records of the Developer Defendants or inspect any developments or residential units under the Developer Defendants' control bearing on compliance with this Consent Decree at any and all reasonable times, provided, however, that the United States shall endeavor to minimize any inconvenience to the Developer Defendants and their tenants from such inspections.

## XIV. LOW-INCOME HOUSING TAX CREDIT PROGRAM COMPLIANCE

51.    The Developer Defendants are hereby notified that, in the event that the Developer Defendants fail to comply with any of the terms of this Consent Decree and the United States obtains an order establishing such noncompliance, the United States may take any

("Act"), all requirements of HDC, all applicable New York City, State and federal laws, and the terms and conditions contained herein.

This Commitment also contains ongoing obligations and financial undertakings as more specifically set forth herein of the Borrower as well as Steven Judelson, Thomas Metallo, Frank J. Anelante, Jr. and Joseph Zitolo (individually and collectively, the "Guarantor") regarding the Project, the Loan, the Additional Loan and the transactions contemplated by this Commitment which shall continue for so long as this Commitment remains in effect.

1. **The Project**

A.     The Project, as more fully described on **Exhibit 1**, is located at 306-318 West 117th Street in New York County ("Premises") and is to consist of the construction of one (1) eight story multi family building containing a total of 95 rental units (plus one (1) superintendent's unit).     Approximately 8,000 square feet of commercial space and approximately 20,000 square feet of community space. The Borrower shall provide that at least 19 of the units in the Project (exclusive of the superintendent's unit) shall be qualified low income units under Section 42 and 142 of the Internal Revenue Code of 1986, as amended ("Code") rented to households whose annual household income does not exceed 50% of area median income; of the 19 low-income units at least three of such units shall be rented to very low-income households whose annual household income does not exceed 40% of area median income.  The initial rents for the low-income and very low-income units shall be approved by the New York City Department of Housing Preservation and Development ("HPD"), provided, however, that such rents shall not exceed thirty percent of fifty percent and thirty percent of forty percent of area median income, respectively, as adjusted by unit size under the provisions of Section 42 of the Code. The remaining 80% of the units shall be subject to the income restrictions of the HDC New Housing Opportunities Program ("New HOP") as described in the HDC Regulatory Agreement.  The Project will be operated as a rental housing project, subject to the marketing, use and occupancy restrictions contained in an HDC Regulatory Agreement.

B.     Prior to issuance of the Bonds, the Borrower, the Borrower's architect and the Borrower's accountant shall supply to HDC's bond counsel, Hawkins, Delafield & Wood, 67 Wall Street, New York, New York 10005 ("Bond Counsel") the information required by Bond Counsel in the Developer's Tax Certification attached hereto as **Exhibit 2**, which information must indicate that at least ninety-five percent (95%) of the proceeds of the Bonds are expected to be used to pay qualified costs ("Qualified Costs") as set forth in the Developer's Tax Certification.

C.     Prior to disbursement of the last ten percent (10%) of the proceeds of the Bonds, the Borrower shall certify that (i) it has complied with the Developer's Tax Certification and (ii) it will be able to deliver the accountant's, architect's and the Borrower's certifications required to be delivered at the time of final drawdown of the proceeds of the Bonds pursuant to the Developer's Tax Certification.  Prior to the last advance under the Loan, the Borrower, the Borrower's architect and the Borrower's accountant must certify as set forth in the Developer's Tax Certification that at least ninety-five percent (95%) of the proceeds of the Bonds were used to pay Qualified Costs as set forth in the Developer's Tax Certification. If such a certificate cannot be delivered then the amount of the Loan shall be reduced to an amount which shall enable such certificate to be delivered.  The Borrower certifies and agrees to ensure that such certifications remain true and complete for the period of time necessary to preserve the exclusion from gross income for federal income tax purposes of interest on the Bonds.

D.     Prior to the issuance of the Bonds, the Borrower shall provide to HDC and Bond Counsel all information and documentation satisfactory to HDC and Bond Counsel necessary to establish and support a Bond Counsel opinion that interest on the Bonds is not included in gross income for Federal income tax purposes.

E.     The plans and specifications for the Project ("Plans and Specifications") and

and the Additional Loan during construction, and if HDC elects to have the Loan insured pursuant to Part I, Section 13 hereof, the plans and specifications and trade payment breakdowns shall be reviewed by the State of New York Mortgage Agency ("SONYMA") or the New York City Residential Mortgage Insurance Corporation ("REMIC"), as the case may be.

2.    **The Borrower**

The Borrower, Larkspur, LLC, is a New York limited liability company whose managing member will be Larkspur Managers LLC, whose members are Steven Judelson, Thomas Metallo, Frank J. Anelante and Joseph Zitolo. The investor member will be L&M Larkspur Investor Member LLC. Prior to the date of sale of the Bonds, the Borrower, its managing member and its investor members having at least 20% interest in the Borrower, and any changes in the Borrower, if any, or such managing or investor members, shall be subject to the prior approval of HDC.

3.    **The Loan, the Construction LOC, Construction Financing and the Additional Loan**

A.    The construction of the Project will be partially financed by the Loan. The principal amount of the Loan shall not exceed $17,600,000. The interest rate on the Loan shall not exceed 5.35% per annum until release of the Construction LOC (defined below) and 6.00% thereafter, inclusive of any servicing fee and mortgage insurance premium, and must be sufficient to pay interest and principal, when due, on the Bonds allocable to the Project ("Allocable Bonds"), the servicing fee of the Construction Servicer when due (and if included in the rate at the Construction Servicer's option) and thereafter the HDC servicing fee when due (as set forth in Section 6(B) hereof) and the regularly scheduled portion of the Trustee's fees (as set forth in Section 6(C) hereof).

B.    1.    As a condition to issuing the Bonds to fund the Loan, the Borrower shall be required to obtain a standby letter of credit from the Construction Servicer for the benefit of HDC in an amount equal to the stated principal amount of the Loan plus sixty (60) days of interest on the Loan, with a term of at least twenty-four (24) months and otherwise in form and substance acceptable to HDC ("Construction LOC") . The Borrower shall have entered into a Commitment satisfactory to HDC with the Construction Servicer to provide Construction LOC (the "LOC Commitment") prior to the issuance of the Bonds and shall furnish HDC with a copy of the LOC Commitment. The terms of the LOC Commitment shall be incorporated herein by reference and a default (beyond any applicable notice and cure period) under such LOC Commitment or any of the other LOC documents shall be a default under this Commitment. The making of the Loan and the Additional Loan is subject to Borrower's compliance with the LOC Commitment and all terms and conditions required by the Construction Servicer. In addition, the making of the Loan and the Additional Loan is conditioned upon HDC, the Borrower and the Construction Servicer entering into a mutually acceptable Servicing and Release Agreement ("Servicing and Release Agreement") regarding the servicing of the Loan and the Additional Loan and the release of the Construction LOC.

2.    During construction of the Project, the Construction LOC shall secure HDC in the event of a default by the Borrower under the Mortgage until (i) the construction of the Project is completed and the conditions of this Commitment (including the conditions set forth in Section 11 of Part I hereof are satisfied) and (ii) certain other conditions set forth in the Servicing and Release Agreement are satisfied ("LOC Release"). The Construction LOC shall be returned to the Construction Servicer on the effective date of the LOC Release and thereafter, the Construction Servicer shall no longer service the Loan and the Additional Loan if the term of the Construction LOC is not extended or is extended without the prior consent of HDC. If the LOC Release has not occurred on or prior to the expiration of the Scheduled Construction Period, then the failure to satisfy the conditions for the LOC Release shall be a default under this Commitment, the Loan and the Additional Loan. The Construction Servicer, by issuing the Construction LOC will be assuming all customary lending risks associated with making a loan during construction.

CITY PLANNING COMMISSION
22 Reade Street, New York, NY 10007
FAX # (212) 720-3356

## INSTRUCTIONS

1. Return this completed form with any attachments to the Calendar Information Office, City Planning Commission, Room 2E at the above address.

2. Send a copy of the completed form with any attachments to the applicant's representative as indicated on the Notice of Certification, one copy to the Borough President, and one copy to the Borough Board, when applicable.

APPLICATION # C 020220 HAM

## DOCKET DESCRIPTION

IN THE MATTER OF an application submitted by the Department of Housing Preservation and Development (HPD):

) pursuant to Article 16 of the General Municipal Law of New York State for:

a) the designation of 2161 & 2163/67 Eighth Avenue, and 300, 306/308, 310, 312, 314, 316 and 318 W. 117th Street (Block 1943, Lots 32, 33, 36, 37, 39-43 and 127), as an Urban Development Action Area;

b) an Urban Development Action Area Project for such area; and

) pursuant to Section 197-c of the New York City Charter for the disposition of such property except 306/308 and 312 W. 117th Street (Block 1943 Lots 37 and 40) to a developer selected by HPD;

to facilitate construction of approximately 96 units of housing with ground floor retail and community facility space.

COMMUNITY BOARD NO. ____10____

BOROUGH BOARD __Manhattan__

BOROUGH __Manhattan__

DATE OF PUBLIC HEARING __January 3, 2002__

LOCATION 180 West 135th Street

Harlem YMCA, Little Theater

WAS QUORUM PRESENT?  __X__ YES  ____ NO  (A public hearing requires a quorum of 20% of the appointed members of the board, but in no event fewer than seven such members)

VOTE ADOPTING RECOMMENDATION TAKEN

DATE __January 3, 2002__

LOCATION 180 West 135th Street

Harlem YMCA, Little Theater

## RECOMMENDATION

____ APPROVE   __X__ APPROVE WITH MODIFICATIONS/CONDITIONS

____ DISAPPROVE   ____ DISAPPROVE WITH MODIFICATIONS/CONDITIONS

EXPLANATION OF RECOMMENDATION-MODIFICATION/CONDITIONS (attach additional sheets if necessary)

a) The program be changed and the developer seek inclusion into the 80/20 program

b) The buildings have sophisticated uniform signage contextual with the surrounding area

c) The developer must undertake fuel tank removal, soil and ground water testing to determine the presence of contaminates

d) Testing shall be undertaken on all lots immediately adjacent to lots 29 and 37

e) HPD or developer shall not start side grading, excavation or building construction until testing and remediation have been completed and written approval given by the New York City Department of Environmental Protection's Office of Environmental Planning Assessment

f) The community facility (charter school) site shall not be allowed to be built higher than the eight (8) floors approved by this project

g) If the conditions described are not fully implemented then this negative declaration shall become null and void

## VOTING

IN FAVOR ____39____   AGAINST ____0____   ABSTAINING ____0____

TOTAL MEMBERS APPOINTED TO BOARD ____49 Board Members____

STANLEY N. GLEASON
COMMUNITY/BOROUGH BOARD OFFICER

2/7/02
DATE

TITLE

8/99



:ITY PLANNING COMMISS...
02 JAN -8 AM 11: 28
DEPT. OF CITY PLANNING

THE CITY OF NEW YORK
OFFICE OF THE PRESIDENT
BOROUGH OF MANHATTAN

C. VIRGINIA FIELDS
BOROUGH PRESIDENT

February 7, 2002

ULURP NO.
C 020220 HAM

APPLICANT

Department of Housing Preservation and Development (HPD)
100 Gold Street
New York, New York 10038

REQUEST

In The Matter Of an application submitted by the Department of Housing Preservation and Development (HPD):

1)    pursuant to Article 16 of the General Municipal Law of New York State for:

        a)    the designation of 2161 & 2163/67 Eighth Avenue, and 300, 306/308, 310, 312, 314, 316 and 318 W. 117th Street (Block 1943, Lots 32, 33, 36, 37, 39-43 and 127), as an Urban Development Action Area;

        b)    an Urban Development Action Area Project for such area; and

2)    pursuant to Section 197-c of the New York City Charter for the disposition of such property except 306/308 and 312 W. 117th Street (Block 1943 Lots 37 and 40) to a developer selected by HPD;

to facilitate construction of approximately 96 units of housing with ground floor retail and community facility space.

## PROJECT DESCRIPTION

The New York City Department of Housing Preservation and Development (HPD) is seeking approval of an Urban Development Action Area and Project (UDAAP), and disposition of City-Owned-Property to facilitate the development of a mixed use project in Central Harlem on Block 1943, lots 32, 33, 36, 37,39-43, and 127. The project site is on the southeast corner of Frederick Douglass Boulevard and West 117th Street on a combined lot area of approximately 30,000 square feet. Lots 32, 33, 36, 39, 41, 42, 43 and 127 are subject to the UDAAP and disposition while lots 37 and 40 are only subject to the UDAAP. Disposition of lot 37 was approved by the City on June 9, 1978. Disposition of lot 40 was approved on July 23, 1981. The project is located in Community Board 10, Manhattan.

This project will involve the new construction of approximately 96 units of rental housing, which will be constructed pursuant to the guidelines of the NYC Zoning Resolution's Quality Housing Program. The project will include 8,800 square feet of ground floor retail space and approximately 15,250 square feet of community facility space located on 117th Street to be used as a charter school. In addition, approximately 2,785 square feet will be utilized as open space, divided between a second-floor terrace (1,530sf) and a playground behind the charter school (1,255sf). The project also provides for 24 on-site ground level parking spaces.

The zoning classifications for this project are R7-2 (Residential FAR 3.44 to 4.00 and Community Facility FAR 6.50), and commercial overlays C1-4 (FAR 2.00).

## SUMMARY OF COMMUNITY BOARD ACTION

On January 3, 2002 Community Board 10 held a public hearing to review this application and on the same date voted 30 in favor, 0 against with 0 abstentions to approve C 020220 HAM.

Along with the unanimous approval of the application, the Board included the following conditions:
a) The program be changed and the developer seek inclusion into the 80/20 program;
b) The buildings have sophisticated uniform signage contextual with the surrounding area;
c) The developer must undertake fuel tank removal, soil and ground water testing…;
d) Testing shall be undertaken on lots adjacent to lots 29 and 37;
e) Construction shall not commence until testing completed and approved by NYC DEP;
f) The community facility space (charter school) shall not exceed 8 floors in height.
g) If the above conditions are not implemented, then the Board's negative declaration will become null and void.

## BOROUGH PRESIDENT ACTION

The Manhattan Borough President recommends approval.

The Manhattan Borough President recommends disapproval.

 The Manhattan Borough President recommends approval, subject to the conditions detailed below.

The Manhattan Borough President recommends disapproval, unless the conditions detailed below are addressed as described.

## COMMENTS

Noting the unanimous approval of Community Board 10, the Borough President supports the designation of 2161 & 2163/67 Eighth Avenue, and 300, 306/308, 310, 312, 314, 316 and 318 W. 117th Street (Block 1943, Lots 32, 33, 36, 37, 39-43 and 127), as an Urban Development Action Area and its designation as an Urban Development Action Area Project. Moreover, pursuant to Section 197-c of the New York City Charter the Borough President supports the disposition of such property to a developer selected by HPD to facilitate the development of an eight (8)-story building with approximately 96 units of housing, retail and community facility space. It is the Manhattan Borough President's strong belief that the proposed development will further the goal of a mix of housing types along the Frederick Douglass Blvd. corridor as outlined in the Borough President's Strategy statement  The Manhattan Borough President introduces the following conditions:

The commercial signage for the proposed development along Frederick Douglass Boulevard should respect the urban design guidelines presented in the Manhattan Borough President's *Frederick Douglass Boulevard First Action Plan*.

The Manhattan Borough President is pleased that the disposition of this city-owned land addresses two critical needs in Central Harlem: the need for affordable housing production and the need for new school facilities. Additionally, the Borough President wants to ensure that construction of this project provides economic development benefits to groups that have been historically left out of this process  Therefore, as a condition to the Borough President's approval of the ULURP application No. C 020220 HAM, the Manhattan Borough President strongly recommends that the designated developer make every affirmative effort at locating and offering, via a competitive bidding process, contracts for the proposed construction and labor to Minority/Women owned Business Enterprises located in the New York City area.

The Manhattan Borough President recommends approval of this application, subject to the conditions as detailed in this report.

Report and Recommendation
Accepted:

C. Virginia Fields
Manhattan Borough President



# CoreData

*New York City's housing and neighborhood data hub, presented by the NYU Furman Center.*

CoreData.nyc information should be cited as: **NYU Furman Center's CoreData.nyc.**
For more on citing CoreData, please visit the NYU Furman Center furmancenter.org/coredata

## Property

| | |
|---|---|
| Address | 304 West 117 Street |
| Borough-Block-Lot | 1-01943-7503 |
| Year Built | 2005 |
| Building Count | 1 |
| Total Units | 116 |
| Owner | UNAVAILABLE OWNER |
| DOF Assessed Value | $10,822,949 |

## Political and Administrative Districts

| | |
|---|---|
| Borough | Manhattan |
| Community District | MN 10 - Central Harlem |
| City Council District | City Council District 9 |
| State Senate District | District 30 |
| State House District | District 70 |
| Congressional District | District 13 |
| Sub-Borough Area | Central Harlem |
| Census Tract | 36061020102 |

## Income-Targeted Units

The information is not available at this property.

## Physical and Financial Condition

| | |
|---|---|
| Tax Delinquency | None |
| Housing Code Violations | Yes |
| REAC Score | |

## Regulatory Tools

### Financing
**LIHTC 4%**

| | |
|---|---|
| Agency | NYC Department of Housing Preservation and Development |
| Project Name | LARKSPUR LLC |
| Start Date | 01/01/2005 |
| End Date | 12/31/2035 |
| Preservation Type | |
| Tenure Type | Rental |

### Property Tax Incentives
**421-a Tax Incentive Program**

| | |
|---|---|
| Agency | NYC Department of Finance |
| Project Name | |
| Start Date | 01/01/2007 |
| End Date | 01/01/2032 |
| Preservation Type | New Construction |

**Paragraph 1.A**
- *Remove ...*
  removing ...

*Why:* The way the language ... ... should be parked in the space (e.g. ... make, license plate, etc).

... problematic because ... ... ... and/or 3) guests, like ... ... the building. Leaving the lease limits ... space for these purposes, which we have ... wellbeing of the building.
- Add: "Lessee will not rent or sublet the ..."

*Why:* Our understanding is that all of this is ... tenant spot being rented out for profit. ... ... ... to be related to any prior problem with using a ... ... vehicle.

**Paragraph 2 B ii a**
- *Remove Paragraph "2 B ii a" entirely,* as it would allow Licensor the right to revoke your parking spot for any reason, other than abusing, misusing, or vacating the building, which is accounted for in Paragraph 2 B ii b. (Note: if you keep this subparagraph the Licensor could find someone willing to pay more, or could just feel like taking your spot to use for vendors or management.)

**Why consider**

*If the majority of us don't sign our parking agreements until I am comfortable with the lease, we hope to be able to protect our rights to park in the underground lot for the price at which the parking opened.*

**Thanks,**
**Your Neighbors**

# LICENSE AGREEMENT

LICENSE AGREEMENT made and entered into as of the day of 19th October 2022, by and between LARKSPUR L.L.C. a New York limited liability company, c/o Lemle & Wolff, Inc. 5925 Broadway, Bronx, NY 10463 ("Licensor") APOLLO CHIROPRACTIC PC and residing at 304 WEST 117TH STREET, Apt COMM, New York, New York 10026 ("Licensee").

## WITNESSETH:

WHEREAS, the Licensor is the owner of the multifamily rental apartment building located at 304 West 117 Street, New York, NY 10026 known as "Larkspur LLC" including, without limitation, certain garage parking spaces numbered one (1) through twenty-eleven (27) ("*Parking Space(s)*"), located in the cellar of the building; and

WHEREAS, the Licensee desires to obtain from the Licensor a limited revocable license to utilize: "Licensed Spaces(s)") in Parking Space number 14 accordance with the terms and conditions of this License Agreement; and

WHEREAS the Licensor desires to grant the Licensee a limited revocable license to utilize the Licensed Space(s) in Parking Space number 14 accordance with the terms and conditions of this License Agreement.

NOW, THEREFORE, the parties hereto, in consideration of the premises and mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agree as follows:

## 1. Grant of License.

A. Subject to the terms and conditions of this License Agreement, the Licensor grants to the Licensee a revocable license ("*License*") to utilize the Licensed Space for the purpose of parking one (1) non-commercial vehicle with the make and model number ___Audi AS___ and the license plate number ___HFE 5312___ registered in the State of ___N Y___. Notwithstanding the foregoing, in no event shall the Licensee have or claim, now or hereafter, any right, title and/or interest of any nature whatsoever in and to the Parking Spaces and/or the Licensed Space except as specifically provided in this License Agreement. The License granted to the Licensee pursuant to this License Agreement is personal to the Licensee and in no event shall any person, firm or entity other than the Licensee be permitted to utilize all or any portion of the Licensed Space, pursuant to the provisions of this License Agreement or otherwise, without the express prior written consent of the Licensor, which consent may be withheld in the sole and absolute discretion of the Licensor.

B. The Licensee hereby represents, warrants and covenants to the Licensor that, at all times during the Term of this License Agreement, the Licensee shall (i) park only in the Licensed Space(s) so as not to interfere, in any manner whatsoever, with the use of any portion of the cellar, including other Parking Spaces by the Licensor and/or any licensee of any of the other Parking Spaces and (ii) keep the Licensed Space free of all debris, trash, garbage and/or rubbish and free from stains or other marks that may be caused by fluids from the Licensee's vehicle.

C. The Licensee hereby acknowledges, represents, warrants, and agrees that at no time, now or hereafter, shall this License Agreement, or the License granted to the Licensee herein, be deemed to be a landlord-tenant relationship between the Licensor and the Licensee, express or implied, of any nature whatsoever. Any claim made by the Licensee in contravention of the provisions of this paragraph 1.C shall be deemed void ab initio and, in the event of any such claim, the Licensor shall immediately be entitled to seek injunctive relief in any court of competent jurisdiction restraining the Licensee from pursuing any such claim.

D. Licensor reserves the right to change the Licensed Space assigned to the Licensee upon no less than twenty-four (24) hour written notice to the Licensee in the manner prescribed in paragraph 7 hereof.

## 2. Term of License Agreement.

A. This License Agreement shall commence on January 1, 2023 and shall continue up to and including the date that this License is terminated by either the Licensee or the Licensor in accordance with the terms and conditions of paragraph 2.B herein below ("*Term*").

B. i. The Licensee shall have the right to terminate this License Agreement as of the last day of a calendar month and upon no less than thirty (30) days prior written notice to the Licensor in the manner prescribed in paragraph 7 hereof.

181273.1

| ...ysical Condition | 2. Maintenance Policies and Practices |
|---|---|
| ...uperior __X_ Satisfactory ____ Below Average ____ Unsatisfactory | ___ Superior _X_ Satisfactory ____ _Below Average ____ Unsatisfactory |
| ...ant: In part E, Explain the basis for any below average or unsatisfactory rating | |

art E: Comments. Cross reference each comment to a line item in part B, C or D of this report. Attach additional sheets, if needed.

Part                                                   Date

Line

Reference                                                     Closed

## _304 West 117th Street, New York, NY 10026_

**A-7**    There are seven (7) commercial tenants:
1. Prudential Real Estate
2. Bakery
3. Carrot Health Food
4. Dry Cleaners
5. Vacant
6. Chiropractor
7. Subway
8. Metro PCS Cell Tower

**B/**    **HDC REFERENCE NOTE**: The project consists of one (1) seven (7) story elevator building with a basement. The project has a 27 space garage as well as two elevators. It shares its boiler room with Little Larkspur, another HDC project owned and managed by Lemle & Wolfe.

**B-1**    !a) Monitor the efflorescence evident on the bulkhead and the exterior walls. Recommend power-washing the affected areas. (HDC CODE AA)

b) Visible holes were present on the stone panels above the bakery. In addition, the water and rust stains were stemming from the holes. The penetration poses possible water infiltration into the wall cavity and ultimately, it will damage the exterior and interior walls. Remedy the problem.

c) Visible holes were present on the stone panels adjacent to an exterior light and a CCTV camera at the southeast corner of the building. The penetration poses possible water infiltration into the wall cavity and ultimately, it will damage the exterior and interior walls. Remedy the problem.

d) There were graffiti on the door of retail store 2163. Remove the graffiti.

**B-2/**    **HDC Reference Note:** A telecommunication company called "Metro PCS" is leasing the roof.

**B-2**    Water ponding was present near the tenant balcony on the lower roof. Monitor the roof for any leakages and re-level the roof slope for proper roof drainage.

**B-4**    There is one (1) handicapped parking space located in the parking lot. However, the handicapped space was not accessible due to the recycled and regular garbage and it poses an ADA accessibility issue. Remedy the problem by relocating the garbage cans to another location and provide a clear path for the user to access the handicapped space. Consult with the ADA guidelines for further information.

**B-5**    a) There were cracks on the concrete sidewalks adjacent to a light pole on Fredrick Douglas Boulevard. Repair the sidewalks.

b) There were cracks on the concrete sidewalks adjacent to trees on West 117th Street. Repair the sidewalks.

| Unique ID Building | Borough | Address | Income Restricted Units | Market Rate and Income Restricted Units | Registered Units |
|---|---|---|---|---|---|
| 117 | Bronx | 330 E 148TH ST | 0 | 3 | 4 |
| 118 | Queens | 104-29 37TH RD | 0 | 0 | 4 |
| 119 | Brooklyn | 504 MYRTLE AVE | 29 | 143 | 143 |
| 120 | Queens | 93-15 LAMONT AVE | 0 | 0 | 8 |
| 121 | Queens | 30-92 29TH ST | 0 | 53 | 55 |
| 122 | Queens | 37-36 75TH ST | 0 | 0 | 4 |
| 123 | Queens | 44-33 COLLEGE POINT BLVD | 0 | 3 | 3 |
| 124 | Queens | 84-10 127TH ST | 0 | 0 | 4 |
| 125 | Queens | 37-50 108TH ST | 0 | 3 | 4 |
| 126 | Brooklyn | 103 TROUTMAN ST | 0 | 0 | 8 |
| 127 | Bronx | 1684C BANYER PL | 0 | 6 | 6 |
| 128 | Bronx | 128 E CLARKE PL | 0 | 0 | 64 |
| 129 | Queens | 23-27 31ST RD | 0 | 14 | 14 |
| 130 | Queens | 37-46 108TH ST | 0 | 0 | 4 |
| 131 | Brooklyn | 88 JEFFERSON ST | 0 | 0 | 15 |
| 132 | Bronx | 150 E 151ST ST | 0 | 6 | 6 |
| 133 | Manhattan | 189 AVENUE C | 0 | 8 | 9 |
| 134 | Queens | 88-35 51ST AVE | 0 | 0 | 5 |
| 135 | Queens | 27-13 21ST ST | 0 | 49 | 49 |
| 136 | Queens | 43-28 COLDEN ST | 0 | 4 | 4 |
| 137 | Queens | 40-21 69TH ST | 0 | 0 | 6 |
| 138 | Queens | 143-19C 38TH AVE | 0 | 0 | 4 |
| 139 | Brooklyn | 878 METROPOLITAN AVE | 1 | 1 | 7 |
| 140 | Manhattan | 453 W 37TH ST | 80 | 80 | 394 |
| 141 | Brooklyn | 543 CARROLL ST | 0 | 8 | 8 |
| 142 | Queens | 35-09 LEAVITT ST | 0 | 0 | 6 |
| 143 | Brooklyn | 93 WAVERLY AVE | 0 | 7 | 7 |
| 144 | Queens | 40-43 97TH ST | 0 | 1 | 5 |
| 145 | Manhattan | 600 W 58TH ST | 13 | 65 | 65 |
| 146 | Queens | 25-15 CRESCENT ST | 0 | 0 | 12 |
| 147 | Brooklyn | 428 HICKS ST | 0 | 8 | 8 |
| 148 | Queens | 27-03 42ND RD | 0 | 142 | 142 |
| 149 | Bronx | 937 CROES AVE | 0 | 0 | 7 |
| 150 | Brooklyn | 415 RED HOOK LN | 0 | 74 | 108 |
| 151 | Bronx | 524 E 236TH ST | 0 | 0 | 25 |
| 152 | Queens | 41-39 COLLEGE POINT BLVD | 0 | 3 | 3 |
| 153 | Bronx | 1319A PROSPECT AVE | 2 | 7 | 7 |
| 154 | Queens | 54-21 102ND ST | 0 | 0 | 6 |
| 155 | Bronx | 3612 BARNES AVE | 0 | 3 | 10 |
| 156 | Brooklyn | 66 AINSLIE ST | 10 | 48 | 49 |
| 157 | Queens | 65-84 AUSTIN ST | 0 | 0 | 66 |
| 158 | Queens | 187-21 HILLSIDE AVE | 0 | 6 | 6 |
| 159 | Brooklyn | 20 N 5TH ST | 0 | 0 | 113 |
| 160 | Manhattan | 300 W 117TH ST | 0 | 0 | 116 |
| 161 | Queens | 2-11 27TH AVE | 0 | 0 | 8 |
| 162 | Brooklyn | 103 VARET ST | 2 | 8 | 8 |
| 163 | Queens | 44-35 COLLEGE POINT BLVD | 0 | 1 | 3 |
| 164 | Queens | 93-06 SHORE FRONT PKWY | 0 | 0 | 64 |
| 165 | Queens | 99-39 66TH AVE | 0 | 36 | 38 |
| 166 | Brooklyn | 1815 EASTERN PKWY | 0 | 10 | 10 |
| 167 | Brooklyn | 2417 ALBEMARLE RD | 0 | 0 | 43 |
| 168 | Bronx | 2007 LAFONTAINE AVE | 0 | 0 | 88 |
| 169 | Queens | 35-26 150TH PL | 0 | 4 | 4 |
| 170 | Brooklyn | 836 BEDFORD AVE | 0 | 8 | 9 |
| 171 | Brooklyn | 480 STRATFORD RD | 0 | 14 | 14 |
| 172 | Brooklyn | 186 MESEROLE ST | 0 | 6 | 7 |
| 173 | Brooklyn | 90 MESEROLE ST | 0 | 7 | 8 |
| 174 | Manhattan | 332 E 22ND ST | 14 | 14 | 14 |

*HDC Document*

# INTEROFFICE MEMORANDUM

| | |
|---|---|
| Date: | **January 25, 2006** |
| To: | File |
| From: | John Fagan |
| Subject: | **CEQR findings: 300 – 314 West 117th Street, Manhattan Block 1943; Lots 32, 33, 36, 37, 39-43, and 127** |

The City of New York through its Department of Housing Preservation and Development ("HPD") has acted as *"lead agency"* pursuant to the State Environmental Quality Review Act ("SEQRA") regulations and the City Environment Quality Review ("CEQR") procedures regarding the development of a residential housing facility that will cover the subject addresses.

On <u>March 12, 2004</u> HPD issued a Type II Declaration under CEQR/SEQRA (attached), which found that this Project is "not likely to have any significant impacts and therefore, requiring no further environmental review."

By letter dated February 9, 1983 (copy attached), HDC and HPD agreed to coordinate their environmental assessments of the projects jointly acted upon by both agencies. This is in compliance with SEQRA regulations, 6 N.Y.C.R.R. Section 617.14(d) which states: *"agencies are strongly encouraged to enter cooperative agreements with other agencies regularly involved in carrying out or approving the same actions for the purpose of coordinating their procedures."* HDC agreed to rely upon and defer to HPD's environmental assessments for HDC financed properties that are reviewed and approved by HPD.

HDC's reliance on HPD's Negative Declaration for the Project falls within the scope of the February 9, 1983 environmental review procedures coordination agreement between HPD and HDC. (See also 6 N.Y.C.R.R. Section 617.3(h)). Therefore, the findings and filings made by HPD for the Project are accepted by HDC and no further SEQRA actions are required.

Jf691/915/955



TS 000462


S 000463



Today
11:30 AM

TS 000460


TS 000461





Alice Lombardo Maher, M.D.
350 Central Park W, Ste 1G
New York, N.Y. 10025
212-866-1883 (tel)
212-662-5098 (fax)

September 13, 2023

To Whom It May Concern:

I am a psychiatrist licensed to practice in New York State, License No 129617. Coanne Wilshire has been under my care since 2006 for the treatment of anxiety and other life stressors.

In recent years, her dynamics have centered around the loss of her handicapped parking space in 2018 and the psychological aftereffects. She has worked very hard to regain, not just her parking space, but all that it represents to her. Her process is unique and a significant step toward healing.

In my medical judgment, the ability to share her story, and help others in similar situations, is an essential part of the healing process.

Respectfully,

Alice Lombardo Maher, M.D

🔍

**News Releases:   Headquarters | Chemical Safety and Pollution Prevention (OCSPP)**

CONTACT US <https://epa.gov/newsreleases/forms/contact-us>

# Biden–Harris Administration Finalizes Ban on Most Uses of Methylene Chloride, Protecting Workers and Communities from Fatal Exposure

## Rule requires stronger worker safety requirements for remaining industrial uses

April 30, 2024

### Contact Information
EPA Press Office (press@epa.gov)

**WASHINGTON** – Today, April 30, 2024, the U.S. Environmental Protection Agency finalized a ban on most uses of methylene chloride <https://epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-methylene-chloride>, a dangerous chemical known to cause liver cancer, lung cancer, breast cancer, brain cancer, cancer of the blood, and cancer of the central nervous system, as well as neurotoxicity, liver harm and even death. Ending most uses of methylene chloride will save lives and complements President Biden's Cancer Moonshot ☑ <https://www.whitehouse.gov/cancermoonshot/>, a whole-of-government initiative to end cancer as we know it.

EPA's final action, also known as a risk management rule under the Toxic Substances Control Act (TSCA), will protect people from health risks while allowing key uses to continue safely with a robust new worker protection program. This is the second risk management rule to be finalized using the process created by the 2016 TSCA amendments <https://epa.gov/assessing-and-managing-chemicals-under-tsca/frank-r-lautenberg-chemical-safety-21st-century-act>.

"Exposure to methylene chloride has devastated families across this country for too long, including some who saw loved ones go to work and never come home," **said EPA Administrator Michael S. Regan**. "EPA's final action brings an end to unsafe methylene chloride practices and implements the strongest worker protections possible for the few remaining industrial uses, ensuring no one in this country is put in harm's way by this dangerous chemical."

"The USW applauds EPA's final rule banning certain uses of methylene chloride and lowering allowable workplace exposure levels. More than 100,000 workers die from occupational disease each year, including those sickened by harmful chemical exposures. Our union fought for the updated Toxic Substances Control Act so that we could ensure that worker exposures to harmful substances like methylene chloride are appropriately assessed and regulated at harmful levels. Now, thanks to the current administration, workers are safer and better protected," **said David McCall, International President, United Steelworkers.**

"Today's announcement to ban most commercial uses of the toxic chemical methylene chloride in paint strippers is a significant step to protect more workers from this deadly chemical," **said Sarah Vogel, Senior Vice President for Healthy Communities at Environmental Defense Fund.** "We are honored to stand beside the Hartley family, who has bravely shared their story to encourage this long overdue action that will save lives."

Methylene chloride is used by consumers for aerosol degreasing and paint and coating brush cleaners, in commercial applications such as adhesives and sealants, and in industrial settings for making other chemicals. For example, methylene chloride is used in the production of more climate-friendly refrigerant chemicals.

"My son, Kevin, died in 2017 from methylene chloride exposure from refinishing a bathtub at work. I am pleased that the EPA is finally taking action and banning methylene chloride as a commercial bathtub stripper. This is a huge step that will protect

vulnerable workers," **said Wendy Hartley, mother of Kevin Hartley,** who died from methylene chloride poisoning.

Since 1980, at least 88 people have died from acute exposure to methylene chloride, largely workers engaged in bathtub refinishing or other paint stripping, even, in some cases, while fully trained and equipped with personal protective equipment. While EPA banned one consumer use of methylene chloride in 2019, use of the chemical has remained widespread and continues to pose significant and sometimes fatal danger to workers. EPA's final risk management rule requires companies to rapidly phase down manufacturing, processing and distribution of methylene chloride for all consumer uses and most industrial and commercial uses, including its use in home renovations. Consumer use will be phased out within a year, and most industrial and commercial uses will be prohibited within two years.

EPA's methylene chloride rulemaking also establishes landmark worker protections under the nation's premier chemical safety law. For a handful of highly industrialized uses, EPA has created a Workplace Chemical Protection Program. This workplace chemical protection program has strict exposure limits, monitoring requirements, and worker training and notification requirements that will protect workers from cancer and other adverse health effects caused by methylene chloride exposure.

Uses that will continue under the Workplace Chemical Protection Program are highly industrialized and important to national security and the economy. These are uses for which EPA received data and other information that shows workplace safety measures to fully address the unreasonable risk could be achieved. These uses include:

1. Use in the production of other chemicals, including refrigerant chemicals that are important in efforts to phase down climate-damaging hydrofluorocarbons under the bipartisan American Innovation and Manufacturing Act <https://epa.gov/climate-hfcs-reduction/aim-act>.
2. Production of battery separators for electric vehicles.
3. Use as a processing aid in a closed system.
4. Use as a laboratory chemical.
5. Use in plastic and rubber manufacturing, including polycarbonate production.
6. Use in solvent welding.

Additionally, specific uses of methylene chloride required by the National Aeronautics and Space Administration, the Department of Defense, and the Federal Aviation Administration will also continue with strict workplace controls because sufficient reductions in exposure are possible in these highly sophisticated environments, minimizing risks to workers.

For uses of methylene chloride continuing under the Workplace Chemical Protection Program, most workplaces will have 18 months after the finalization of the risk management rule to comply with the program and would be required to periodically monitor their workplace to ensure that workers are not being exposed to levels of methylene chloride that would lead to an unreasonable risk. In consideration of public comments on the proposal, EPA extended the compliance timeframe to give workplaces ample time to put worker protections in place. EPA also revised several other aspects from the proposal including ensuring the Workplace Chemical Protection Program applies to the same uses whether they are federal or commercial uses, establishing a *de minimis* concentration, and provisions to strengthen and clarify aspects of the Workplace Chemical Protection Program such as monitoring requirements.

EPA will also host a public webinar to explain what is in the final rule and how it will be implemented. The agency will announce the date and time in the coming weeks.

For more information, please read the Risk Management for Methylene Chloride page <https://epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-methylene-chloride>.

Contact Us <https://epa.gov/newsreleases/forms/contact-us> to ask a question, provide feedback, or report a problem.

LAST UPDATED ON APRIL 30, 2024



# Discover.

**Accessibility Statement** <https://epa.gov/accessibility/epa-accessibility-statement>

**Budget & Performance** <https://epa.gov/planandbudget>

**Contracting** <https://epa.gov/contracts>

**EPA www Web Snapshot** <https://epa.gov/utilities/wwwepagov-snapshots>

**Grants** <https://epa.gov/grants>

**No FEAR Act Data** <https://epa.gov/ocr/whistleblower-protections-epa-and-how-they-relate-non-disclosure-agreements-signed-epa>

**Plain Writing** <https://epa.gov/web-policies-and-procedures/plain-writing>

**Privacy** <https://epa.gov/privacy>

**Privacy and Security Notice** <https://epa.gov/privacy/privacy-and-security-notice>

# Connect.

**Data** <https://epa.gov/data>

**Inspector General** <https://www.epaoig.gov/>

**Jobs** <https://epa.gov/careers>

**Newsroom** <https://epa.gov/newsroom>

**Regulations.gov** ☑ <https://www.regulations.gov/>

**Subscribe** <https://epa.gov/newsroom/email-subscriptions-epa-news-releases>

**USA.gov** ☑ <https://www.usa.gov/>

**White House** ☑ <https://www.whitehouse.gov/>

# Ask.

**Contact EPA** <https://epa.gov/home/forms/contact-epa>

**EPA Disclaimers** <https://epa.gov/web-policies-and-procedures/epa-disclaimers>

**Hotlines** <https://epa.gov/aboutepa/epa-hotlines>

**FOIA Requests** <https://epa.gov/foia>

**Frequent Questions** <https://epa.gov/home/frequent-questions-specific-epa-programstopics>

# Follow.

    

Visit ups.com for details on our privacy practices.

COANNE WILSHIRE
2124647973
304 W 117TH ST
NEW YORK  NY 10026

**1 LBS**      **1 OF 1**

DWT: 11,9,1

**SHIP TO:**
PRO SE INTAKE UNIT
SOUTHERN DISTRICT COURT NEW YORK
GOVERNMENT OFFICE
500 PEARL ST
**NEW YORK  NY  10007**



# NY 102 9-10

# UPS GROUND

TRACKING #: 1Z 8TM 0L0 03 0139 2226



BILLING: P/P

XOL 24.07.06      NV45 28.0A 07/2024*

™