**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COANNE WILSHIRE,
Plaintiff,
-against-
L&M DEVELOPMENT PARTNERS, et al.
Defendants.

No. 20-CV-7998 (OTW)

**AFFIRMATION OF**
**COANNE WILSHIRE**

COANNE WILSHIRE,
Plaintiff,
-against-
LEMLE& WOLFF INC. et al.
Defendants.

No. 24-CV-1756 (OTW)

<u>AFFIRMATION OF COANNE WILSHIRE ~ PRELIMINARY STATEMENT</u>

My name is Coanne Wilshire, pro se Plaintiff and long-term resident at Larkspur – 304 West 117th Street, in Central Harlem. My background as a Public Facing, lifestyle imaging and promotional initiative creator, in entertainment, private sector and government.  I did not make a lot of money per se but work came with a bounty of invaluable perks, that made for high-end living.  *See EXHIBIT B1*

In the early 2000s due to the development of bony deformities of both feet, life as I knew it was destined to change. I needed to drastically simplify and downsize to ensure I could keep a roof over while I figured out how to pivot for the first time in my adult life.

I studied Bloomberg's 2003 New Housing Marketplace Plan (NHIP) and applied to offerings with nice apartments and availability of a handicap parking space.

Because of my new circumstances and because I have been a creator myself, I was fully sold on the sociological aspects of the NHIP initiatives and its marketing of Larkspur, a luxury building. with inclusion that supports diversity.   Knowing I had a roof over my head and a solution to mobility with a handicap

1

parking space, I sought out mental-wellness component I needed to accept the limitations of my disability and create a new normal for a fulfilled life. My work had defined how I saw myself and I believed how others saw me. It was difficult to accept myself as a person with a disability. Especially a disability that affected how my feet looked, which came with its own deep-seated cultural biases.

After successfully creating initiatives *which are still carried on today*, that garnered accolades and recognition from City Council, Mayor's office and the Governor's office in the **Deep South**, it never occurred to me that I would ever be entrenched in a multifaceted, insidious orientation of discrimination. Defendants were alternately covert and in-my-face, at the same time. I was experiencing discrimination for the first time in my life, in-my-beloved New York, at my big age. I was devastated knowing how I'm being treated is connected to my disability. Defendants placed white slats of wood in the access aisle to not crowd Parking Space No. 26 with refuse and to keep the bulk of garbage on Parking Space No. 25.

When I complained that the dust and garbage was overwhelming me at my handicap parking space, -- I was told I did not rent a handicap parking space and only Parking Space No. 26 is a handicap parking space. When I made a complaint to about the disability rules on my parking space, -- Defendants used White paint to disguise the standard FHA Accessibility design at Parking Space No. 25.

When I asked to be transferred to Parking Space No. 26, I was told I'm not in a wheelchair so they did not have to transfer me. Then in a backwards attempt to cover themselves on the same day they offered Handicap Space No. 26 to the long-term tenant confined to a wheelchair. The tenant told me she had been on the waiting list for years before so when they out-of-the-blue offered her a handicap space, she thought Defendants were offering her free. Space.

Defendant's Position Statement in response to my DHR complaints, denied Defendants knew ever notified them that she had a handicap, despite Defendant's Tenant Record for Plaintiff, containing many conspicuous disability notices throughout the record, beginning with Plaintiffs' 2004 Rental Application. Defendants seem to believe Plaintiff should have a Handicap stamp on her forehead, the anthesis of FHA.

Defendants weaponized their lawyers against me in DHR filings for more than two years. Defendants happily incurred legal fees when it was for me to be bullied.

The timing of the Pablo Rios years was the worst possible, I was helping to care for my Mom as she cared for my Dad who had fallen at home in 2017., I should be executing a plan I had worked really hard with my Psychiatrist to "get back out there" in 2018, after an idea that would have allowed me to remain hidden from the world, failed in 2012 and rocked my confidence again.

In 2018, I was supposed to be presenting my ideas in front of people in order to have "changed circumstances" ahead of looming senior citizenship.

My emotions were out of control, I became a fearful, person.  Trying my best to use reason and logic to get Defendants to return my parking space rental to its original condition.  Instead, conditions got worse, I felt like it was Pablo Rios job to erase me.  In Defendant's Position Statement response, to my first DHR complaint, Ms. Smith wrote, "**specifically** Ms. Wilshire's parking space is next to a **Half Space**, which is used by the building for storage, when there is construction in the building." *See EXHIBIT A1* Astoundingly, DHR Executive Ms. Iris Carrasquillo, repeated Ms. Smith's claims, actually putting in writing that the shared Access Aisle between Handicap Parking Space No. 25 and Handicap Parking Space No. 26, is indeed a "Half Space, for storage, when there is construction in the building."

I was in the Twilight Zone, the agency tasked with fair review of disability discrimination, does not recognize required features of Accessibility.   Even if such a thing as a **Half-Space** existed *(which it does not)* the dump of uncontained construction refuse and excess garbage on an open-lot, would be against all NYC and NYS laws.

It cannot be plausible that Defendants, and Ms. Carrasquillo are incapable of recognizing the visual of a blue rectangle with diagonal blue lines within.  The blue marking were badly faded from the excessive dust and garbage but still visible, especially to housing providers, an "Investigator" and a Lawyer.    I had 30 days to appeal to State Court, but a State agency, was so outrageously flawed in its Determination, I could not trust

State Court.  In my second DHR Case No. 10210288, Plaintiff discovered Defendants were in cahoots with DHR representative, Ms. Iris Carrasquillo. *See Document Entry 100*

Defendants had no legal expense burden when the government agency was obviously not fairly reviewing my complaints and silencing my voice.  Defendants heinous disregard for Accessibility laws continued to be perpetrated in-between Plaintiffs' filings.   Whether its 2018 – 2021, 2020 – 2022 or 2022 – 2024, I am a human-being, with inalienable rights under the Constitution, also Human Rights, and Housing Rights of Protected Class.  The **dash** *(time)* between the years Defendants made me unnecessarily suffer, Matter.

The outright lies in Defendants Position Statement were so flagrant and DHR's investigation so void of fair review, it snapped me out of my fear-cloud.  I set about gathering evidence that I could get validated by government agencies, knowing I would need more than truth to counter the lies Defendant's reflexively present.

I started my search at New York City Department of Buildings (DOB), combing through microfiche to find approved site-plans to prove there are two handicap spaces on the Lot and I rented one of them.  It was the time of Covid, I had a car waiting, and I could not quickly comprehend the microfiche images. microfiche.  I paid for copies of all 28 slides so I could examine them more closely at home. I found proof of two parking spaces, along with construction inconsistencies that led to my discovery of affordable housing fraud.  All things litigation would have never happened if Defendants did in 2018, what the decided to do one random day, in 2024.

It may have been late December 2023, when Defendants put up a Handicap Sign at Parking Space No,25, cleared the access aisle/ access route, primarily stopped using tenants parking spaces while tenants were not parked, indicated that I had a qualified disability, things they **denied** to DHR and throughout Civil Case 1:20-cv-07998. *See Document Entries 80-84*.

## STATEMENT OF FACTS

2. In 2023 I spent time and money going away for a month so the floor completion could be done.

Defendants kept delaying scheduling, until Plaintiff got the hint that her floors would not be completed without signing Defendant's gag-order, posing as a settlement offer.

2. I returned home to a ghetto-mess which I've been forced to reside in ever since. As a person to whom surrounding is very important, I feel like a little of my spirit dies every day. This is why I offered conciliation of HUD for unit transfer, which should be a no-brainer for Defendants. Unless they are not educated on rules and laws against HOUSING discrimination.

3. In official DOB records, **Sandy Loewentheil** is listed along with **Frank Anelante** as Owner-Representatives of L&M Managers, LLC. Plaintiff opposes Defendants request to remove Larkspur Managers LLC from filings. In United States of America vs. Larkspur LLC, and LARKSPUR MANAGERS LLC, et al, **Case 1:11-cv-06321-DAB**, *even though Larkspur Defendants reneged*, a Consent Decree was duly signed and Ordered, without Larkspur Managers, LLC claims of non-ownership **Sidebar: In United States of America vs. Larkspur LLC, and Larkspur Managers, LLC, et al, the L&M Larkspur Investor Member, LLC remained hidden from the US Attorney General's Office.**

4. In DOB records Larkspur is represented as ONE residential building, Address: 300-318 West 117th Street a/k/a 2161-2169 Frederick Douglass Blvd. (formerly Eighth Ave) *See BIS NYC*. *See Case 1:11-cv-06321-DAB, Document #20, January 26, 2012.*

5. L&M Defendants gave Lemle & Wolff, a huge leg up by pushing them into large scale development site acquisition of Larkspur. Lemle & Wolff then used Larkspur *(and Plaintiff's unit)* to elevate further allowing Lemle & Wolff to acquire HPD contracts on their own and with L&M Defendants, etc.
Lemle & Wolff used Plaintiffs' unit as their model-apartment, as developer and developer funding professionals towards growing their company. By 2015 when the property ran out of space for refuse, Lemle & Wolff increasingly removed accessibility and usability from Handicap Parking Space No. 25 and its accompanying access aisle/access route. When Plaintiff complained, she was evicted using a thinly veiled pretext.

6. **L&M Larkspur Investor Member LLC**, DOS ID 2772654, formed **May 30, 2002**, **facilitated acquisition** from which everything unlawful at Larkspur, including Fannie Mae loan and discriminatory conduct against Plaintiff is derived.

7. In Defendants housing scheme a dictate for a 160-desk Charter School to **enhance the existing community** is eliminated and converted into 22 additional units, without expanding allotted space for the refuse room or the [Ghost] parking lot, sized for 24 parking spaces.

In Plaintiffs' original 120-cv-07998 filing, Marshals attempted to serve Larkspur Managers LLC at 590 Franklin Ave, Mt. Vernon NY 10550 but were unsuccessful. *See Docket Entry 12.*

8. **590 Franklin Ave, Mt. Vernon NY 10550**, is/was a known address of **Steven Judelson** the HPD Selected Sponsor awarded the large-scale development site upon which Larkspur is constructed. The address is also associated with an LLC of L&M Defendants named "**The LLC**", and with **Great American Construction** *founder* **Thomas Metallo** who is a managing member of Larkspur LLC and Larkspur Managers, LLC.

**William Clarke**, an Executive of Great American Construction is also associated with, 590 Franklin Ave, Mt. Vernon NY 10550. William Clarke is a name associated with *reportedly* **HPD's biggest racketeering scandal**, which ran from 2000-2011.

9. In retrospect, it is par for the course, how real estate professionals known as slumlords in inner-city during the 80s and 90s, are awarded abundant land contracts in the 2000s.

10. Upon information and belief, Steven Judelson **who HPD named as the SPONSOR** may be a *Shill* or *Straw Buyer*. Judelson is the Sponsor but is not a managing member of Larkspur LLC.

Defendants acquired 10 Lots but only registered 9, getting away with having a Ghost Parking from April 2005 to December 2022. Defendants acquired Lot 2161 - 2167 Eighth Ave (Frederick Douglass Blvd) but fraudulently registered 2161-**2169**. *See EXHIBIT B1*

11. In HUD 02-22-0807 and Civil Case 1:20-cv-07998-OTW, Defendants describe the building as having fifty-

some-odd units.  In **L&M Development Partners** leasing advertisement, commercial spaces and 18 units are listed to address, **2161-2169 Frederick Douglass Blvd**.

12. The development is unlawfully sliced and dissected among a syndicate of stakeholders.  The demands of the Cornerstone Program, Project Summary is contradicted by New York Housing Preservation and Development's (HPD) sister-agency New York Housing Development Corporation (HDC).  Another incident of Disparate Effect.

13. Defendants authorized building-staff and third-party building staff to spy on me and take clandestine pictures of me with any guest they suspected to be City Officials.

14. The group of real estate "professionals" (stakeholders) involved with Larkspur have "solved" any question of affordable housing programs being too restrictive, by agreeing to everything needed to gain approval from, Community Board, Planning Commission, Borough President's Office etc. then use the property as desired for predatory profits.

15. Whenever Plaintiff would tell the Building Super the things he was saying and doing to me were illegal, the Super would tell Plaintiff, "I told the office what you said and they said they had lawyers for that".

16. Defendants tell a different story about me depending on which agency they are speaking to.  In Civil Case No: 120-cv-07998, Defendants claim they legitimately terminated Plaintiff from Handicap Parking Space No. 25, but to my complaint for Defendants insisting I sign a one-sided License Agreement instead of a issuing a parking Lease, Defendant's affirm to DHCR that I voluntarily gave up Parking Space No. 25.
On an obviously discriminatory inspection notice, left on the **17** of the 19 doors of 20% tenants.  Ms. Smith writes that "Rios listed the 17 of 19 units as "a matter of efficiency" and submitted two manufactured to cover-up the first. Grouping select persons in a category, is a known practice of Racists.  I have endured too much in fighting for the truth of myself and tenants like me to be heard. I ask that Defendants not be allowed to delay the Proceedings any further.

s/Coanne Wilshire

One does not to be familiar with the Inspection process to see how nonsensical the additional November notices are, or how opposite of efficient it would be to add a list of units to the notice.



# HARLEM CONGREGATIONS FOR COMMUNITY IMPROVEMENT, INC.

2854 Frederick Douglass Blvd, New York, NY 10039 • (212) 281-4887 Tel • (212) 281-8102 Fax • www.hcci.org

**EMPOWERING HARLEMITES
REBUILDING COMMUNITIES**

established
1986

**OFFICERS**
Canon Frederick B. Williams
*Chairman of the Board*

Rev. Dr. Edward E. Johnson
*1st Vice Chair*

Ms. Bernell K. Grier
*2nd Vice Chair*

Apostle William Brown
*3rd Vice Chair*

Hans E. Hageman, Esq.
*Treasurer*

Bishop Roger Rhoss
*Secretary*

Imam Izak-El Mu'eed Pasha
*Assistant Secretary*

Lucille L. McEwen, Esq.
*President/CEO*

**BOARD OF DIRECTORS**
Rev. Walter C. Barton, Jr.
Rev. Dr. John E. Carrington
Ms. Pearline Cox
Ms. Evelyn Cunningham
Rev. Dr. Charles Curtis
Mr. Larry Dais
Ms. Sharon Davison
Mr. Elijah Etheridge
Rev. Dr. James A. Forbes, Jr.
Rev. Earl Kooperkamp
Muriel Petioni, M.D.
Bishop Norman Quick
Imam Talib' Abdur Rashid
Rev. Dr. Adolph Roberts
J. Phillip Thompson, Ph. D.

**TRUSTEE EMERITUS**
Rev. Dr. Wyatt Tee Walker

February 9, 2004

Ms. Peggy Joseph
Vice President
New York City Housing
Development Corporation
100 William Street, 10th Floor
New York, New York 10038

Re:     **Notice of Intent to Begin Marketing
Larkspur, LLC
306-318 West 117th Street
New York, NY 10027
76 Middle Income Units**

Dear Ms. Joseph:

The above referenced project is nearing completion, and we expect apartment units to become available in the summer of 2004.

We will establish a Post Office Box to receive applications.

The community contact letters will be mailed on or about March, 2004.

In addition, the print media advertising listed in the marketing will commence on or about March, 2004.

If you have any questions or require additional details, please feel free to contact me at 212 234-5200

Sincerely,

Yvette Coar
Director, Marketing Sales

C: Carrie Reich, L & M
    Ron Moelis, L & M
    Rubin Wolf, NYCHPD
    Frank Anelante, L & W

| Office of Health & Wellness Strategies | Office of Real Estate Development | Family Life & Conference Center | Bradhurst Academy of Excellence | Bradhurst Village Career Center |
|---|---|---|---|---|
| (212) 283-5268 PH | (212) 283-1377 PH | (212) 491-3315 PH | (212) 926-3015 PH | (212) 491-5280 PH |
| (212) 283-7243 FAX | (212) 283-2194 FAX | (212) 491-3539 FAX | (212) 926-2957 FAX | (212) 491-5058 FAX |

**NEW YORK CITY HOUSING DEVELOPMENT CORPORATION**

**Marketing Plan Summary Sheet**
**New Housing Opportunities Program**

It is recognized that HDC and the owner have a mutual interest in ensuring that the marketing program is consistent with HDC program standards and regulatory provisions and that the rental of the units is accomplished in a manner which advances the policy objectives of the New Housing Opportunities Program. The primary objective of the marketing and rent-up effort will be to achieve the ethnic, age and geographic diversity of tenants as well as a pool of disabled applicants with mobility, visual or hearing impairments that require accessible/adaptable units. However, while HDC has set forth general principles relating to the marketing and management process of the units, the owner will have primary authority and responsibility for the marketing and rent-up of each project. The owner also needs to be aware of its responsibility to comply with all fair housing and equal opportunity and other governmental requirements as may be applicable.

This Summary Sheet may be utilized to outline the major components of your Marketing Plan. You may feel free to call HDC to discuss any questions you may have in preparing your marketing plan.

Sample Summary Sheet

A.     **Owner**

Name: _Larkspur, LLC_

Address: _c/o 1865 Palmer Avenue_          *L+M address*

Phone Number: **914 833-3300**

B.     **Project**

Name: _____306-318 West 117th Street_____      ← *manipulating aka address to*

Location: _____West 117th Street and Frederick Douglass Blvd_____   *hide fraudulent use.*

No. Of Units:                    Initial Rents
**Very Low**

0 BR  0 _____                    ____0_____
1 BR  1 _____                    $425.00 _____
2 BR  2 _____                    $512.00 _____
3 BR _____                    _____

No. Of Units:                    Initial Rents
**Low**

0 BR  0 _____                    ____0_____
1 BR  4 _____                    $542.00 _____
2 BR  10 _____                   $653.00 _____
3 BR  2 _____                    $757.00 _____

2484 pdf

Menu

Posted on April 27, 2017 by Haisten Wills in Loans, Multifamily, New York, Northeast, Retail



*The Larkspur is a mixed-use property in the Central Harlem neighborhood of Manhattan.*

NEW YORK CITY — Bellwether Enterprise Real Estate Capital, the commercial and multifamily mortgage banking subsidiary of Enterprise Community Investment, has secured $37 million in financing for The Larkspur, a mixed-use property in the Central Harlem neighborhood of Manhattan. The eight-story building includes 116 apartment units along with seven ground-floor commercial spaces. Bellwether provided a fixed-rate CMBS loan with a 12-year term through Fannie Mae. The terms of the financing ensure that at least 20 percent of the units are reserved for low-income families or individuals. Jim Gillespie of Bellwether Enterprise's New York office arranged the loan for The Lemle & Wolff Cos.

    

loans

Ms. Smith, the initial HUD investigation conclusion highlighted the year 2017, which illuminated the following information which I will be distributing, use in our litigation or must be factored into consideration of Settlement.
Certainly the character of both parties matter.

The article states the 2017 Fannie Mae loan is acquired for Lemle & Wolff not Larkspur LLC.

Lemle & Wolff claims to strictly be the property management company, despite also being the Owner of 300-318 West 117th Street, MN NY 10026.

LARKSPUR LLC is listed as the corporate title Owner of Larkspur: 300-318 West 117th Street, MN NY 10026.
The Managing Members of LARKSPUR LLC is Frank Anelante, Joseph Zitolo (Lemle & Wolff) and Thomas Metallo (Great American Construction)
L&M Larkspur Investor Member LLC owns a percentage of Larkspur LLC. (Sanford Loewentheil, Ronald Moelis)
The HPD selected Sponsor of the UDAAP development site is Steven Judelson (SW Development, etc.)

There is no ethical disclosure to tenants or government agencies, regarding the incestuous nature between ownership and property management. Both Lemle & Wolff and Steven Judelson have reputations as slumlords in the late 80s and 90s.

Per the article, Lemle & Wolff received a $37M loan on the property in 2017.

In 2019 DOB BIS proves that the property's Certificate of Occupancy used to acquire the $37M Fannie Mae loan, contains material False Statements.
The certificates of occupancy were issued using Professional Certification of the property owners disgraced Architect, Robert Larsen (Larsen, Shein, Ginsberg,

Snyder LLP).

Also, in contradiction to the article the property only has 19 low income apartments, which is less than 20% of 115 dwelling units. (Plus 1 Super's unit)

The second Residential building on the property, 318 West 117th Street (intended to be a Charter School) is exclusively rented to White families (perhaps one or two multi-racial since 2005), and historically there have been zero low income units in 318.

The Owners benefit from 80/20 Affordable Housing benefits, but the 22 dwelling units at 318 West 117th Street, have no low income residents: This is not the intention of Affordable Housing 80/20 mix!

In NYC Department of Finance, the property tax bills on Larkspur are issued to LARKSPW LLC (which is not a registered corporate title), and mailed to Lemle & Wolff's address.

The amount of property owned collectively by all involved in ownership, in consideration of the level of fraud at Larkspur, is nothing short of alarming for the future of NYC Tenants.

Thank you,
Coanne Wilshire

## Lease Provisions

Leases must use words with common and everyday meanings and must be clear and coherent. Sections of leases must be appropriately captioned and the print must be large enough to be read easily. *(General Obligations Law § 5-702; NY C.P.L.R. § 4544.)*

The following lease provisions are not allowed :

· Exempting landlords from liability for injuries to persons or property caused by the landlord's negligence, or that of the landlord's employees or agents *(General Obligations Law § 5-321);*

· Waiving the tenant's right to a jury trial in any lawsuit brought by either of the parties against the other for personal injury or property damage *(Real Property Law § 259-c);*

· Requiring tenants to pledge their household furniture as security for rent *(Real Property Law § 231);*

· Exempting landlords from mitigating the damages of a tenant vacating the premises before the lease expires *(Real Property Law § 227-e);*

· Waiving the Warranty of Habitability *(Real Property Law § 235-b);* and

· Restricting a tenant from living with their immediate family members and/or one additional occupant and the occupant's dependent children *(Real Property Law § 235-f).*

If a lease states that the landlord may recover attorney's fees and costs incurred, a tenant automatically has a reciprocal right to recover those fees as well *(Real Property Law § 234).* If the court finds a lease or any lease clause to have been unconscionable at the time it was made, the court may refuse to enforce the lease or the clause in question *(Real Property Law § 235-c).*


If only a portion of the apartment is damaged, the rent maybe reduced pursuant to a court order or by DHCR in proportion to the part of the apartment that is damaged. The landlord must then repair those portions of the apartment and return them to livable condition.

### Landlord's Duty of Repair

Landlords of multiple dwellings must keep the apartments and the building's public areas in "good repair" and clean and free of vermin, garbage, or other offensive material. Landlords are required to maintain electrical, plumbing, sanitary, heating, and ventilating systems, and appliances that the landlord installed (such as refrigerators and stoves) in good and safe working order. All repairs must be made within a reasonable time that may vary depending upon the severity of the repairs. In New York City, the landlord is required to maintain the public areas in a clean and sanitary condition *(NYC Admin. Code§ 27–2011)*. Tenants should bring complaints to the attention of their local housing officials *(Multiple Dwelling Law §78 and §80; Multiple Residence Law §174.)* The Multiple Dwelling Law applies to cities with a population of 325,000 or more and the Multiple Residence Law applies to cities with less than 325,000 and to all towns and villages.

### Lead-Based Paint

In New York, landlords should maintain their properties to reduce the likelihood that young children will be exposed to dangerous lead-based paint. Although limits on the level of lead in paint used in homes were imposed by New York City in 1960, by New York State in 1970, and by the federal Consumer Product Safety Commission in 1978, paint with lead levels higher than those limits remains on the walls and other surfaces

| Managing Agent | 07/12/2022 AND 09/01/2023 | LEHLE WOLFF INC | KLEIMAN ANDREW 5925 BROADWAY | BRONX NY 10463 |
|---|---|---|---|---|

## Open Violations - ALL DATES
There are 11 Violations. Arranged by category:  A class: 5   B class: 4   C class: 2   I class: 0

For Definitions of the columns indicated below, select glossary under the Services option (located at the upper right).

To sort the columns, click on their underlined headers below in the blue area.

| Apt Story | Reported Date NOV ISSUED Date | Hard Class no | Order Violation ID, NOV ID, NOV Type | Violation Description | Status Status Date | Certify By Date Actual Cert. Date |
|---|---|---|---|---|---|---|
| 3H 3 | 2022/09/22 A 2022/09/26 | | 501 15390029 8050771 Original | § 27-2005 adm code properly repair the broken or defective upper and lower cabinet doors in the kitchen located at apt 3h, 3rd story, 4th apartment from west at north | NOV SENT 2022/09/26 | 2023/01/13 |
| 2J 2 | 2022/09/19 C 2022/09/20 | | 568 15374922 8044114 Original | hmc adm code: § 27-2017.4 abate the infestation consisting of roaches in the entire apartment located at apt 2j, 2nd story, 5th apartment from west at north | NOI SENT 2022/09/20 | 2022/10/21 |
| 2J 2 | 2022/09/19 C 2022/09/20 | | 569 15374923 8044114 Original | hmc adm code: § 27-2017.4 abate the infestation consisting of mice in the entire apartment located at apt 2j, 2nd story, 5th apartment from west at north | NOI SENT 2022/09/20 | 2022/10/21 |
| 2J 2 | 2022/09/19 B 2022/09/20 | | 649 * 15374924 8044113 Original | § 27-2026 adm code remove all obstructions and repair all defects in at the wash basin waste line in the 2nd bathroom from east located at apt 2j, 2nd story, 5th apartment from west at north | NOV SENT 2022/09/20 | 2022/11/08 |
| 2J 2 | 2022/09/19 B 2022/09/20 | | 502 15374925 8044113 Original | § 27-2005 adm code properly repair with similar material the broken or defective wood base cabist at sink in the kitchen located at apt 2j, 2nd story, 5th apartment from west at north | NOV SENT 2022/09/20 | 2022/11/08 |
| 2J 2 | 2022/09/19 A 2022/09/20 | | 554 15374926 8044112 Original | § 27-2005 adm code paint metal in accordance with dept. regulation the entrance door in the entrance located at apt 2j, 2nd story, 5th apartment from west at north | NOV SENT 2022/09/20 | 2023/01/07 |
| 2J 2 | 2022/09/19 A 2022/09/20 | | 554 15374927 8044112 Original | § 27-2005 adm code repair the broken or defective plastered color at ceiling and all walls in the kitchen located at apt 2j, 2nd story, 5th apartment from west at north | NOV SENT 2022/09/20 | 2023/01/07 |
| 2J 3 | 2022/09/19 B 2022/09/20 | | 1503 15374928 8044119 Original | § 27-2046.1 hmc: repair or replace the carbon monoxide detecting device(s). missing in the entire apartment located at apt 2j, 2nd story, 5th apartment from west at north | NOV SENT 2022/09/20 | 2022/11/08 |
| 2J 2 | 2022/09/19 B 2022/09/20 | | 702 15374929 8044113 Original | § 27-2045 adm code repair or replace the smoke detector missing in the entire apartment located at apt 2j, 2nd story, 5th apartment from west at north | NOV SENT 2022/09/20 | 2022/11/08 |
| 7N 7 | 2022/06/22 A 2022/06/23 | | 554 15219083 7949697 Original | § 27-2005 adm code paint metal in accordance with dept. regulation the outta door in the entrance located at apt 7n, 7th story, 1st apartment from south at west , section "east" | NOV SENT 2022/06/23 | 2022/10/10 |
| 3H 3 | 2021/06/02 A 2021/06/07 | | 504 14367753 7369709 Original | § 27-2005 adm code provide seal at gap between baseboard and floor, in the entire apartment located at apt 3h, 3rd story, 4th apartment from north at east , section at north | NOT COMPLIED 2022/09/23 | 2021/09/24 |



All LIHTC Tenants on HPD Open Violations.

Repairs and apartment Maintenance is unequal

From: ▮▮▮▮▮▮▮▮ (Buildings) ▮▮▮▮▮@buildings.nyc.gov
Subject: RE: [EXTERNAL] FALSE - Overview for Complaint #:1664439
= RESOLVED
Date: May 5, 2024 at 10:59:52 PM
To: C. W. soireenews@outlook.com

Good Day Coanne,

Your complaint talking about civil matter issue ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.



NCY Department of Buildings
Overview for Complaint #:1664439 = RESOLVED

Complaint at: 304 WEST 117 STREET          BIN: 1037201     Borough: MANHATTAN    ZIP: 10026
Re: Quality Housing missing outdoor recreation space. Aggravated violation. Tenant want to enjoy total eclipse

Category Code:     83    CONSTRUCTION - CONTRARY/BEYOND APPROVED PLANS/PERMITS
                        CONSTRUCTION IN PROGRESS - CONTRARY TO PLAN

Assigned To:     MANHATTAN CONSTRUCTION ENFORCEMENT          Priority: B
                                                              311 Reference Number: 311-18161329

Entered By: WEB (W) 04/04/2024 19:37:16

Received:   04/04/2024            Block: 1943    Lot: 7503          Community Board: 110
Owner:      UNAVAILABLE OWNER

           Last Inspection: 05/03/2024 - - BY BADGE # 2▮▮▮▮▮▮▮
           Disposition: 05/03/2024 - 12 - NO VIOLATION WARRANTED FOR COMPLAINT AT TIME OF INSPECTION
           Disposition Entered By: ACA 05/03/2024 08:40:29
           Comments: ATO! 8TH FLOOR ROOFTOP RECREATION AREA AT PREMISES IS ACCESSIBLE TO
                     TENANTS VIA ELECTRONIC KEY FOB LOCK

                          Complaint Disposition History

| # | Disposition Date | Code | Disposition | Inspection By | Date |
|---|---|---|---|---|---|

Thank you, Regards,

▮▮▮▮▮▮▮▮

Assistant Chief Inspector
Department of Buildings
Borough Construction Enforcement Unit
280 Broadway, New York NY 10007
Office: 212 323 8079, Cell: 929 271 2617

**From:** C. W. <soireenews@outlook.com>
**Sent:** Friday, May 3, 2024 2:08 PM
**To:** ▮▮▮▮▮▮▮ (Buildings) <▮▮▮▮▮@buildings.nyc.gov>
**Subject:** [EXTERNAL] FALSE - Overview for Complaint #:1664439 =
RESOLVED

CAUTION: This email originated from outside of the organization. Do not click links
or open attachments unless you recognize the sender and know the content is
safe. Forward suspect email to phish@oti.nyc.gov as an attachment (Click the
More button, then forward as attachment).

Good Afternoon ▮▮▮▮▮▮▮▮,
Tenants DO NOT have fob keys to access the 8th Floor Roof.
Please reinspect ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**For Immediate Release:** July 30, 2021
**Contact:** dobcommunications@buildings.nyc.gov, **(212) 393-2126**

## DOB ISSUES MONTHLY ENFORCEMENT BULLETIN

*Report Highlights DOB Enforcement Outcomes from June 2021 to Deter Bad Actors and Keep New Yorkers Safe*

**New York, NY** –Today, the New York City Department of Buildings released its June2021 enforcement bulletin, which provides highlights of the agency's actions to sanction and deter bad actors in the construction industry through the enforcement of safety laws and codes of conduct for construction professionals. Today's bulletin includes summaries of DOB- imposed disciplinary actions, including penalties and license suspensions and revocations.

The actions below represent a portion of DOB's overall work to enforce the City's building codes and safety laws, in addition to the thousands of inspections conducted and violations issued by the agency each month for illegal building and construction conditions.

DOB took a number of major enforcement actions in June, including:

37 violations and $415,000 in penalties issued for failure to safeguard construction sites on 36 separate occasions.

35 violations and $764,050 in penalties, including daily penalties, issued for illegal building alterations at six locations.

13 violations and $129,562 in penalties, including daily penalties, issued for illegal transient use at four locations.

13 violations and $145,000 in penalties issued to 12 different individuals for failure to carry out duties of construction superintendents.

Below are individual enforcement highlights for June 2021:

## Manhattan

$6,125 in penalties issued to Larkspur LLC, the owners of 304 West 117th Street, Manhattan, for making false statements on a Certificate of Correction filing related to off-street parking spaces. The owners had previously filed a Certificate of Correction with the Department which included photographic evidence showing that they had restored illegally removed parking spaces at the property. A subsequent DOB inspection determined that the parking spaces in the photos were much smaller than stated in the filing, and contrary to the Zoning Resolution.



**CONDOMINIUM NO.** 1511

**STATE OF NEW YORK**
**OFFICE OF THE ATTORNEY GENERAL**

**ELIOT SPITZER**
Attorney General

**DIETRICH L. SNELL**
Deputy Attorney General
Division of Public Advocacy

**ERIC R. DINALLO**
Bureau Chief
Investment Protection Bureau

June 24, 2003

Alvin Schein, Esq.
Seiden & Schein
570 Lexington Avenue
New York, New York 10022

Re: 2161 Frederick Douglass Boulevard Condominium
    Index No. NA03-0044

Dear Mr. Schein:

The Department of Law has reviewed your application for a "no-action letter"
submitted on March 17, 2003 concerning a transaction involving the above premises.

On the basis of the facts and circumstances stated in your letter and supporting
documentation, the Department has determined that it will not take any enforcement action
because the described transaction occurs without filing or registration pursuant to Section 352-e
and Section 359-e of the General Business Law. We understand that it is your opinion as counsel
that the transaction is not subject to those registration and filing requirements.

This position is based solely upon the limited information supplied and
representations made in your letter and supporting documentation. Any different set of facts or
circumstances might result in the Department's taking a different position. In addition, this letter
expresses the Department's position on enforcement action which could arise from this
transaction only, occurring without filing or registration, and does not purport to express any
legal conclusion on any subsequent transaction or offering.

The issuance of this letter shall not be construed to be a waiver of or
limitation on the Attorney General's authority to take enforcement action for violations of
Article 23-A of the General Business Law and other applicable provisions of law.

Very truly yours,

Marissa Piesman
Assistant Attorney General

120 Broadway, New York, N.Y. 10271

TOTAL P.01

 
This Retail Property is no longer advertised on LoopNet.com.



Expand Map · Directions · Street View

# 2161-2169 Fredrick Douglass Blvd.

New York, NY 10026 · 11,015 SF · Retail For Lease

📄 Create Reports · 🖨 Print



## LARKSPUR PLAZA

Rental Rate   N/A     Property Type   Retail

Total Space     Property

| | | | |
|---|---|---|---|
| Rentable | 11,015 SF | Subtype | Street Retail |
| Min. Divisible | 1,000 SF | Building Size | 100,000 SF |
| Max. Contiguous | 8,704 SF | | |

Listing ID: 13998627          Date Created: 08/26/2004 Last Updated: 05/05/2005

# DESCRIPTION

L&M's Larkspur Plaza at 117th Street and Frederick Douglass Boulevard is a 117 unit mid-rise that is scheduled to open in the summer of 2004. The development includes 18 apartments reserved for residents at 60% of area median income or below, together with 99 middle income units. The site also incorporates 15,000 square feet of retail space and 4,000 square feet of community facilities for the local area.

The historic Frederick Douglass Boulevard (8th Avenue) has been the site of a surge of exciting new investment in West Harlem.

# HIGHLIGHTS

- Great Opportunity
- Will Divide

# TRAFFIC

Development
Partners



**L+M's retail department is responsible for the design, leasing, construction, tenant relations and management of our portfolio.**

Our high-level of involvement throughout the different stages of the tenant-landlord relationship allows us to be responsible landlords who are committed to improving local communities and facilitating the success of our tenants' businesses.



Apollo Physical Therapy & Physical Therapist Assistant, PLLC
271 W.125th Street, Suite 211
New York, NY 10027
Phone 917-493-9600 Fax 917-493-2078

September 4, 2008

Larkspur, LLC
1865 Palmer Road
Larchmont, NY 10538
ATTN: Christina Warner

← *Christina Warner Commercial Leasing Director, L+M*

Dear Christina Warner:

We acknowledge receipt of the substituted amended schedule A and we
accept the same.

Armando Pennella



## Leases

A lease is a contract between a landlord and a tenant that contains the terms and conditions of the rental. It cannot be changed while it is in effect unless both parties agree. Leases for apartments that are not rent stabilized may be oral or written. To avoid disputes, the parties may wish to enter into a written agreement. A party must sign the lease to be bound by its terms. An oral lease for more than one year cannot be legally enforced *(General Obligations Law § 5-701)*.

At a minimum, leases should identify the premises, specify the names and addresses of the parties, the amount and due dates of the rent, the duration of the rental, the conditions of occupancy, and the rights and obligations of both parties. Except where the law provides otherwise, a landlord may rent on such terms and conditions as are agreed to by the parties. Any changes to the lease should be initialed by both parties.

New York City rent stabilized tenants are entitled to receive a fully executed copy of their signed lease from their landlords within 30 days of the landlord's receipt of the lease signed by the tenant. The lease's beginning and ending dates must be stated. Rent stabilized tenants must also be given a rent stabilization lease rider, prepared by DHCR, which summarizes their rights under the law and provides specific information on how the rent was calculated.

From: C. W. ▓▓▓▓▓@outlook.com
Subject: FOIL REQUESTS
Date: May 13, 2024 at 6:41:09 AM
To: M▓▓▓▓▓▓▓▓▓▓▓▓@nychdc.com

Good Morning,

Requesting copies of:

1) Construction Costs breakdown or invoices for 116 Dwelling Units. Also, any additional or related documents for Unit ▓.

2) Requesting copies of Annual Registration for Unit ▓.

3) Requesting copies of Tenant Income Certification for ▓ or under my name.

Thank you,

Coanne Wilshire

HDC does not have any of the information requested below.
Please note the bullets below also serve to remind Ms. Wilshire
that her assertions regarding the number of dwelling units are
inaccurate as she is combining two separate developments
(Larkspur and Little Larkspur):

1. Unit  is part of the Larkspur Development which
   consists of 94 units. The referenced unit (████) is one of the
   19 low-income units in this development. HDC has no
   record of the construction cost breakdown or invoices for
   this development.
2. HDC has no record of Annual Registrations for unit ████
3. HDC no longer has a copy of the 2004 initial Tenant
   Income Certification (TIC) for unit ████ or any subsequent
   TICs.

Let me know if you need any additional information.

Thank you,

Alex

NYC ●HDC
NEW YORK CITY
HOUSING DEVELOPMENT
CORPORATION

**Alex Medina | SVP, Asset Management**
120 Broadway, 2nd Floor
New York, NY 10271
212.227.2441 (o)
amedina@nychdc.com



U.S. Department of Housing and Urban Development
New York State Office
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York 10278-0068

February 28, 2024

Coanne Wilshire
304 West 117th Street, Apt. 3H
New York, NY 10026

Dear Complainant:

Subject:     Housing Discrimination Complaint
             Wilshire, Coanne v. Lemle & Wolff, Inc., et al.
             Inquiry No. 676850
             HUD Case No. 02-22-0807-8

The U.S. Department of Housing and Urban Development (HUD) has reopened the investigation
of Wilshire, Coanne v. Lemle & Wolff, Inc., et al. based upon additional information provided
by Complainant after closure. HUD will continue its administrative processing of this complaint
under the Fair Housing Act of 1968.

If you have any questions regarding this reopening please contact Tiffany Hall, Equal
Opportunity Specialist, at Tiffany.L.Hall@hud.gov.

Sincerely,

Jo-Ann Frey
Region II Enforcement Division Director
Office of Fair Housing and Equal Opportunity

From: C. W. soireenews@outlook.com
Subject: HUD Settlement
Date: May 9, 2024 at 5:20:42 PM
To: Mary A. Smith mary.smith@jacksonlewis.com

Good Afternoon Ms. Smith,
I know that you know the HUD conciliation offer was not going to be accepted.
Do you want to speak and come up with an agreement for HUD Investigation?
If moving to another as a swap out is not good with your client just say so.
Certainly me moving would have eliminated many of the issues in 3H, but so be it.

As the same with Civil Suit, if we are not going to get together and hammer out a plan, time is only wasting.
Defendants are not even supposed to have market Rate apartments. I have the audio and documents where in order to get approval from Manhattan Borough President, community Board and City Planning Commission for the construction they agreed that the 80% would be middle income.
Not to mention acquisition of the Large Development Site without the RFP process.

If Defendants are only going to exercise rules on me while they are breaking all the rules, going forward with Court is the only thing left.

I do not feel confident we can settle civil suit but I think HUD may be possible. If we move forward without the lawyer games and communicate on a what's the bottom line basis on HUD.
You started off HUD negotiations offering full floor replacement that was already promised for DHCR Repair a year ago.

If you're interested in having a real conversation, and getting to a quick conclusion within a week or so, I'm in... if not we can notify HUD definitively that Conciliation consideration is over.

Kindly let me know where you and your clients are at. I'm not getting any younger! The only way to any settlement is straight talk between us. This slow drag like we did last year is not going to happen the same way again.

From: C. W. soireenews@outlook.com
Subject: HUD Investigation Settlement Talks?
Date: May 20, 2024 at 7:13:36 AM
To: Mary A. Smith mary.smith@jacksonlewis.com

Good Morning Ms. Smith,

I anticipated we would have been communicating often in our quest to settle HUD investigation within a week?

You and I have shared a mutual desire to move HUD off the table, but perhaps your client does not agree?

Tomorrow will be one week since we spoke.

Ms. Smith, I am very uncomfortable with the feeling that I am wasting time when attempting to have settlement talks.

In last communications with HUD Investigator, [prior to speaking with you], I asserted the Respondents actions against me and their complete ignorance of FHA Rules and Requirements are at a level of Public Interest.

The Investigator never responded although I wrote it in at least three emails to her.

I have been holding off pursuing that thought to higher-authority HUD personnel, while I'm supposed to be negotiating with you... except we have had only one talk, which for me is not negotiating. This is a repeat of attempting civil suit settlement talks.

Please contact me today to let me know where we are. We gave ourselves a week deadline for HUD Investigation, which is tomorrow.

Coanne Wilshire

From: **C. W.** soireenews@outlook.com
Date: <mark>May 20, 2024 at</mark> 6:51:46 PM
To: **Mary A. Smith** mary.smith@jacksonlewis.com

FYI- regarding Motion to Dismiss.

 **hud.gov**
https://www.hud.gov › complaint-...

# Learn About FHEO's Process to Repc and Investigate Housing Discriminati

You may file a private civil lawsuit, even if you have a filed an allegation with HUD. You must file your lawsi two (2) years of the most recent ...

**You must file your lawsuit within two years of the most recent date of alleged discriminatory action**. If you do file a complaint with HUD and even if HUD dismisses your complaint, the Fair Housing Act gives you the right to file a private lawsuit against the respondent(s) in Federal District Court.



**TEAR at the PERF** Please and keep pages 1 & 2 for your information.

**NEW YORK STATE OF OPPORTUNITY. | Department of Motor Vehicles**

**APPLICATION FOR A PARKING PERMIT OR LICENSE PLATES, FOR PERSONS WITH SEVERE DISABILITIES**

Please read pages 1 and 2 of this packet before you complete this application. If you apply for a parking permit, take the completed application to the issuing agent (local municipality) in the city, town or village where you live; **do not send your application to the Department of Motor Vehicles because DMV does not issue motor parking permits.**

## Part 1 INFORMATION ABOUT PERSON WITH DISABILITY — (Please print and sign by the arrow.)

Last Name WILSHIRE    First COANNE    M.I.    Telephone No. ( )

Address: No. and Street 304 West 117th Street    Apt. No. 3H    City N.Y    State NY    Zip Code 10026

Date of Birth    ☐ Male ☐ Female    I want: ☐ License Plates *(Apply to DMV.)* ☐ A Parking Permit *(Apply to your local issuing agent.)*

Do you have license plates for persons with disabilities?    NYC residents - Attach a copy of your driver license or non-driver ID. If you had a New York
☐ Yes - My license plate number is:    ☑ No    State permit, print the permit number here:

*Read note on page 4 before you sign*

X *Coanne Wilshire* (Signature of Person with Disability or Signature of Parent or Guardian) — *If signed by a parent or guardian, please write your relationship to the person with the disability after your signature.*    12/20/21 (Date)

## Part 2 MEDICAL CERTIFICATION

**NOTE: PERMANENT DISABILITIES** may be certified by a Medical Doctor (MD), Doctor of Osteopathy (DO), Physician Assistant (PA), Nurse Practitioner (NP), a Doctor of Podiatric Medicine (DPM, for disabilities related to the foot) or Optometrist (OD, for blindness). **TEMPORARY DISABILITIES**, however, may be certified only by a Medical Doctor or Doctor of Osteopathy.

**Check the box(es) that describe the disability, and fill in the diagnosis:**

☐ **TEMPORARY DISABILITY:** A person with a temporary disability is any person who is temporarily unable to ambulate without the aid of an assisting device. Examples of an assisting device include, but are not limited to, a brace, cane, crutch, prosthetic device, another person, wheelchair or walker. *IMPORTANT:* Temporary permits are issued for six months or less regardless of expected recovery date.

Expected Recovery Date: _____    Diagnosis: _____

What assistive device is needed? _____

☑ **PERMANENT DISABILITY:** A "severely disabled" person is any person with one or more of the PERMANENT impairments, disabilities or conditions listed below, which limit mobility.
Diagnosis: Bilateral foot deformities & Chronic pain | Moderate Bronchial Asthma    Please check the conditions that apply:

☐ Uses portable oxygen ☐ Legally blind ☐ Limited or no use of one or both legs ☑ Unable to walk 200 ft. without stopping
☐ Neuromuscular dysfunction that severely limits mobility ☐ Class III or IV cardiac condition. (American Heart Assoc. standards)
☑ Severely limited in ability to walk due to an arthritic, neurological or orthopedic condition
☑ Restricted by lung disease to such an extent that forced (respiratory) expiratory volume for one second, when measured by spirometry, is less than one liter, or the arterial oxygen tension is less than sixty mm/hg of room air at rest
☐ Has a physical or mental impairment or condition not listed above which constitutes an equal degree of disability, and which imposes unusual hardship in the use of public transportation and prevents the person from getting around without great difficulty.
**EXPLAIN BELOW HOW THIS DISABILITY LIMITS FUNCTIONAL MOBILITY.**

MD/DO/DPM/NP/PA/OD Name    **MARCELLO DIBONA, MD**
1073 MACE AVENUE    Professional License No. 174113
MD/DO/DPM/NP/PA/OD Address    **BRONX, NY 10469**
**TEL: (718) 655-3535**    Telephone No. ( )
**FAX (718) 655-3746**

*Read note on page 4 before you sign*

X _____ (MD/DO/DPM/NP/PA/OD Signature)    12/20/21 (Date)

## Part 3 FILE INFORMATION *(For Issuing Agent Use Only)*

☐ Blue ☐ Red    **Parking Permit No.** _____    Date Issued: _____    Date Expires: _____

☐ First ☐ Second    9-digit number from NYS Driver License/ID Card _____

☐ Denied ☐ Revoked    Reason: _____
(Date)

X _____
(Issuing Agent)    (Locality)

MV-684.1 (2/17)    PAGE 3 OF 4

reset/clear

The Access Aisle AND my spot fully occupied. Nothing related to Construction. So even if there was such a thing as a "Half Space for Construction" Pruned refuse from sidewalk trees has nothing to do with building construction..



I was the only tenant that had unacceptable conditions, yet was forced to accept it.

It is beyond unreasonable to expect a parking tenant especially at a rate of $261.00 to subject a vehicle to high risk of damage. Note Lemle & Wolff Parking Agreement holds themselves harmless from any damage or injury.

Moreover the Parking Agreement does not say that tenant has to allow management to use their spot for other cars without my permission. This has been my experience throughout the 14 years parking history.

I rented in 2005 but received copy of my Parking Agreement in 2018. Also, I believe Pablo Rios underlined/modified before forwarding to me.

conformity with the provisions of this Section.

(2/2/11)

**26-16**
**Central Refuse Storage Area**

All #developments# shall provide facilities for central trash storage within the #zoning lot#. Where such facilities are provided outside of a #building#, such facilities shall be screened by an enclosure containing materials compatible with the materials of the front #building# wall of the #development#.

In all cases, there shall be an area for central trash collection provided at the rate of 75 square feet for uncompressed garbage or 50 square feet for compressed garbage for each 10,000 square feet of #lot area#. Such area shall be ventilated.

(2/6/02)

**26-17**
**Streetscape Modifications**

The City Planning Commission may, by certification to the Commissioner of Buildings, allow modifications of the requirements of this Chapter. Such modifications will be allowed when the Commission finds that such modifications will enhance the design quality of the #development#.

(2/2/11)

**26-20**
**SPECIAL REQUIREMENTS FOR LOTS WITH PRIVATE ROADS**

To provide for the orderly development of #residences# that are distant from #streets#, site planning requirements are established in Sections 26-20 through 26-27, inclusive. The regulations of this Section are intended to:

(a) optimize vehicular access within and among #zoning lots# containing #private roads#;

(b) regulate the size of and distance between curb cuts to minimize undue conflict between pedestrian and vehicular



**2018**







# THE STATE OF GEORGIA

## SECRETARY OF STATE

I, Cathy Cox, Secretary of State of the
State of Georgia, do hereby recognize

# CoAnne Wilshire

for

# Outstanding Contributions to the
# Metropolitan Atlanta Community



Given this **26th** day of **August**

in the year Two Thousand **Three**

_____

_____

Cathy Cox, Secretary of State

October 28, 2022

## TENENTS:

BEFORE you sign your new lease agreement for your parking spot in 2023, please consider emailing ~~Zulma@lemle...~~ and asking for paragraphs 1A and 2B to be amended as follows:

**Paragraph 1 A**
- *Remove "non-commercial" and all words after "vehicle" in the first sentence* therefore removing mention of a specific vehicle (including a rental vehicle).

*Why:* The way the language currently reads, the lease requires that only one vehicle per household be parked in the spot at any given time – i.e. the vehicle you report on your lease (by make, license plate, etc).

This is problematic because multiple tenants have: 1) more than one vehicle, 2) use rental vehicles, and/or 3) guests, like elderly or disabled relatives, who visit and need close proximity to the building. Leaving the lease in its current form would jeopardize one's ability to use the space for these purposes, which we have been doing for years, and believe poses no risk to the wellbeing of the building.
- *Add: "Lessee will not rent or sublet the parking spot for profit."*

*Why:* Our understanding is that all of this is an issue now because at one point, there was a tenant spot being rented out for profit. Thus, this current change in the lease does NOT appear to be related to any prior problem with using a spot for guests, rental cars and/or a second vehicle.

**Paragraph 2 B ii a**
- *Remove Paragraph "2 B ii a" entirely,* as it would allow Licensor the right to revoke your parking spot for any reason, other than abuse or misuse, or vacating the building. which is accounted for in Paragraph 2 B ii b. (Note, if you keep this subparagraph the Licensor could find someone willing to pay more, or could just feel like taking your spot to use for vendors or management.)

**Why consider**

*If the majority of us don't sign our parking spot leases until Lemle addresses these issues we hope to be able to protect our rights to park as they have been. for the last 17 years since the building opened*

Thanks,
Your Neighbors

*5/16/2002*

## THE COUNCIL

## JOINT REPORT OF THE LAND USE COMMITTEE
## AND THE
## SUBCOMMITTEE ON PLANNING, DISPOSITIONS
## AND CONCESSIONS

### L.U. No. 4 (Res. No. 290)

### By Council Members Katz and Martinez

**SUBJECT**

**MANHATTAN CB - 10**                                      **C 020220 HAM**

    City Planning Commission decision approving an application submitted by the Department of Housing Preservation and Development (HPD):

1)        pursuant to Article 16 of the General Municipal Law of New York State for:

        a)        the designation of 2161 and 2163/67 Eighth Avenue; and 300, 306/308, 310, 312, 314, 316 and 318 West 117th Street (Block 1943/Lots 32, 33, 36, 37, 39-43 and 127), as an Urban Development Action Area;

        b)        an Urban Development Action Area Project for such area; and

2)        pursuant to Section 197-c of the New York City Charter for the disposition of such property, except 306/308 and 312 West 117th Street (Block 1943/Lots 37 and 40), to a developer selected by HPD.

**INTENT**

    To facilitate construction of approximately 96 units of housing and ground floor retail and community facility space.

*HDC DOC*

| Unit Type | # of Units | Monthly Rent | Rent per s.f. |
|---|---|---|---|
| One Bedroom (NewHOP) | 11 | $1,300 | $26.00 |
| Two Bedroom (NewHOP) | 10 | $1,700 | $24.00 |

Total          22 units   *(1 - 2 BR superintendent's unit)*

## Parties

Developer:          L&M Equity Partnership

Borrower:           Larkspur 117th Street, LLC      *no registered title*

Guarantors:         Ron Moelis and Sandy Loewentheil

- 7 -

General Contractor:     L&M Construction

Principals of Borrower:  The principals of the Borrowing entity that will have an interest in the LLC are Ron Moelis and Sandy Loewentheil.

Managing Agent:         Through its subsidiary, PWB Affordable Management, LLC, HEC has served as property manager for over 20 years for properties located in the Bronx, Brooklyn, Manhattan and Rockland County totaling approximately 1,700 units, including almost 500 units financed by HDC. PWB Management, LLC has compiled a "Satisfactory" record with HDC's Asset Management Department.

*Lemle & Wolff is NOT the approved Property Management Company.*

*Why the change to Lemle & Wolff?*

## Third Party Reports

The following third party reports will be completed, reviewed, and presented in the final underwriting memo for the Project:

- Appraisal
- Phase I Environmental Report
- SEQRA Review

## Design review

Revised plans were sent to HPD for design approval on February 18, 2004.

## Disclosure

DOB Document

## 20 Site Characteristics

**Yes No**
- ☐ ☐ Tidal Wetlands
- ☐ ☐ Coastal Erosion Hazard Area
- ☒ ☐ Fire District

**Yes No**
- ☐ ☐ Freshwater Wetlands
- ☐ ☐ Urban Renewal
- ☐ ☐ Flood Hazard Area

**Flood Hazard Area Information:**

**Yes No**
- ☐ ☐ Substantial improvement?
- ☐ ☐ Substantially damaged?
- ☐ ☐ Floodshields part of proposed work?

## 21 Demolition Details
Not Applicable

## 22 Asbestos Abatement Compliance

## 23 Signs
Not Applicable

## 24 Comments

**Comments for Document 01**

I hereby state that I have exercised a professional standard of care in certifying that the filed application is complete and in accordance with applicable laws, including the rules of the Department of Buildings, as of this date. I am aware that the Commissioner will rely upon the truth and accuracy of this statement. I have notified the owner that this application has been professionally certified. If an audit or other exam discloses non-compliance, I agree to notify the owner of the remedial measures that must be taken to meet legal requirements. I further realize that any misrepresentation or falsification of facts made knowingly or negligently by me, my agents or employees, or by others with my knowledge, will render me liable for legal and disciplinary action by the Department of Buildings and other appropriate authorities, including termination of participation in the professional certification procedures at the Department of Buildings.

## 25 Applicant's Statements and Signatures    ( See paper form or check Forms Received )

**Yes No**
- ☐ ☐ For New Building and Alteration 1 applications filed under the 2008 or 2014 NYC Building Code only: does this building qualify for high-rise designation?
- ☐ ☐ Directive 14 applications only: I certify that the construction documents submitted and all construction documents related to this application do not require a new or amended Certificate of Occupancy as there is no change in use, exits, or occupancy.

## 26 Owner's Information

**Name:** SANDY LOEWENTHEIL

**Relationship to Owner:**

**Business Name:** LARKSPUR MANAGERS LLC          **Business Phone:** 718-884-7676

**Business Address:** 5925 BROADWAY BRONX NY 10463          **Business Fax:**

**E-Mail:**          **Owner Type:** CORPORATION

**Non Profit:** ☐ Yes  ☒ No

**Yes No**
- ☐ ☐ Owner's Certification Regarding Occupied Housing (Remain Occupied)
- ☐ ☒ Owner's Certification Regarding Occupied Housing (Rent Control / Stabilization)
- ☐ ☒ Owner DHCR Notification
- ☐ ☐ Owner's Certification for Adult Establishment
- ☐ ☐ Owner's Certification for Directive 14 (if applicable)

### Condo / Co-Op or Corporation Second Officer

**Name:** FRANK ANALANTE          **Title:** MEMBER

**Business Name:** LARKSPUR MANAGERS LLC          **Business Phone:** 718-884-7676

**Business Address:** 5925 BROADWAY BRONX NY 10463          **Business Fax:**

**E-Mail:**

---

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.



 Share

## Tenant Rights

It is illegal for building owners to force tenants to leave their apartments or <mark>surrender their rights</mark>. If you are a tenant in an apartment in the City who is being harassed by your landlord, you can get information and help.

*same for parking space*

## Harassment of tenants by landlords or owners can include:

- Not offering leases or lease renewals, or repeatedly trying to pay you to move out.
- Unjustified eviction notices or illegal lockouts.
- Threats and intimidation, such as late-night phone calls.
- Overcharging for a rent-regulated apartment.
- Failure to provide necessary repairs or utilities.
- <mark>Deliberately causing construction-related problems for tenants, such as working after hours, blocking entrances, or failing to remove excessive dust or debris.</mark>

SECTIONS

Overview

Your Rights

Fire
Damaged/Vacat
Order
Apartments

Frequently
Asked
Questions

Fact Sheets

Forms

Operational
Bulletins

Policy
Statements

the payment system at any time.

### 6) What are my rights concerning garage/parking spaces?

Garage/parking spaces are considered an ancillary service which are provided by owners to tenants as a service sometimes included in the apartment rent, with no separate lease or charge. If the owner requires the tenant to continue to use the service, the owner cannot unreasonably refuse to allow the tenant to sublet it for the term of each lease renewal.

The garage/parking space can also be offered under a lease that is separate and apart from the apartment. If it is offered by the owner and if there is or was a history of common ownership, directly or indirectly between the building owner and the contractor, or if the service is exclusively for the tenants, then it is subject to rent stabilization. In this situation, an initial free market rent can be set for a tenant signing their first separate lease for the service. However, renewal leases for the garage/parking space are subject to guideline rate limitations and the tenant is not required to renew the lease. If it is offered by a contractor and there was never common ownership between the contractor and the building owner, then the service is not subject to rent stabilization.

In all rent stabilized situations, the tenants keeping the space unoccupied indefinitely is not grounds for the discontinuance of the service.

### 7) I am a rent stabilized tenant in a building that was converted into a co-op/condo. Are

SECTIONS

Overview

Rent
Increases

Collecting
Overcharges

Frequently
Asked
Questions

Fact Sheets

Forms

Policy
Statement

### 7) Are tenants required to pay NYC Sales Tax to the owner on a garage/parking space that is subject to Rent Stabilization?

The NYC Sales Tax can be collected if the tax was imposed on the owner for the garage/parking space, and the garage/parking space was provided to the tenant in a charge separate from the apartment rent. It can never be calculated in the apartment rent.

### 8) Can a tenant in a rent regulated apartment take in a roommate and is there a limit on the rent that the roommate can be charged?

When only one tenant is named on a lease, the tenant has the right to take in a roommate and the roommate's dependent children. When two or more tenants are named on the lease, the number of tenants and roommates cannot exceed the number of tenants named in the lease. In all situations, occupancy may be restricted in order to comply with municipal regulations concerning overcrowding.

In a rent stabilized apartment, the rent collected from the roommate cannot exceed their proportionate share of the apartment. For example, one tenant named on a lease can take in one roommate and the roommate can be charged no more than half of the rent charged to the prime tenant. The roommate can be advised to file a complaint of rent overcharge with DHCR if they were charged in excess of that proportionate share.

In a rent controlled apartment, a roommate may not be charged an amount of rent that is in excess of the legal rent for the apartment. Any determination of a rent overcharge is

| Debt Service Coverage: | HDC 1st Loan Only: | 1.20 |
| | Total Loans: | 1.15 |

*(The Project's debt service coverage ratio on the HDC 1st is equal to the New HOP program guidelines of 1.20, and meets the overall coverage of 1.15)*

| | Income to Expense Ratio: | 1.11 |

*(The Project's Income-to-Expense Ratio is better than the Program Guidelines of 1.05 to 1.)*

| Tax Abatement: | 421a – 25 year term |
| HDC Fee: | .75% on First Mortgage to be collected upon execution of commitment. |
| Collateral for HDC Loans: | Stand-by LOC from JP Morgan Chase during construction (bond amount + 60 days interest) |
| Construction Lender: | JP Morgan Chase |
| Lender Credit Rating: | JP Morgan Chase: A+/A-1/Stable (Standard & Poor's) |

## Project Economics:

No. of Units:     22 (21 rental units and 1 superintendent's unit)

Apartment Types and Rents:

| Unit Type | # of Units | Monthly Rent | Rent per s.f. |
|---|---|---|---|
| One Bedroom (NewHOP) | 11 | $1,300 | $26.00 |
| Two Bedroom (NewHOP) | 10 | $1,700 | $24.00 |

Total     22 units   *(1 - 2 BR superintendent's unit)*

## Parties

| Developer: | L&M Equity Partnership |
| Borrower: | Larkspur 117th Street, LLC |
| Guarantors: | Ron Moelis and Sandy Loewentheil |

## Cross-Collaterization:

The 93-unit NewHOP 80/20 (306-318 West 117th Street) will be cross-collateralized with the 22-unit NewHOP project (316 West 117th Street) to serve as additional security for the HDC loans.

## New Project Proposal:

This memorandum also recommends the approval to proceed with a full underwriting of the above-captioned project, which comprises one newly constructed 5 story elevator building containing 22 units. Total area of the proposed building will be 31,500 square feet. Additionally, there will be 3,750 square feet of commercial space.

If approved, this loan will further HDC's mission of financing the creation of affordable housing and provides the following benefits:

- **Location:** The project is located in the Morningside Heights neighborhood of upper Manhattan. HDC has financed numerous projects in this neighborhood including the adjacent 93-unit NewHOP 80/20 project on 308-318 West 117th Street and the 138-unit NewHOP at 279 West 117th Street.
- **Affordability:** Creation of 22 affordable housing units in Manhattan under the New Housing Marketplace Plan, all of which will be targeted specifically towards families earning less than 250% AMI.
- **Prior Experience:** L&M Equity Participants has successfully completed numerous projects with HDC. Most notably, L&M has served as lead developer on the development of three buildings totaling 291 units on this portion of West 148th St., all of which utilized HDC financing and are performing
- **Management Company:** Through its subsidiary, PWB Affordable Management, LLC, HEC has served as property manager for over 20 years for properties located in the Bronx, Brooklyn, Manhattan and Rockland County totaling approximately 1,700 units, including almost 500 units financed by HDC. PWB Management, LLC has compiled a "Satisfactory" record with Asset Management

*L&M secured the deal but hide their ownership, as part of the Housing Racketeering scheme acquisition*

## REMIC MORTGAGE INSURANCE OFFERING
### January 22, 2007

**SITE/DESCRIPTION:**

304 West 117th Street, New York, New York
Block 1943 Lot 1201

- The Project consists of a new construction, 8-story elevator apartment building containing 94 units. There are 25 one-bedroom units, 58 two-bedroom units, 10 three-bedroom units and 1 super's unit.
- The Project contains 14,323 square feet of commercial space. Current tenants of the commercial space include a dry cleaner, a natural food store, a real estate broker, an art gallery and a cafe. There is one commercial vacancy.
- The Project construction completion date was April 26, 2005 and was fully rented as of September 2005.
- The Project was financed under the New HOP 80/20 program and monthly rents for the occupied units range from $2,110 to $425 per month.

**NEIGHBORHOOD/LOCATION:**

Morningside Heights

- The Project is located in the Morningside Heights neighborhood of upper Manhattan.
- Subway transportation is provided by the B and C trains that stop at 116th and Fredrick Douglas Blvd., less than two blocks away. The 2 and 3 trains stop at 116th and Lenox Ave., two avenues from this property.
- Local convenience shopping is found in the neighborhood, with primary retail located on 116th Street.
- There are a number of schools within walking distance.
- The northern point of Central Park is 7 blocks south of the project and Morningside Park is less than two blocks west.

**BORROWER:**

Larkspur, LLC

- The principals of Larkspur LLC are Frank Anelante, Jr., Thomas Metallo and Joseph Zitolo. The general contractor is L&M Construction Corp. whose principals are Ron Moelis and Sandy Loewentheil.
- L&M Equity Participants are an experienced development team who has been active in New York City real estate for over 20 years. They have also completed a number of projects with HDC, including: 201 West 148th Street, 203-215 West 148th Street and 202-216 West 148th Street, all in Manhattan.

**FINANCING:**

**Type of Loans:**

HDC First and Second Mortgage--Public (HDC 2002 A MFHRB NHOP 80/20 Open Res)

| Amount of Loans: | $17,600,000 | HDC First Mortgage |
| | $3,440,000 | HDC Second Mortgage |

| Mortgagee: | New York City Housing Development Corporation ("HDC") |

## Insurance Offering Backup Sheet
### 304 West 117th Street (Big Larkspur)

|  | Amt. | Interest Rate | Term | Mortgagee |
|---|---|---|---|---|
| 1st Mort. Amt. | $17,600,000 | 6.00% | 30 years | HDC |
| 2nd Mort. Amt. | $3,440,000 | 1.00% | 30 years | HDC |
| Total | $21,040,000 |  |  |  |

Both Mortagages are self amortizing

| REMIC Amount Requested | $3,520,000 | 20% of 1st Mort. |
|---|---|---|

| Gross Rents | $1,750,104 |
|---|---|
| less 5% vacancy | $87,505 |
| Net Rents | $1,662,599 |

| Retail, Community Facility, Laundry | $510,395 |
|---|---|
| less 10% vacancy | $51,040 |
| Other Revenue | $459,355 |

| Effective Gross Income | $2,121,954 |
|---|---|

| O & M | $457,459 |
|---|---|
| Building Reserve | $23,500 |
| Taxes | $24,780 |
| Total O & M | $505,739 |

| Net Operating Income/avail for debt service | $1,616,215 |
|---|---|

| 1st Mort. Debt Service | $1,266,251 |
|---|---|
| 2nd Mort. Debt Service | $133,089 |
|  | $1,399,340 |

| DSC(at least 1.15 overall) | |
|---|---|
| Debt Service Coverage | 1.28 |
| Debt Service Coverage Total Debt | 1.15 |

| LTV (less than 80%) | |
|---|---|
| Appraised VALUE | $28,400,000 |
| L/V 1st Mort. | 62.0% |
| L/V Total Morts. | 74.1% |

| Income to Expense - 1.05 Test | 1st Mort | Total Morts |
|---|---|---|
| Effective Gross Income | $2,121,954 | $2,121,954 |
| Expenses + Debt Service | $1,771,990 | $1,905,079 |
| Income to Expense | 1.20 | 1.11 |

| Residential Income | # of Units | Avg. Monthly Rent | Total Monthly Rent |
|---|---|---|---|
| One Bedroom (Market) | 3 | $1,783 | $5,349 |
| One Bedroom (NHOP) | 17 | $1,395 | $23,715 |
| One Bedroom (Low Income) | 3 | $543 | $1,629 |
| One Bedroom (Very Low Income) | 2 | $425 | $850 |
| Two Bedrooms (Market) | 5 | $2,800 | $14,000 |
| Two Bedrooms (NHOP) | 41 | $1,810 | $74,210 |
| Two Bedrooms (Low Income) | 11 | $653 | $7,183 |
| Two Bedrooms (Very Low Income) | 1 | $512 | $512 |
| Three Bedrooms (NHOP) | 8 | $2,110 | $16,880 |
| Three Bedrooms (Low Income) | 2 | $757 | $1,514 |
| Super's Two Bedroom Apt. | 1 | $0 | $0 |
| Total |  |  | $145,842 |
|  |  |  | X 12 |
|  |  | Total Annual Rent | $1,750,104 |

*[handwritten: NO Mention of Parking Lot]*

From: ~~Boxer, Belinda B~~ @hud.gov
Subject: RE: <External Message> <mark>Fair Housing Act Title VIII Case No.:</mark>
<mark>02-22-0807-8</mark>
Date: <mark>Nov 1, 2023 at 6:16:19 PM</mark>
To: C. W. ~~[redacted]~~
Cc: ~~[redacted]~~ @hud.gov

Good evening Ms. Wilshire,

I have copied Tiffany Hall on this email, she is the new investigator on this case, I apologize for any confusion. She will reach out to you regarding the case.

Best,
~~[redacted]~~

~~[redacted]~~, Senior Investigator/Senior Equal Opportunity Specialist
U.S. Dept. of Housing and Urban Development |Office of Fair Housing & Equal Opportunity
26 Federal Plaza, Rm 3532 | New York, NY 10278
( 212.542.7561| 7 212.264.9829 | ~~[redacted]~~ @hud.gov



**From:** C. W. <~~[redacted]~~.com>
**Sent:** <mark>Wednesday, November 01, 2023 5:42 PM</mark>
**To:** ~~Boxer, Belinda B~~ <~~[redacted]~~ @hud.gov>
**Subject:** <External Message> <mark>Fair Housing Act Title VIII Case No.: 02-22-0807-8</mark>

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Good Afternoon Ms. Boxer,
~~[redacted]~~ Federal Case 1:20-cv-07998 (JPO).
I would very much like to update you regarding the incomplete repairs still in my apartment and what has transpired over the last few months.

May I please have a brief, introductory call with you. My number is 212 464 7973.

Coanne Wilshire

Name: Ashley Myrick
Date: Wednesday, August 31 2022
Time: 7:30 am

To Whom It May Concern:

1. Property manager Pablo Rios disclosed Coanne Wilshire's rental status to me, describing her as a low-income tenant. When he told me this, I believe he thought she was lesser than other tenants and wanted me to feel that way about her too.
Pablo Rios joked to me about Coanne Wilshire losing her agency case and if she tried to sue them she will not win in court. Pablo Rios complained about Coanne Wilshire taking pictures in the parking lot but implied she was wasting her time because she couldn't win against them.

2. I heard Pablo Rios complain to the building super and the porters (Cesar and Angel) that Coanne Wilshire's taking pictures of the conditions of the parking lot was the reason they had to spend more time clearing garbage for the space next to Parking Space #25. Both Porters would become angry and agitated with Coanne Wilshire due to her relationship with the super and property manager and complained to me and each other about her taking pictures and causing issues for them. One porter (Cesar) stopped speaking with Coanne Wilshire altogether. The building Super also complained about Coanne Wilshire taking pictures and repeated Pablo Rios' disclosure, telling me that Coanne Wilshire was low income to and to not answer any questions she had regarding commercial business parking in the lot.

3. I witnessed Pablo Rios treat another tenant he described as a low-income tenant differently. The tenant had entered the building and Pablo Rios followed him to ask if he lived in the building due to profiling after I told him the tenant lived there.

4. In March 2020, I reported to building Super that the tenant at space #4 had a non-resident car with NJ plates parking in her space. The building super told me if the tenant said it was okay it was not a problem. After explaining this to Coanne Wilshire in response to her explaining her incidents regarding Pablo Rios and the termination of her Parking Space No. 25 for allowing the same commercial tenant Andrew Dube, park in her space. It brought some concerns about the tenant parking regulations.

5. I witnessed multiple cars regularly parked in parking spaces on the Lot.

6. I witnessed the Building Super open the gate to let contractors park in empty parking tenant spaces many times due to no street parking.

7. In March 2020, I witnessed the Building Super put up an Attendant sign with his phone number on it after inspections by Department of Buildings writing a ticket for no attendant on the Lot. I have never witnessed the building Super performing Parking Attendant Duties.

8. I witnessed that Andrew Dube (Apollo Chiropractic) usually parked in Parking Space #14. When Andrew Dube was not in Parking Space #14, he parked on #30 and #31. He would ask me to call him to move his car if the tenants of spaces #1, 2 and 3 needed to get in or out of their spaces.

9. Andrew Dube's phone number was listed on Security's Emergency number list in the lobby.

10. Andrew Dube often made snarky remarks to me about Coanne Wilshire, saying I should ignore her if she complained and not take her complaints seriously. He told me she is only one person who is giving them a hard time as a tenant.

11. I witnessed employees of Apollo Chiropractic regularly using the tenant's Laundry Room.

12. I witnessed that Apollo Chiropratic has a mailbox in the residential lobby. Andrew Dube and his employees

regularly picked up their mail.
Packages for Apollo Chiropractic was left with Security, just like packages for residents.

13. Apollo Chiropractic was the only commercial tenant allowed to have packages delivered to Security.

14. I witnessed construction and renovation garbage was placed between Parking Spaces #25 and #26.



Ashley Myrick

Wednesday, August 31, 2022

7:30 am

HOSSAIN MOHAMMED N
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN           COUNTY
COMMISSION EXP

date -08-31-2022

EXHIBIT A

62-New York or Manhattan
1088 3H t0010008

## RENEWAL LEASE FORM

Owners and Tenant should read INSTRUCTIONS TO OWNER and INSTRUCTIONS TO TENANT
on reverse side before filling out or signing this form
THIS IS A NOTICE FOR RENEWAL OF LEASE AND RENEWAL LEASE FORM ISSUED UNDER SECTION 2523.5(a) OF THE
RENT STABILIZATION CODE. ALL COPIES OF THIS FORM MUST BE SIGNED BELOW AND RETURNED TO YOUR
LANDLORD WITHIN 60 DAYS.

Dated: __December 27, 2016__

| Tenant's Name(s) and Address: | Owner's/Agent's Name and Address: |
|---|---|
| **COANNE WILSHIRE** | **LARKSPUR LLC** |
| **304 WEST 117 STREET** | **C/O LEMLE & WOLFF, INC.** |
| **3H** | **5925 BROADWAY** |
| **NEW YORK, NY         10026** | **BRONX, NY 10463** |

1. The owner hereby notifies you that your lease
will expire on: ___4___ / ___30___ / ___2017___

### PART A - OFFER TO TENANT TO RENEW

2. You may renew this lease, for one or two years, at your option, as follows:

| Column A Renewal Term | Column B Legal Rent on Sept.30th Preceding Commencement Date of this Renewal Lease | Column C Guideline % or Minimum $ Amount (If unknown, check box and see below)* ☐ | Column D Applicable Guideline Supplement, if any | Column E Lawful Rent Increase, if any, Effective after Sept. 30th | Column F New Legal Rent (If a lower rent is to be charged, check box and see item 5 below )☐ |
|---|---|---|---|---|---|
| 1 Year | $     856.99 | ( 0.00 %) $_____ | $_____ | $_____ | $     856.99 |
| 2 Years | Same as above | ( 2.00 %) $    17.13 | $_____ | $_____ | $     874.12 |

* If applicable guideline rate is unknown at time offer is made check box in column c and enter current guideline which will
be subject to adjustment when rates are ordered.

3. Security Deposit:
Current Deposit: $ 856.99          Additional Deposit Required – 1 year lease:  $_____
                                   Additional Deposit Required – 2 year lease:  $ 17.13

4. Specify separate charges, if applicable:
a. Air conditioner : $_____      c. 421a (2.2%) : $_____      Total separate charges: $_____
b. Appliances      : $_____      d. Other       : $_____

5. Lower Rent to be charged, if any,  1 year lease $_____,  2 year lease $_____  Agreement attached: Yes ☐  No ☐

6. Tenant shall pay a monthly rent (enter amount from 2F or 5) of $ 856.99 _____ for a 1 year renewal or $ 874.12 ____ for a
2 year renewal, plus total separate charges (enter amount from 4) $_____ for a total monthly payment of
$ 856.99 ____ for a 1 year renewal or $ 874.12 ____ for a 2 year renewal.

7. This renewal lease shall commence on ___05 / 01 / 2017___, which shall not be less than 90 days nor more than 150
days from the date of mailing or personal delivery of this Renewal Lease Form. This Renewal Lease shall terminate on
___04 / 30 / 2018___ (1 year lease) or ___04 / 30 / 2019___ (2 year lease.)

8. This renewal lease is based on the same terms and conditions as your expiring lease. (See instructions about additional provisions.)

9. SCRIE and DRIE. Owner and Tenant acknowledge that, as of the date of this renewal, Tenant is entitled to pay a reduced monthly
rent in the amount of $_____ under the New York City SCRIE program or the New York City DRIE program. The
reduced rent may be adjusted by orders of such program.

This form becomes a binding lease renewal when signed by the owner below and returned to the tenant. A rider setting forth the
rights and obligations of tenants and owners under the Rent Stabilization Law must be attached to this lease when signed by the
owner and returned to the tenant. The rent, separate charges and total payment provided for in this renewal lease may be increased or
decreased by order or annual updates of the Division of Housing and Community Renewal (DHCR) or the Rent Guidelines Board (RGB).

### PART B - TENANT'S RESPONSE TO OWNER

Tenant: Check and complete where indicated one of three responses below after reading instructions on reverse side. Then date and sign
your response below. You must return this Renewal Lease Form to the owner in person or by regular mail, within 60 days of the date this
Notice was served upon you by the owner. Your failure to do so may be grounds for the commencement of an action by the owner to evict
you from your apartment.

☐ I (we), the undersigned Tenant(s), accept the offer of a one (1) year renewal lease at a monthly rent of $ 856.99 _____,
plus separate charges of $_____ for a total monthly payment of $ 856.99 _____

☑ I (we), the undersigned Tenants(s), accept the offer of a two (2) year renewal lease at a monthly rent of $ 874.12 _____,
plus separate charges of $_____ for a total monthly payment of $ 874.12 _____

☐ I (we) will not renew my (our) lease and I (we) intend to vacate the apartment on the expiration date of the present lease.

Dated: _4/8_ ___ 20 _17_          Tenant's Signature(s): _____

Dated: _5/18_ ___ 20 _17_         Owner's Signature(s): _____

RTP-8 (3/10)                      LARKSPUR LLC

# CHECKLIST FOR RENEWAL LEASES / STABILIZED

*Please initial all items you have received from your Landlord/Agent with your renewal lease:*

| | | |
|---|---|---|
| ✓ | 1. | Standard Form of Renewal Lease |
| ✓ | 2. | NYC pamphlet "What every tenant should know about Local Law 1" |
| ✓ | 3. | EPA pamphlet "Protect Your Family From Lead In Your Home" |
| ✓ | 4. | Lease/Commencement of Occupancy Notice For Prevention of Lead Based Paint Hazards – Inquiry Regarding Child |
| ✓ | 5. | NYC Window Guard Form |

## Contact Information Update

Home Telephone _212 464 7973_
Place of Employment _____
Business Address _____
Business Telephone _____
Cell Phone _____
E-Mail Address _soireenews@aol.com_

## Emergency Contact Information Update

Name of contact person _Ayana Brantley_
Relationship _Neice_
Home Telephone _917 570 0504_
Business Telephone _____
Cell Phone _917 570 0504_

APPENDIX A



# LEMLE & WOLFF, INC.
— EST. 1938 —
5925 BROADWAY, BRONX, N.Y. 10463
(718) 884-7676 ° FAX (718) 884-5300 ° TTY (347) 332-1328
REAL ESTATE MANAGEMENT ° DEVELOPMENT ° REHABILITATION ° MORTGAGES ° INSURANCE

Sprinkler system notice pursuant to RPL § 231-a (check all that apply):

[ ] An operative sprinkler system is <u>not</u> present in the residential leased premises or common areas of the building.

[ ] An operative sprinkler system is present in □ the residential leased premises. The last date of maintenance and inspection of the sprinkler system was _____, 20____.

[ ] An operative sprinkler system is present in □ the common areas of the building. The last date of maintenance and inspection of the sprinkler system was _____, 20____.

## LEASE/COMMENCEMENT OF OCCUPANCY NOTICE FOR PREVENTION OF LEAD BASED PAINT HAZARDS – INQUIRY REGARDING CHILD

You are required by law to inform the owner if a child under seven years of age resides or will reside in the dwelling unit (apartment) for which you are signing this lease/commencing occupancy. If such a child resides or will reside in the unit, the owner of the building is required to perform an annual visual inspection of the unit to determine the presence of lead-based paint hazards. IT IS IMPORTANT THAT YOU RETURN THIS FORM TO THE OWNER OR MANAGING AGENT OF YOUR BUILDING TO PROTECT THE HEALTH OF YOUR CHILD.

If a child under seven years of age does not reside in the unit now, but does come to live in it at any time during the year, you must inform the owner in writing immediately. If a child under seven years of age resides in the unit, you should also inform the owner immediately at the address below if you notice any peeling paint or deteriorated subsurfaces in the unit during the year.

Please complete this form and return one copy to the owner or his or her agent or representative when you sign the lease/commence occupancy of the unit. Keep one copy of this form for your records. You should also receive a copy of a pamphlet developed by the New York City Department of Health explaining about lead based paint hazards when you sign your lease/commence occupancy.

CHECK ONE:  ☐  A child under six years of age resides in the unit.

☑  A child under six years of age does not reside in the unit.

(Occupant Signature/s) x _Corine Wilshre_     x _____

_CORINNE WILSHRE_        _CORY WILSHRE_
Tenant Name Print             Co/Tenant Name Print

Print occupant's address and apartment number: _304 W 117th St_   Apt# _3H_
_NYC - 10026_

**Certification by Owner:** I certify that I have complied with the provisions of §27-2056.8 of Article 14 of the Housing Maintenance Code and the rules promulgated thereunder relating to duties to be performed in vacant units, and that I have provided a copy of the New York City Department of Health pamphlet concerning lead based paint hazards to the occupant.

_____       **(Owner/Agent Signature)**
Lemle & Wolff, Inc.

RETURN THIS FORM TO:    *Lemle & Wolff, Inc. 5925 Broadway, Bronx, NY, 10463*

OCCUPANT: KEEP ONE COPY FOR YOUR RECORDS
OWNER COPY / OCCUPANT COPY

## Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards

### Lead Warning Statement

*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

### Lessor's Disclosure

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

    (i) \_\_\_\_ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

    _____

    (ii) ✓ Lessor has no knowledge of lead-based paint and/ or lead-based paint hazards in the housing.

(b) Records and reports available to the lessor (check (i) or (ii) below):

    (i) \_\_\_\_ Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

    _____

    (ii) ✓ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

### Lessee's Acknowledgment (initial)

(c) \_\_\_\_ Lessee has received copies of all information listed above.

(d) \_\_\_\_ Lessee has received the pamphlet *Protect Your Family from Lead in Your Home.*

### Agent's Acknowledgment (initial)

(e) \_\_\_\_ Agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852d and is aware of his/ her responsibility to ensure compliance.

### Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | |
|---|---|---|
| _____ for Lemle & Wolff, Inc., Managing Agent of Lessor, *Larkspur LLC* | | _4/18/17_ |
| Lessor | | Date |
| _____ | | _4/18/17_ |
| Lessee        Date | Lessee | Date |
| _V. Colon_   _4/18/17_ | | |
| Agent        Date | Agent | Date |

6. New Legal Regulated Rent                                   $_____

*6A. Preferential Rent                                        $_____
     (if charged)                                                              $_____
                                                                              (enter 6 or 6A)

7. Air Conditioner Surcharges:                                                 $_____

8. Appliance Surcharges (Tenant installed washer, dryer, dishwasher)           $_____

9. Ancillary Services charged (e.g., garage)                                   $_____

10. Other (specify_____)                                   $_____

11. New Tenant's Total Payment                                                 $_____

*If a "preferential rent" is being charged, please read Provision #21 of this Rider.

☐  (B)  This apartment was Rent Controlled at the time the last tenant moved out. This tenant is the first rent
        stabilized tenant and the rent agreed to and stated in the lease to which this Rider is attached is $_____
        The owner is entitled to charge a market rent to the first rent stabilized tenant. The first rent charged to
        the first rent stabilized tenant becomes the initial legal regulated rent for the apartment under the rent
        stabilization system. However, if the tenant has reason to believe that this rent exceeds a "fair market rent",
        the tenant may file a "Fair Market Rent Appeal" with DHCR. The owner is required to give the tenant notice,
        on DHCR Form RR-1, of the right to file such an appeal. The notice must be served by certified mail. A
        tenant only has 90 days, after such notice was mailed to the tenant by the owner by certified mail, to file an
        appeal. Otherwise, the rent set forth on the registration form becomes the initial legal regulated rent.

☐  (C)  The rent for this apartment is an Initial or Restructured Rent pursuant to a Government Program.
        (Specify Program_____)                             $_____

☐  (D)  Other_____        -or-_____  $_____

        (Specify - for example, a market or "first" rent after renovation to an individual apartment where the outer
        dimensions of the apartment have been substantially altered.)

┌──────────────────────────────────────────────────────────────────────────────┐
│        Section 2 -  This section needs to be completed for vacancy and renewal leases │
└──────────────────────────────────────────────────────────────────────────────┘

Lease Rider for the housing accommodation:

_354 West 118+ 3A_

_NYC 10026_
.(Print Housing Accommodation's Address and Apartment Number)

Lease Start Date: _5/1/17_                    Lease End Date: _4/30/19_

Lease Dated:_____

The tenant named in the lease hereby acknowledges the contemporaneous receipt of the above lease rider for the
housing accommodation stated above.

                                        _CORNNE DULSAIRE_
                                        Print Name of Tenant(s)

                                        _____
                                        Signature(s) and Date

Subject to penalties provided by law the owner of the housing accommodation hereby certifies that the above rider is
hereby contemporaneously provided to the tenant with the signing of the lease and the information provided by the owner
herein is true and accurate based on its records.

                                        _Oronna Colon_  _4/18/17_
                                        Print Name of Owner or Owner's Agent

                                        LEMLE & WOLFF, INC.
                                        Signature and Date
                                        5925 Broadway
                                        Bronx, NY 10463

# WINDOW GUARDS REQUIRED
### Lease Notice to Tenant

*You are required by law to have window guards installed in all windows if a child 10 years or younger lives in your apartment.*

*Your landlord is required by law to install window guards in your apartment if you ask him to install window guards at any time (you need not give a reason)*
### OR
*If a child 10 years of age or younger lives in your apartment,*

*It is a violation of law to refuse, interfere with installation, or remove window guards where required.*

## CHECK ONE

[ ] CHILDREN 10 YEARS OF AGE OR YOUNGER LIVE IN MY APARTMENT

[✓] NO CHILDREN 10 YEARS OF AGE OR YOUNGER LIVE IN MY APARTMENT

[ ] I WANT WINDOW GUARDS EVEN THOUGH I HAVE NO CHILDREN 10 YEARS OF AGE OR YOUNGER

_CONNIE WILSHIRE_
Tenant (Print)

_304 West 117th St, 3H NYC 10026_
Tenant Address

_Connie Wilk_
Tenant Signature          Date

_____
Tenant Signature          Date

**RETURN THIS FORM TO:**          Lemle & Wolff, Inc.
5925 Broadway
Bronx, NY 10463

*For Further Information Call:*
*Window Falls Prevention (212) 676-2162*

WF-013 *(Rev. 11/02)*

**EXHIBIT B**

# LICENSE AGREEMENT

LICENSE AGREEMENT made and entered into as of the 4 day of 7, 2005. by and between **Larkspur L.L.C.**, a New York limited liability company, c/o Lemle & Wolff, Inc. 5925 Broadway, Bronx, NY 10463 ("Licensor") and _____, residing at 304 West 117th Street, Apt. 3H, New York, New York 10026 ("Licensee").

## WITNESSETH:

WHEREAS, the Licensor is the owner of the multifamily rental apartment building located at 304 West 117th Street, NY, NY 10026 known as "Larkspur" including, without limitation, certain garage parking spaces numbered one (1) through twenty seven (27)["*Parking Space(s)*"], located in the cellar of the building; and

WHEREAS, the Licensee desires to obtain from the Licensor a limited revocable license to utilize Parking Space number(s) ("*Licensed Space(s)*") in accordance with the terms and conditions of this License Agreement; and

WHEREAS, the Licensor desires to grant the Licensee a limited revocable license to utilize the Licensed Space(s) in accordance with the terms and conditions of this License Agreement.

NOW, THEREFORE, the parties hereto, in consideration of the premises and mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agree as follows:

1. **Grant of License.**

A. Subject to the terms and conditions of this License Agreement, the Licensor grants to the Licensee a revocable license ("*License*") to utilize the Licensed Space for the purpose of parking one (1) non-commercial vehicle with the make and model number TBD and the license plate number TBD registered in the State of NY. Notwithstanding the foregoing, in no event shall the Licensee have or claim, now or hereafter, any right, title and/or interest of any nature whatsoever in and to the Parking Spaces and/or the Licensed Space except as specifically provided in this License Agreement. The License granted to the Licensee pursuant to this License Agreement is personal to the Licensee and in no event shall any person, firm or entity other than the Licensee be permitted to utilize all or any portion of the Licensed Space, pursuant to the provisions of this License Agreement or otherwise, without the express prior written consent of the Licensor, which consent may be withheld in the sole and absolute discretion of the Licensor.

B. The Licensee hereby represents, warrants and covenants to the Licensor that, at all times during the Term of this License Agreement, the Licensee shall (i) park only in the Licensed Space(s) so as not to interfere, in any manner whatsoever, with the use of any portion of the cellar, including other Parking Spaces by the Licensor and/or any licensee of any of the other Parking Spaces and (ii) keep the Licensed Space free of all debris, trash, garbage and/or rubbish and free from stains or other marks that may be caused by fluids from the Licensee's vehicle.

C. The Licensee hereby acknowledges, represents, warrants and agrees that at no time, now or hereafter, shall this License Agreement, or the License granted to the Licensee herein, be deemed to be a landlord-tenant relationship between the Licensor and the Licensee, express or implied, of any nature whatsoever. Any claim made by the Licensee in contravention of the provisions of this paragraph 1.C shall be deemed void ab initio and, in the event of any such claim, the Licensor shall immediately be entitled to seek injunctive relief in any court of competent jurisdiction restraining the Licensee from pursuing any such claim.

D. Licensor reserves the right to change the Licensed Space assigned to the Licensee upon no less than twenty-four (24) hour written notice to the Licensee in the manner prescribed in paragraph 6 hereof.

2. **Term of License Agreement.**

A. This License Agreement shall commence on June, 2005 and shall continue up to and including the date that this License is terminated by either the Licensee or the Licensor in accordance with the terms and conditions of paragraph 2.B hereinbelow ("*Term*").

B. i. The Licensee shall have the right to terminate this License Agreement as of the last day of a calendar month and upon no less than thirty (30) days prior written notice to the Licensor in the manner prescribed in paragraph 7 hereof.

1E1273 1

ii.     The Licensor shall have the right to terminate this Agreement upon the occurrence of any of the following events:

a.     as of the last day of a calendar month upon no less than thirty (30) days prior written notice to the Licensee in the manner prescribed in paragraph 7 hereof; or

b.     immediately and without notice to the Licensee being required, in the event that (i) Licensee ceases to reside at the apartment building, (ii) any License Payment (hereinafter defined) is received by the Licensor more than ten (10) days after the date that the same is due and owing or (iii) the Licensee breaches or is in default with respect to any provision of this License Agreement in the sole and absolute judgment of the Licensor.

C.     In the event that this License Agreement is terminated in accordance with the terms and conditions of paragraph 2.B hereinabove, then in such event, the Licensee shall vacate and surrender the Licensed Space to the Licensor on or before the date set forth in the given written notice pursuant to paragraph 2.B.i or 2.B.ii.a hereinabove or on the date that any of the events specified in paragraph 2.B.ii.b, as the case may be, and shall have removed all of the Licensee's personal property from the Licensed Space on or before such a date. If the Licensee's personal property is not removed by such date, Licensor shall remove such property at the sole cost and expense of the Licensee. Notwithstanding the termination of this License Agreement in accordance with the provisions of paragraph 2.B above, the Licensee shall remain absolutely liable for any and all License Payments (as such term is defined paragraph 3.A hereof) due and owing in accordance with the provisions of this License Agreement up to and including the date that this License Agreement expires and/or is terminated, as the case may be.

3.     **License Payments.**

A.     In consideration of the License granted hereunder, the Licensee shall pay to the Licensor, on the first (1st) day of each and every month during the Term of this License Agreement, the sum of One Hundred and Seventy ($170.00) Dollars plus a tax in the amount of $31.45. **The total payment due to the Licensor each month will be $201.45 ["*License Payment(s)*"].** The effective tax rate shall be adjusted as determined by the New York State Department of Taxation and Finance. Licensee may pay a reduced tax rate only upon the provision to Licensor of a valid Parking Tax Exemption Certificate issued by the New York City Department of Finance. In the event that any License Payment is not made within ten (10) days of the date that such License Payment is due, a late charge in the amount of Fifty ($50.00) Dollars (in addition to such delinquent License Payment) shall be immediately due and payable by the Licensee to the Licensor.

B.     The obligation of the Licensee to make the License Payments to the Licensor shall survive the expiration of the Term of this License Agreement or the sooner termination of this License Agreement for any reason whatsoever.

C.     Licensor may increase the License Payment(s) during the term of this License Agreement upon no less than thirty (30) days prior written notice to the Licensee in the manner prescribed in paragraph 7 hereof.

4.     **Release and Indemnity.**

A.     The Licensee, together with the Licensee's partners, employees, agents, representatives, contractors, subcontractors, servants, invitees, guests, relatives, heirs, executors, administrators, personal representatives, successors and/or assigns (collectively, the "*Indemnifying Parties*"), hereby, jointly and severally, release, indemnify and hold harmless the Licensor, together with the Licensor's principals, members, shareholders, officers, directors, partners, employees, agents, representatives, contractors, subcontractors, servants, invitees, guests, heirs, executors, administrators, personal representatives, successors and/or assigns (collectively, the "*Indemnified Parties*") from and against any and all actions, causes of action, suits, debts, dues, sums of money, accounts, liens (mechanic's or otherwise), reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, costs, claims, expenses and demands whatsoever, in law, admiralty or equity (collectively, "*Claims*"), which against the Licensor the Indemnifying Parties may have at any time, now or hereafter, against any of the Indemnified Parties including, without limitation, any Claims arising from or in any way related, directly or indirectly, to the Licensed Space, the use of the Licensed Space by the Licensee or this License Agreement.

B.     In addition to the provisions of paragraph 4.A hereinabove, the Indemnifying Parties hereby, jointly and severally, indemnify and hold harmless the Indemnified Parties from and against any and all claims by any person, firm and/or entity which may be made against any of the Indemnified Parties which is from or in any way related, directly or indirectly, to the Licensed Space, and/or the use of the Licensed Space by the Licensee or this License Agreement.

C.    The Licensee hereby acknowledges that the release and indemnity granted by the Licensee in favor of the Licensor pursuant to paragraphs 4.A and 4.B hereinabove are a material inducement and a condition precedent to the Licensor granting the License to the Licensee hereunder.

INITIALS OF LICENSEE: _____ ✕

## 5.    Invalidity and Severability.

If any provision of this License Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions of this License Agreement, and, to that extent, the provisions of this License Agreement are intended to be and shall be deemed severable. In particular and without limiting the foregoing sentence, in the event any provision of this License Agreement shall be held to be invalid or unenforceable, unenforceability shall attach only to such provision and shall not affect or render invalid or unenforceable any other provision of this License Agreement, and this License Agreement and any such provision shall be construed as if such provision had been more narrowly drawn so as not to be invalid or unenforceable.

## 6.    Notices.

Any notice required or permitted to be given under this License Agreement shall be sufficient if in writing and if personally delivered or sent by nationally recognized overnight courier to the Licensee and/or the Licensor, as the case may be, at their respective addresses set forth on the first page of this License Agreement.   Either party to this License Agreement may designate an alternative address for notices in accordance with this License Agreement. Notices shall be deemed given on the date personally delivered or the day after being sent via nationally recognized overnight courier.

## 7.    Relationship of the Parties.

The provisions of this License Agreement are not intended to create, nor shall they be deemed or construed to create, any joint venture, partnership, landlord-tenant or other relationship between the Licensor and the Licensee other than that of independent entities contracting with each other solely for the purpose of carrying out the provisions of this License Agreement. Neither party to this License Agreement shall have the authority to bind the other party nor shall a party be responsible for the acts or omissions of the other party, unless otherwise stated in this License Agreement.

## 8.    Assignment.

The Licensee shall not assign any of its rights and/or obligations under and pursuant to the terms and conditions of this License Agreement. Any assignment in violation of the terms and conditions of this paragraph 9 shall be void ab initio and of no force and/or effect of any nature whatsoever.

## 9.    Entire Agreement.

This License Agreement contains the entire agreement of the parties as to the subject matter hereof and supercedes any and all other agreements of the parties as to the subject matter hereof. It may not be changed, modified, extended or discharged orally, and no provision hereof may be waived orally, but only by an agreement in writing signed by the party against whom enforcement of any change, modification, extension, discharge or waiver is sought.

10.    Parking Procedures

Licensor shall comply with the Parking Procedures that are attached to and made a part of this License Agreement.

11.    Applicable Law.

This License Agreement shall be construed in accordance with the laws of the State of New York without regard to any principles of conflicts of law.

IN WITNESS WHEREOF, the parties hereto have executed this License Agreement as of the day and year first above written.

LICENSOR:

Larkspur, L.L.C.

By: _____
    Name:Lemle & Wolff, Inc.
    Title: Managing Agent

LICENSEE:

NAME: COANNE WILSHIRE

**EXHIBIT C**



# LEMLE & WOLFF, INC.

——— EST. 1938 ———

5925 BROADWAY, BRONX, N.Y. 10463
(718) 884-7676 ° FAX (718) 884-5300

*REAL ESTATE MANAGEMENT ° DEVELOPMENT ° REHABILITATION ° MORTGAGES ° INSURANCE*

July 31, 2018

<u>**REGULAR & CERTIFIED MAIL: 7017-2620-0000-9522-7666**</u>

Coanne Wilshire
304 West 117th St, Apt. 3H
New York, NY 10026

# <span style="color:red">BREACH AND TERMINATION</span>

RE:    **PARKING SPACE TERMINATION**
        **PARKING SPACE # 25**

Dear Ms. Wilshire:

This letter is to inform you that you are in breach of the license agreement dated <u>**June 1, 2005**</u> (the "License Agreement").

You are hereby notified that your license agreement terminates as of <u>**August 31, 2018**</u> for violation paragraph 1.A. of this document. Failure to remove unauthorized vehicles on or before <u>**August 31, 2018**</u> will result in the immediate towing of any vehicles from the parking space at the vehicle owner's expense.

Pursuant to paragraph 1.A. of the License Agreement, your license limits your use of the above-referenced parking space to the parking of one vehicle owned by you as Licensee. This same paragraph clearly states that "in no event shall any person, firm or entity other than the Licensee be permitted to utilize all or any portion of the licensed space."

On a number of occasions, including, but not limited to, July 27, 2018, it has been observed that a different vehicle other than the vehicle described in your license agreement and/or vehicle not belonging to you was/has been parking in the parking space designated under the License Agreement (see attached picture).



Please feel free to contact me with any questions at (718) 865-1868 or via email: prios@lemlewolff.com.

Yours truly,

*Pablo Rios*

Pablo Rios
Property Manager

**EXHIBIT D**



**LW** Lemle&Wolff
COMPANIES
*Real Estate. Real Value.*

September 27, 2017

Larkspur LLC
304 West 117th Street
New York, NY 10026

**Re: Annual Apartment Inspection**

Dear Tenant's,

On **Thursday, October 5, 2017 between 10:00am and 1:00pm** we will be conducting our annual inspection for the following apartments:

2J, 2L, 2P, 3A, 3H, 3N, 3P, 4N, 4P, 5A, 5N, 5P, 6D, 6N, 7A, 7N, 8P

The apartments that are not listed above either have already been inspected for 2017 or will be inspected on a future date.

If you are unable to provide access on this date and would like to reschedule your annual inspection appointment or if you have any questions please contact the undersigned at (718) 884-7676 extension 268 or via email at: prios@lemlewolff.com.

Thank you.

Sincerely,

*Pablo Rios*

Pablo Rios
Property Manager



**LW** Lemle&Wolff
COMPANIES
*Real Estate. Real Value.*

November 3, 2017

Larkspur LLC
304 West 117th Street
New York, NY 10026

**RE: ANNUAL APARTMENT INSPECTION**

Dear Resident:

On **Monday, November 13, 2017, between 10:00am and 1:00pm** we will be conducting our annual inspection of your apartment.

As per the Federal Guidelines that regulates the tax credit program we **MUST** conduct an annual inspection of your apartment.

*If you are unable to provide access on the above date please reach out to the undersigned immediately to schedule an appointment.* It is imperative that we conduct an inspection of your apartment.

You may reach me at (718) 865-1868 or via email at: prios@lemlewolff.com.

Thank you.

Sincerely,

*Pablo Rios*

Pablo Rios
Property Manager



LW Lemle&Wolff
COMPANIES
*Real Estate. Real Value.*

November 14, 2017

Larkspur LLC
304 West 117th Street
New York, NY 10026

**RE: ANNUAL APARTMENT INSPECTION**

Dear Resident:

On **Tuesday, November 21, 2017, between 10:00am and 12:00pm** we will be conducting our annual inspection of your apartment.

As per the Federal Guidelines that regulates the tax credit program we **MUST** conduct an annual inspection of your apartment.

*If you are unable to provide access on the above date please reach out to the undersigned immediately to schedule an appointment.* It is imperative that we conduct an inspection of your apartment.

You may reach me at (718) 865-1868 or via email at: prios@lemlewolff.com.

Thank you.

Sincerely,

*Pablo Rios*

Pablo Rios
Property Manager

**Magistrate Judge Ona T. Wang**
United States District Court
Southern District of New York

RE: **Docket 1:20-cv-07998 (OTW, 1:24-cv-01756**

**July 31, 2024**

Dear Honorable Judge Wang,

I am Pro Se Plaintiff, Coanne Wilshire. I am notified by the Pro Se Clerk's Office that my submissions on July 26, 2024, had issues with the PDFs.

I am informed of your decision, which was made without seeing everything I submitted.

I understand reviewing everything I submitted may have the same result. However I humbly request that all my submissions with EXHIBITS be entered unto the record.

Respectfully,
s/Coanne Wilshire

COANNE WILSHIRE
304 West 117th Street, 3H
New York NY 10026

My name is Stacey Stukes ~ Baker, I have lived at Larkspur since June 1, 2005, in apartment 7N.

I have a disability and I am confined to a wheelchair.

Since Pablo Rios started working in 2017 it has been difficult to get any repairs and I have always experienced a racist attitude from Pablo Rios.

1. One afternoon in 2017, Amy Ferguson allowed me to park in her parking space, #27.

I was parked there for a less than an hour when Ms. Ferguson told me the Super, said I had to move my car from her spot.

Ms. Ferguson allows White, non-disabled tenants to park in her space without the Super complaining or making them move their cars.

2. A couple of months after making me move from parking Space #27, the Super surprised me by offering me Parking Space #26. The Super told me that parking space is a handicap parking space so I have first rights to it.

After I said yes, and accepted the space, the Super sprung it on me that I would have to pay over $200 a month to park in the space. I felt like the whole experience was a mean joke.

3. In 2019 there were many issues with the elevators and tenants were getting stuck. When my care assistant got stuck on the elevator for more than an hour, I began asking to be moved to an apartment on the second floor.

The Security man, Alex said the Super refused to let him call 911 to get my health care assistant out. She was stuck in the elevator until someone came from the Bronx to get her out.

Alex said that when White tenants got stuck the Super would get them out himself or give him permission to call 911, so the white tenants paying higher apartment rent, did not have to be stuck for long.

4. In June 2022, I found out a new tenant was moving out from Apartment 2E after living in the apartment for only a couple of months.

I contacted Lemle & Wolff with another accommodation request but no one responded. I contacted 311 but the Landlord did not respond to my 311 request either.

I feel that I was not given the transfer because 2E was a newly renovated apartment.

5. I have to wait even for simple repairs like getting my door painted, or to get a working carbon monoxide device and smoke detector. I have been waiting for a proper fix of my peephole and my floors.

6. I have been asking for repairs of my buckled floors for months on months but Pablo Rios refuses to approve repairs.

I feel like he wants me to fall out of my chair before I can get them fixed.

7. I am told to write repair requests in the lobby repair book but it is a waste of time.

When Pablo Rios finally responds he acts like he is doing me a favor and his time is more precious than mine.

8. When he finally responded on July 9, 2022, he told me he has 600 apartments to manage like he was wasting his time talking to me.

9. Pablo Rios is aggressive and his attitude is racist, He told me I could never do his job which is inappropriate. I asked for his supervisor's contact but he refused to give me the information. Knowing how he behaves I had a counselor listening in for proof.

9. Like a crazy person, Pablo Rios told me that all the other tenants love him except me.

That is crazy talk from a Property Manager and I have not heard a good review about Pablo Rios from any tenant. I have good reason to not like him at all.

10. Pablo Rios has sent Ymer to my door and because I'm not there Pablo Rios says Ymer was not provided access. He acts like only his schedule matters.

11. I am unable to use the side door of the building because it is not wheelchair accessible. Other tenants use the driveway and parking lot as outdoor space but because of my wheelchair I cannot access the side door or even the sidewalk gate into the parking lot. If I want some fresh air I have to sit at the front door on the sidewalk.

12. In 2011 Larkspur settled a complaint of constructing the building without disability laws. I only found out in 2022 there was a Fund setup in 2011 for tenants with disabilities because the landlord and architects were sued for the building without disability features. The Landlord and Architect were ordered to notify tenants about the lawsuit, the settlement, and the Fund, but I was never notified. The Landlord showed disability discrimination before Pablo Rios and in 2017 the discrimination got worse.

Thank you,

*Stacey Stukes Baker*

Stacey Stukes ~ Baker
304 West 117th Street, 7N
NYC, 10026

STATE OF NEW YORK } SS.
County of New York

Sworn to before me this
19th Day of December, 2022.

*Julian M. Hill*

JULIAN M HILL
NOTARY PUBLIC-STATE OF NEW YORK
No.
Qualified in
My Commission Expires 12-17-2023